IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:15-CR-141-DJH |
| | ) | *Electronically Filed* |
| MATTHEW B. CORDER | ) | |

## GOVERNMENT'S MOTION TO ADMIT 404(b) EVIDENCE

The United States, by and through undersigned counsel, respectfully requests an *in limine* order authorizing the government to introduce in its case-in-chief, pursuant to Federal Rule of Evidence ("Rule") 404(b), evidence of two prior instances in which Defendant Matthew Corder, a former deputy with the Bullitt County Sheriff's Office, abused his official authority to retaliate against civilians who disrespected him. This evidence is highly probative of a central issue—whether Defendant Corder had the specific intent to deprive D.B. of a constitutional right—and satisfies the remaining Rule 404(b) prerequisites. In support of its motion, the United States offers the following:

## I.    Background

### A.    Procedural History

On December 16, 2015, a federal grand jury sitting in Louisville, Kentucky, returned an Indictment charging Defendant Corder with two counts of willfully depriving a Louisville resident of his constitutional rights under color of law, in violation of 18 U.S.C. § 242. Count One alleges that Defendant Corder seized the victim, D.B., without probable cause to believe that D.B. committed a crime, and unlawfully entered D.B.'s home to effect the seizure. Count Two alleges that Defendant Corder charged D.B. with two crimes that he did not commit, and included false

and misleading information in the charging document, both of which caused D.B. to be detained in jail pending resolution of the charges, which were eventually dismissed.

### B.  Statement of Facts

On the evening of October 22, 2014, D.B. drove home after work to find a patrol car parked in front of his trailer.  Defendant Matthew Corder, then a deputy with the Bullitt County Sheriff's Office, was sitting in the driver's seat.  D.B. parked on his front lawn, walked up the steps to his front porch, and asked Defendant Corder what was going on.  Defendant Corder, who had been dispatched to the location to respond to a disturbance at a different trailer, told D.B. to mind his own business.  D.B. informed Defendant Corder that his patrol car was parked in D.B.'s spot, and asked him to please move it to one of the other open spaces.  Defendant Corder responded that the road was public property and he had a right to be there.  Frustrated by Defendant Corder's attitude, D.B. told him to "fuck off."  Defendant Corder asked D.B. to repeat himself.  "I said fuck off," D.B. said, then turned and walked inside his trailer.

What happened next was captured by Defendant Corder's body camera.  *See* Exhibit 1 (body camera footage).  Defendant Corder marched up the front steps and banged on D.B.'s front door.  When D.B. opened the door, Defendant Corder ordered him to come outside.  D.B. refused.  Defendant Corder said, "You're gonna come out here or you're gonna be issued [a citation]."  D.B. again refused to come outside, and stated that Defendant Corder had no right to come inside without a warrant.  Defendant Corder said, "I don't need no warrant, Dude.  Right now you were out here hollering at me, and you ran in, which means there's exigent circumstances, so back yourself out here."  When D.B. did not move, Defendant Corder reached inside, grabbed D.B. by the arm, and attempted to pull him outside.  D.B. braced his other arm against the door frame, and reiterated that Defendant Corder was not allowed inside his home

2

without a warrant.  Defendant Corder stepped inside and wrestled D.B. to the ground.  Defendant

Corder said, "I ain't playing with you. You're about to get your ass tased."  D.B. said, "Would

you please listen?"  Defendant Corder ordered him to put his hands behind his back.  When D.B.

did not comply, Defendant Corder tased D.B. in the neck, the side, and the back.  D.B. yelled out

in pain, and his pregnant step-sister, who overheard the struggle from the next room, began

crying.  Defendant Corder handcuffed D.B., yanked him up, and led him outside.  D.B.

apologized to Defendant Corder for swearing at him.  "Fuck that," Defendant Corder replied,

"You get to go to jail tonight."  D.B. asked Defendant Corder how long he was going to be

locked up.  Defendant Corder responded, "I don't know and I don't care. . . . Tell someone to

fuck off. . . What planet do you ever think that was gonna fucking go?"  Defendant Corder

shoved D.B. into the backseat of the patrol car.  "Next time you tell a police officer to fuck off,"

Defendant Corder said, "you might want to think about it."

Defendant Corder drove D.B. to jail and charged him with three offenses: disorderly

conduct in the second degree, in violation of KY. REV. STAT. ANN. § 525.60; fleeing and evading in

the second degree, in violation of KY. REV. STAT. ANN. § 520.100; and resisting arrest, in violation

of KY. REV. STAT. ANN. § 520.90.  Disorderly conduct in the second degree makes it a crime to

make unreasonable noise or engage in threatening behavior in a public place with the intent to

cause public inconvenience, annoyance, or alarm. KY. REV. STAT. ANN. § 525.60(1).  Statutory

commentary expressly provides that "a person may not be arrested for disorderly conduct as a

result of activity which annoys only the police."  KY. REV. STAT. ANN § 525.060, 1974 Kentucky

Crime Commission/LRC Commentary.  Fleeing and evading in the second degree makes it a crime

for a suspect to intentionally flee from or evade an officer who has reasonable suspicion to believe

that the suspect has committed a crime; and for the suspect, in so doing, to create a substantial risk of physical injury. KY. REV. STAT. ANN. § 520.100(1)(a).

Defendant Corder had been trained in the elements of disorderly conduct and fleeing and evading. Knowing that he could not legally charge D.B. with disorderly conduct without evidence of public alarm, Defendant Corder falsely stated in the arrest citation that the incident "caused alarm to neighbors." Knowing, similarly, that he could not legally charge D.B. with fleeing and evading without evidence that D.B. actually fled from him, Defendant Corder falsely stated in the arrest citation that D.B., "to evade[,] ran inside [his] trailer."

At D.B.'s arraignment on those charges the next day, a pretrial services official recommended, based on her finding that D.B. did not pose a danger to society, that D.B. be released on his own recognizance. The presiding judge reviewed the charges and factual allegations in Defendant Corder's arrest report and, in reliance on that report, found that D.B. posed a danger to the community and correspondingly denied D.B.'s request to be released on his own recognizance. D.B. sat in jail pending trial.

Meanwhile, Defendant Corder's supervisor at the Bullitt County Sheriff's Office reviewed Defendant Corder's arrest report and bodycamera video, and concluded that the charges Defendant Corder filed against D.B. were unsupported by the evidence. A representative from the sheriff's office recommended to the Bullitt County Attorney's Office to drop the charges against D.B. After reviewing the evidence, the prosecuting attorney agreed and dropped the charges, but by that time the damage was already done: D.B. had spent two weeks in jail, had been fired from his job, and was ultimately evicted from his home.

### C.     The Prior Incidents

Defendant Corder was employed by, and fired from, three law enforcement agencies over his 15-year career as a police officer.  He worked for the Louisville Metro Police Department ("LMPD") from 1991 through 2003.  During that time, Defendant Corder was formally investigated four times for using excessive force,[1] was twice reprimanded for conduct unbecoming an officer, was suspended for insubordination, and was eventually terminated for abuse of authority in connection with an incident in which Defendant Corder arrested a tow-truck driver who was lawfully repossessing Defendant Corder's personal vehicle (claiming that the driver had committed disorderly conduct), and then let him go in exchange for his supervisor's agreement not to repossess the vehicle.  Defendant Corder worked for the Audubon Park Police Department ("APPD") for several months in 2009, but was fired during his probationary period after an off-duty road-rage incident.  Defendant Corder worked for the Bullitt County Sheriff's Office ("BCSO") from 2013 through 2015, when he was eventually terminated for unlawfully arresting D.B. and including false and misleading information in his report.

The government seeks to introduce, in its case-in-chief, evidence of two prior incidents in which Defendant Corder abused his official authority to retaliate against civilians who disrespected him.  As explained in Section II.B of this motion, the government intends to offer such evidence for the narrow purpose of establishing Defendant Corder's specific intent to deprive D.B. of a constitutional right.

---

[1] One of the excessive force investigations, which the government brings to the Court's attention because it may come up during jury selection, was an inquiry into Defendant Corder's publicized beating of arrestee Adrian Reynolds, which sparked protests and fueled an outcry for independent review of police misconduct.

### 1.     The traffic-stop incident

On June 2, 1997, J.W., a painter, and his two co-workers were struck in rush-hour traffic on Interstate 265.  When they approached the exit to merge onto Interstate 64, they saw several vehicles use the open emergency lane to access the exit, and decided to do the same.  Defendant Matthew Corder, who was driving his LMPD patrol car in the right lane, cut in front of them and reduced his speed, maintaining it consistent with the pace of traffic in the remaining lanes. When the road widened near the off-ramp, J.W. attempted to go around Defendant Corder's patrol car.  Defendant Corder angled his patrol car to block J.W.'s van and put the car in park. Defendant Corder got out, pointed his gun at them, and said, "Put your fucking hands in the air." They complied.  Defendant Corder walked over to the van, grabbed J.W., handcuffed him, and marched him to the patrol car.  Defendant Corder opened the rear door and shoved J.W. inside. J.W. said, "take it easy."  Defendant Corder yelled something back at him.  J.W. said, "fuck you."  Defendant Corder leaned in and said, "what did the fuck did you say, boy?"  J.W. stayed silent.  Defendant Corder said, "that's what I thought," reached for his pepper spray, and sprayed J.W. in the face.

Defendant Corder brought J.W. to jail, and charged him with reckless driving and resisting arrest.  The next day, at his arraignment, J.W. was released on his own recognizance. Both charges were eventually dismissed.

J.W. filed a civil lawsuit alleging that Defendant Corder violated his rights by pepper-spraying him without a legitimate reason.  After deposing J.W. and several civilian witnesses, whose accounts were consistent with J.W.'s account, the City Law Department settled the lawsuit for an undisclosed sum.

### 2.      The repossession incident

During the Summer and Fall of 2002, Defendant Corder and his then-wife Shelly had fallen behind on their car payments, and had received several notices that their Lincoln Navigator would be repossessed.  On October 8, 2002, while Defendant Corder and Shelly were at home, they noticed three agents of Bluegrass Recovery, a repossession company, hooking up the Navigator to a tow truck with the company's logo on the side.  Defendant Corder ran outside, drew his gun, and ordered the agents to get on the ground.  The supervisory repossession agent attempted to show Defendant Corder the repossession paperwork to clear up any potential misunderstanding about their identity, but Defendant Corder told her that he did not care who they were, and threatened to shoot them if they moved.  The tow-truck driver, concerned for his safety, asked the supervisory agent to call the police.  Defendant Corder, who was not in uniform, shoved his badge in the agent's face and said, "I am the fucking police."  When the tow-truck driver again asked his supervisor to call the police, Defendant Corder pushed him against the side of his patrol car, cuffed him, and placed him under arrest for disorderly conduct. Defendant Corder then struck a deal with the supervisor: he would release the tow-truck driver if she would let him keep the Navigator.  Before Defendant Corder removed the handcuffs and let the agent go, Defendant Corder threatened to arrest all of the agents if they reported the incident to the internal affairs department at LMPD.

LMPD's internal affairs department nevertheless learned about the incident and opened an investigation.   After interviewing everyone involved, investigators concluded that Defendant Corder abused his authority and lied to cover up his misconduct.  The Chief of Police fired him. Defendant Corder requested a merit-board hearing to appeal his termination.  The Merit Board upheld his termination after a formal hearing.

Later that year, Defendant Corder was brought up on state criminal charges of official misconduct, unlawful imprisonment, wanton endangerment, and witness tampering.  At trial, the prosecution admitted into evidence the repossession notices sent to Defendant Corder, and elicited testimony from all three repossession agents.  In the defense case-in-chief, Shelly Corder testified on Defendant Corder's behalf that Defendant Corder had no idea about the impending repossession, and that he mistook the repossession agents for thieves.  After her testimony, the proceedings were interrupted when a juror told the court that he had overheard during a break a woman discussing Defendant Corder's history of misconduct with LMPD.  Concluding that the juror could not remain impartial, the court ordered a mistrial.  During the retrial, Shelly Corder did not testify; instead, Defendant Corder took the stand and echoed Shelly's previous testimony.  Believing that story, the jury acquitted Defendant Corder on all counts.

A decade later, the government has obtained newly discovered evidence establishing that Defendant Corder knew about the impending repossession, and that he lied under oath during the trial.

## II.   Argument

### A.   Background law

Federal Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).  Other-act evidence is admissible under Rule 404(b) if the Court determines that "(1) the 'other act' actually occurred, (2) the evidence is

offered for a permissible purpose, and (3) its probative value is not substantially outweighed by unfair prejudice." United States v. Carter, 779 F.3d 623, 625 (6th Cir. 2015).

**B.**     **Analysis**

Evidence of the traffic stop and repossession incidents satisfies each prong of the Rule 404(b) test: (1) there is sufficient evidence that both incidents occurred; (2) evidence of the two incidents is highly probative of a central issue in the case: whether Defendant Corder had the specific intent to deprive D.B. of a constitutional right; and (3) the considerable probative value of that evidence is not substantially outweighed by any danger of unfair prejudice.  For those reasons, this evidence should be admitted under Rule 404(b).

**1.**     **There is sufficient evidence that the 404(b) incidents occurred**

The first determination a court must make before admitting other-act evidence under Rule 404(b) is whether there is sufficient evidence that the other act occurred.  The standard of proof is low: the government is not required to prove the other act beyond a reasonable doubt, by clear and convincing evidence, or even by a preponderance of the evidence. United States v. Bell, 516 F.3d 432, 441 (6th Cir. 2008) (citing Huddleston v. United States, 485 U.S. 681, 689 (1988)). The government need submit only enough evidence to support a reasonable finding that the defendant committed the other act. Id.

At trial, the government would offer eyewitness testimony and documentary evidence to establish that the two prior incidents occurred.  To prove up the traffic-stop incident, the government would offer testimony from J.W. and the two eyewitnesses, as well as Defendant Corder's deposition testimony.  To prove up the repossession incident, the government would offer the repossession notices and paperwork, testimony from the repossession agents, as well as the above-referenced newly discovered evidence.  This evidence would satisfy the government's

minimal burden of establishing that these prior incidents occurred. See, e.g., United States v. Bonds, 12 F.3d 540, 572 (6th Cir. 1993) (finding that testimony from single eyewitness "amply support[ed]" a finding that the other act occurred).[2]

### 2. The 404(b) evidence is probative of a central non-character issue: whether Defendant Corder had the specific intent to deprive D.B. of a constitutional right

The second determination a court must make before admitting other-act evidence under Rule 404(b) is whether it is offered for a permissible purpose: i.e., that "it is probative of a material issue other than character." United States v. Cox, 957 F.2d 264, 267 (6th Cir. 1992) (quoting Huddleston, 485 U.S. at 689).  More specifically, the Court may admit evidence of prior bad acts under Rule 404(b) for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . ."  Id.

One accepted non-character purpose for admitting other-act evidence is to establish the defendant's intent to commit the charged crime. Fed. R. Evid. 404(b).  Evidence of intent naturally tends to rebut the defense of mistake, and vice versa, so the two concepts are often considered together. DAVID H. KAYE ET. AL, THE NEW WIGMORE. A TREATISE ON EVIDENCE:

---

[2] That the state prosecution of Defendant Corder arising out of the repossession incident resulted in an acquittal has no bearing on the admissibility of evidence of that incident under Rule 404(b). See Dowling v. United States, 493 U.S. 342, 349 (1990) (affirming the admission of 404(b) evidence, notwithstanding the fact that the defendant had previously been acquitted of charges arising out of it, because the jury's verdict that the government did not prove every element of the prior robbery charge did not foreclose a finding that the defendant "was the masked man who entered [the victim's] home").  "Consequently, evidence of an act which had been the subject of a count of acquittal in a prior criminal trial is admissible in a subsequent prosecution" as long as it satisfies the Rule 404(b) prerequisites. United States v. Carney, 387 F.3d 436, 452 (6th Cir. 2004); see also Wade v. Timmerman-Cooper, 785 F.3d 1059, 1074 (6th Cir. 2015) (holding that 404(b) evidence was properly admitted even though it  "relate[ed] to alleged criminal conduct for which [the] defendant ha[d] been acquitted").  Because the 404(b) evidence in this case amply supports a finding that Defendant Corder falsely arrested a repossession agent and then made a deal to release him in exchange for a personal favor, even if the evidence at trial did not support a finding beyond a reasonable doubt at the state trial that Defendant Corder committed the four charged crimes, the collateral-estoppel component of the Double Jeopardy Clause does not bar its introduction.

EVIDENCE OF OTHER MISCONDUCT AND SIMILAR EVENTS § 7.2.2 (2015) ("[T]here is no meaningful difference between stating that the evidence is offered to prove 'intent' and stating that it is offered to prove 'absence of mistake or accident.'").  The non-propensity chain of reasoning goes as follows: "the recurrence of similar acts incrementally reduces the possibility that the given instance . . . is the result of inadvertence, mistake, or other innocent event." United States v. Holloway, 740 F.2d 1373, 1377 (6th Cir. 1984) (quoting United States v. Semak, 536 F.2d 1142, 1145 (6th Cir. 1976)).

The probative value of other-act evidence offered as proof of intent increases with the number and the similarity of the other acts. See United States v. Albert, 595 F.2d 283, 288 (5th Cir. 1979) ("The probative value of the extrinsic offense evidence was strong because of the high degree of similarity between the two occurrences."); United States v. Brutzman, 99 F.3d 1147 (9th Cir. 1996) (unpublished) ("The striking similarities between [defendant's] prior crime and the current offense provide a high degree of probative value.").  For example, in a health-care fraud case, evidence that the defendant committed a single act of tax fraud would not be especially probative of his intent to commit health care fraud; it would show that he is a man capable of fraud, but not much more.  By contrast, evidence that the defendant had been convicted of several similar health-care-fraud schemes would have a much higher probative value; it would show that he had the specialized knowledge to perpetrate the scheme, would indicate that he was on notice that such conduct violates the law, and would reduce the likelihood that acted innocently or by mistake.

The probative value of other-act evidence offered as proof of intent is also heightened where, as here, a defendant's corrupt intent cannot readily be inferred from the criminal act. Huddleston, 485 U.S. at 685.  Take, for example, the crime in Huddleston: possession of stolen

11

property.  There are plenty of ways a person may innocently come into possession of stolen property: he may purchase it or receive it as a gift, not knowing it had been stolen; the thief may hide it on his property; *et cetera*.  In such cases, the Supreme Court recognized, other-act evidence may be "critical" to establishing the defendant's knowing possession. Id. at 685; see also Semak, 536 F.2d at 1145 (admitting 404(b) evidence because, under the circumstances, the defendant's intent could not "be inferred solely from" the defendant's criminal act).

Other-act evidence offered as proof of intent is especially relevant where, as here, the charged statute is a specific-intent crime.  The Sixth Circuit has recognized that "[i]n prosecuting specific intent crimes, prior acts evidence may often be the only method of proving intent," and has ruled accordingly that where "the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence," provided that the other 404(b) prerequisites are satisfied, "to prove that the defendant acted with the specific intent" charged. United States v. Johnson, 27 F.3d 1186, 1192 (6th Cir. 1994) (admitting 404(b) evidence of defendant's prior cocaine sales to prove his specific intent to distribute cocaine).

The Sixth Circuit recently reaffirmed that proposition in a case where, as here, the issue of whether the defendant committed the criminal act "innocently or intentionally was a central issue—if not the central issue—of the case." United States v. English, 785 F.3d 1052, 1055–56 (6th Cir. 2015).  That the defendant, a CEO of a medical clinic, had committed fraudulent acts was hardly in doubt; the key issue was whether he committed those acts as the result of negligence or inadvertence, as the defense argued, or whether he committed them with the intent to commit Medicare fraud, as the prosecution argued. Id. at 1056.  To prove the defendant's willful intent, the prosecution introduced 404(b) evidence that he had previously been involved in two other Medicare-fraud schemes. Id. at 1055.  The Sixth Circuit affirmed the admission of

12

such evidence, finding it "highly probative" because it "shed light on his true intentions" and showed that his fraudulent conduct was not the result of a mistake or oversight. Id. at 1055–56.

The government anticipates that, as in English, a central issue in this case will be the defendant's intent: whether Defendant Corder specifically intended to deprive D.B. of a constitutional right.  The federal statute charged in the Indictment, 18 U.S.C. § 242, requires the government to prove not only that the defendant deprived another person of a constitutional right, but that he did so "willfully," meaning, in this context, that he acted with the specific intent to deprive the person of a constitutional right. See United States v. Epley, 52 F.3d 571, 576 (6th Cir. 1995) (citing Screws v. United States, 325 U.S. 91, 104 (1945)).

Because of that heavy burden of proof, 404(b) evidence has a comparably higher probative value in § 242 prosecutions. See United States v. Mohr, 318 F.3d 613, 617–20 (4th Cir. 2003) ("In light of the government's heavy burden of proving, beyond a reasonable doubt, that [the defendant] released her dog on [the victim] with the 'particular purpose' of violating or in 'reckless disregard' of [his] right to be free from unreasonable force, the district court clearly did not abuse its discretion in finding the [404(b)] evidence necessary.").  404(b) evidence of prior instances in which a defendant officer acted with the specific intent to deprive a person of a constitutional right is routinely admitted in § 242 prosecutions. See United States v. Brugman, 364 F.3d 613, 619–20 (5th Cir. 2004) (allowing 404(b) evidence of Border Patrol agent's prior willful use of excessive force on an undocumented immigrant attempting to cross the border); Mohr, 318 F.3d at 617–20 (allowing 404(b) evidence of a prior incident in which police officer unreasonably sicced her police dog on an unresisting suspect); United States v. White, 68 F. App'x 707, 709–10 (7th Cir. 2003) (per curiam) (allowing 404(b) evidence of police officer's prior willful use of excessive force against arrestees); United States v. Brown, 250 F.3d 580,

13

584–86 (7th Cir. 2001) (allowing 404(b) evidence of an off-duty police officer's prior willful use of excessive force on an exotic dancer); United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (allowing 404(b) evidence of a prior incident in which a police officer choked out an arrestee); United States v. Boyland, 979 F.2d 851 (6th Cir. 1992) (per curiam) (unpublished) (allowing 404(b) evidence of police officer's prior willful use of excessive force against arrestees and his warning to colleagues not to intervene); United States v. Dise, 763 F.2d 586, 592–93 (3d Cir. 1985) (allowing 404(b) evidence of correctional officer's prior willful mistreatment of inmates).

Depending on its nature, such evidence may have probative value for a variety of different reasons. It may shed light upon the defendant officer's motive to commit the charged incident. See Brown, 250 F.3d at 585 ("[T]he [404(b)] incident is probative of [the defendant's] retaliatory intent to use excessive force whenever his orders are ignored or his authority questioned."); United States v. Rodella, 804 F.3d 1317, 1334 (10th Cir. 2015) (affirming admission of other traffic stops to show that the defendant officer's "motive and intent for pursuing [the victim] was to express his road rage, punish disrespect, and force [the victim] to submit to his authority"). It may show that the officer was on notice that his conduct was unlawful. See White, 68 F. App'x at 710 (holding that 404(b) evidence was properly admitted to show that the defendant officer was "on notice that the use of unnecessary force under color of law is illegal and, more specifically, that unreasonable force in response to non-threatening verbal comments was in excess of his authority"). Finally, it may reduce the likelihood that the officer's misconduct on the charged occasion was the product of mistake or accident. See, e.g., Boyland, 979 F.2d at 851 (explaining that evidence establishing an officer's pattern of using excessive force and of warning his colleagues not to intervene tended to show that his behavior during the charged incident "was not the product of mistake or accident").

14

For all of those reasons, evidence of the above-discussed incidents in which Defendant Corder abused his authority as a police officer to retaliate against civilians who disrespected him is highly probative of his specific intent to do so in this case.  Such evidence tends to rebut the inference that Defendant Corder's conduct was a mistake or a one-time lapse in judgment, or that the account in his arrest report was an oversight, rather than a deliberate lie.  It evinces a motive to punish anyone who disrespects him or questions his authority, and a willingness to abuse his power to do so.  Evidence that Defendant Corder previously had been fired and even criminally prosecuted for falsely arresting a person for disorderly conduct shows that he was on notice of the elements of disorderly conduct, and knew that arresting a person for that offense without supporting evidence was against the law.  Finally, the traffic-stop and repossession incidents are especially probative because they are so strikingly similar to the charged incident.   All three cases follow the same pattern: Defendant Corder became mad when another person disrespected him and/or questioned his authority; Defendant Corder arrested the person for "disorderly conduct," "resisting arrest," or both; and Defendant Corder used intermediate force (taser, pepper spray, empty hand controls) to effect the arrest.

In sum, evidence of the traffic stop and repossession incidents is probative of a material issue other than character—Defendant Corder's specific intent—and its probative value is especially high because the prior incidents are so similar; because the charged statute is a specific-intent crime; because Defendant Corder's intent cannot readily be inferred from the nature of his criminal act; and because Defendant Corder's intent is likely to be a central, contested issue in the case.

### 3. The considerable probative value of the 404(b) evidence is not substantially outweighed by any danger of unfair prejudice

The third determination a court must make before admitting other-act evidence under Rule 404(b) is whether its probative value is substantially outweighed by the danger of unfair prejudice. Cox, 957 F.2d at 267. Courts consider several factors in weighing the probative value of 404(b) evidence against its prejudicial effect.

One factor is the evidence's overall significance to the case. Courts have cautioned that "404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case." United States v. Perez-Tosta, 36 F.3d 1552, 1562 (11th Cir. 1994). The Sixth Circuit has noted in several cases that the centrality of the issue for which the 404(b) evidence was admitted weighs in favor of admission. See United States v. Vance, 871 F.2d 572, 576 (6th Cir. 1989) ("[A]n important indication of probative value of evidence is the prosecution's need for the evidence in proving its case."); English, 785 F.3d at 1056 (emphasizing that 404(b) evidence was "highly probative" because it "shed light on [the defendant's] true intentions," which were "the central issue in the case"); Carney, 387 F.3d at 451-52 (affirming admission of 404(b) evidence in part because it was "crucial to the government's proof"); United States v. Middleton, 246 F.3d 825, 836 (6th Cir. 2001) (affirming admission of 404(b) evidence in part because it "was central to the jury's determination of whether [the defendant's] good-faith belief" excused his misconduct); United States v. Crachy, 800 F.2d 83 (6th Cir. 1986) (affirming admission of 404(b) evidence of intent in part because "[t]he element of intent was of critical importance in this case") (cited with approval in United States v. Cook, 290 F. App'x 874, 881 (6th Cir. 2008)); Holloway, 740 F.2d at 1377 (affirming admission of 404(b) evidence of knowledge in part because "knowledge was a crucial issue in

the case").  "When probative evidence is offered that relates directly to a defense being raised, it is only the rare case in which such evidence would be excluded as being overly prejudicial." Cox, 957 F.2d at 267.

Another factor is the amount of time elapsed between the 404(b) incident and the charged incident.  Generally, the probative value of other-act evidence decreases in a linear fashion as time passes. See United States v. Ismail, 756 F.2d 1253, 1260 (6th Cir. 1985).  But that is not always the case.  Evidence of prior vote tampering, for example, retains its probative value despite a lengthy passage of time because "vote buying . . . by nature cannot be committed every day." See United States v. Adams, 722 F.3d 788, 811 (6th Cir. 2013) (affirming admission of evidence of vote buying occurring decades prior to the charged offense).  Similarly, if there is a long passage of time between the other acts and the charged offense, but the defendant was imprisoned for most of that time, the other acts retain their probative value, despite the passage of time, because the defendant lacked the opportunity to commit like acts in the interim. See United States v. Finnell, 276 F. App'x 450, 455 (6th Cir. 2008) (unpublished) ("[A]lthough slightly more than seven years separates the 'other act' evidence from the date of the alleged instant offense, Defendant was imprisoned on separate state offenses for the majority of that time.").  The Sixth Circuit has ruled, accordingly, that there is "no absolute maximum number of years that may separate a prior act and the offense charged"; and has encouraged courts to consider the circumstances of each case to determine the precise effect a prior act's temporal remoteness has on its probative value. See United States v. Jones, 403 F.3d 817, 821 (6th Cir. 2005).

Another factor is the availability of alternative sources of proof. See Bell, 516 F.3d at 445 ("The district court should consider the government's alternative sources of proving intent when weighing the probative value of other acts evidence.").  One reason to exclude 404(b) evidence of

17

intent, notwithstanding its high probative value to a material issue, is if the government has overwhelming non-404(b) evidence of intent. Id. at 446 (excluding 404(b) evidence of defendant's prior drug sales in part because the government introduced non-404(b) evidence that the defendant possessed massive quantities of drugs as well as drug scales and other paraphernalia that were highly indicative of his intent to distribute).  By contrast, if, whether due to the nature of the crime or the quantity of the government's evidence, the 404(b) evidence is one of the only means of proving the defendant's intent, that fact weighs in favor of admission. See United States v. Jackson, 543 F. App'x 525, 530 (6th Cir. 2013) (noting that "the government did not have significant alternative means to prove [the defendant's] intent"); United States v. Brown, 147 F.3d 477, 483 (6th Cir. 1998) ("There was no alternative for the government to prove intent other than through telephone calls that [the defendant] made at CDC and elsewhere to show similarity of the sales pitches, the promotional schemes, and other actions that indicate [the defendant] had the specific intent to defraud people when he worked at CDC.").

Another factor is the nature and degree of potential prejudice.  Not all prejudice is *unfair* prejudice.  "[U]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." Bonds, 12 F.3d at 567.  404(b) evidence is more likely to compel a jury to render its verdict on an improper basis if it is particularly graphic or inflammatory, or if it is more severe in degree than the charged conduct. See United States v. Blair, 225 F.3d 660 (6th Cir. 2000) (unpublished) (noting that evidence of the 404(b) assault "was more 'graphic,' 'horrendous,' and 'emotional'" than evidence of the charged assault).

Still another factor is the potential for a limiting instruction.  The Sixth Circuit, while recognizing that a limiting instruction is not a cure-all, has held that an instruction carefully

18

setting forth the permissible uses of 404(b) evidence mitigates the prejudicial impact, if any, of such evidence. English, 785 F.3d at 1056.  A limiting instruction is especially impactful if given before and after the evidence at issue, and again during the jury charge. See United States v. Allen, 619 F.3d 518, 525 (6th Cir. 2010).

All of those factors militate in favor of admitting the 404(b) evidence in this case.  First, evidence of prior instances in which Defendant Corder abused his official authority to retaliate against civilians who disrespected him is highly probative of one of the central issues—if not *the* central issue—in the case.  The government anticipates that the defense will not contest that Defendant Corder was acting under color of law, and the government submits that Defendant Corder's bodycamera video, which shows him enter D.B.'s home and arrest D.B. without a warrant or exigent circumstances, establishes by itself that he deprived D.B. of a constitutional right.  The key issue will be whether Defendant Corder was acting in good or bad faith.

Second, although more than a decade elapsed between the 404(b) incidents and the charged offense, Defendant Corder was working full time in law enforcement for only a few of those years, so the two incidents should be considered appropriately close in time for 404(b) purposes. See United States v. Adams, 722 F.3d 788, 811 (6th Cir. 2013) (affirming admission of evidence of vote buying occurring decades prior to the charged offense because "vote buying . . . by nature cannot be committed every day"); United States v. Finnell, 276 F. App'x 450, 455 (6th Cir. 2008) (unpublished) ("[A]lthough slightly more than seven years separates the 'other act' evidence from the date of the alleged instant offense, Defendant was imprisoned on separate state offenses for the majority of that time.").

Third, the government has few alternative sources of proof to establish Defendant Corder's bad faith, which is not readily inferable from the nature of his criminal act.  Police

officers occasionally make honest mistakes that result in the deprivation of a person's rights; indeed, a special exception to the exclusionary rule is devoted to them. See Davis v. United States, 131 S. Ct. 2419, 2427–28 (2011).  In this case, Defendant Corder made several recorded statements indicating that the real reason he arrested D.B. was for swearing at him.[3]  The law is settled that an officer may not arrest a person for swearing at him, see Kennedy v. City of Villa Hills, Ky., 635 F.3d 210, 215–16 (6th Cir. 2011) (holding that no reasonable officer could believe that he had probable cause to arrest a man for disorderly conduct for calling the officer a "fat slob," reasoning that "Kentucky law does not criminalize arguments and noise that disturb only police officers because such conduct does not risk public alarm," and even if it did, "the Constitution prohibits states from criminalizing conduct that disturbs solely police officers"), but the government has no direct evidence, other than the fact that Defendant Corder was trained otherwise, that Defendant Corder knew that doing so was against the law.  For that reason, evidence that Defendant Corder had twice engaged in similar misconduct and been punished for it is a critical part of the government's case.

Fourth, the prejudice, if any, resulting from the admission of the other-act evidence is not the sort of prejudice that Rule 403 was designed to prevent.  The probative value of such evidence derives primarily from its tendency to show Defendant Corder's true intentions, not from their tendency to paint him as a bad guy. See Mohr, 318 F.3d at 619 ("[T]he potency of this [404(b)] evidence lay in its graphic demonstration that [the officer] unreasonably released her

---

[3] See Bodycamera video at 2:44 ("And then you tell me to 'fuck off?' . . . . 'Fuck you' gets you a whole different ballgame, buddy. . . . You get to go to jail tonight."); id. at 3:55 ("You know why, Slick.  You sit up there and tell me to 'fuck off?'"); id. at 4:26 ("Tell somebody to 'fuck off' . . . What planet do you ever think that was gonna fucking go?"); id. at 4:39 ("Next time you tell a police officer to 'fuck off,' you might want to think about it."); id. at 5:28 ("So then he wants to tell me to go 'fuck off' . . ."); id. at 6:15 ("Junior decides to tell me to 'go fuck off.'").

police dog on an innocent, clearly unresisting young person . . . . If believed, such evidence would, of course, severely damage [the officer's] defense, but unfair prejudice under Rule 403 does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence.") (internal quotation marks omitted).  Moreover, the 404(b) evidence in this case portrays incidents that, unlike a graphic rape or bloody assault, are not inherently inflammatory, and, indeed, are arguably less inflammatory than the charged incident, so they are unlikely to compel the jury to render its verdict on an improper basis.

Fifth, by directing the parties to litigate this issue well in advance of trial, this Court is well-positioned to craft an appropriate limiting instruction that would mitigate the prejudicial impact, if any, of such evidence.

In sum, the proposed 404(b) evidence in this case survives Rule 403 balancing, as its considerable probative value is not substantially outweighed by any danger of unfair prejudice.

### CONCLUSION

As the Supreme Court emphasized in Huddleston, 404(b) evidence "may be critical to the establishment of the truth as to a disputed issue, especially when," as here, "that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." 485 U.S. at 685.  Evidence of prior instances in which Defendant Corder abused his authority as a police officer to retaliate against civilians who disrespected him is critical to establishing that he specifically intended to do so in this case; and its considerable probative value is not substantially outweighed by any danger of unfair prejudice.  For those reasons, the government respectfully requests an *in limine* order ruling that the government's 404(b) evidence is admissible under Rule 404(b).

21

Respectfully submitted,


VANITA GUPTA
PRINCIPAL DEPUTY ASSISTANT
ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
UNITED STATES DEPARTMENT OF
JUSTICE

Christopher Perras
Trial Attorney
Criminal Section
Civil Rights Division
U.S. Department of Justice
601 D Street NW
Washington, DC 20004
(202) 353-1130

JOHN E. KUHN, JR.
UNITED STATES ATTORNEY

*s/ Amanda E. Gregory*
Amanda E. Gregory
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 582-5016 (Tel.)
(502) 582-5067 (Fax)


## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2016, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the counsel to the defendant, Donald Meier.

*s/ Amanda E. Gregory*
Amanda E. Gregory
Assistant U.S. Attorney

22