```
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
      UNITED STATES OF AMERICA,      )  Case No. 3:15CR-141-DJH
 4                                   )
              Plaintiff,             )
 5                                   )
      VS.                            )
 6                                   )
      MATTHEW B. CORDER,             )
 7                                   )  June 7, 2016
              Defendant.             )  Louisville, Kentucky
 8

 9            *****************************************

10                 TRANSCRIPT OF MOTION HEARING
                  BEFORE HONORABLE DAVID J. HALE
11                 UNITED STATES DISTRICT JUDGE

12            *****************************************

13
      APPEARANCES:
14
      For United States:        Amanda E. Gregory
15                              U.S. Attorney's Office
                                717 West Broadway
16                              Louisville, KY 40202

17                              Christopher J. Perras
                                U.S. Department of Justice
18                              Civil Rights Division
                                601 D Street, NW
19                              Washington, DC 20004

20

21

22                  Alan W. Wernecke, RMR, CRR
                       Official Court Reporter
23                    232 U.S. Courthouse
                    Louisville, Kentucky 40202
24                        502-625-3779
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

1    APPEARANCES (Continued):

2    For Defendant:            Donald J. Meier
                               Western Kentucky Federal
3                              Community Defender, Inc.
                               620 S. Fourth Avenue, Suite 200
4                              Louisville, KY 40202

5    [Defendant present.]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Begin proceedings in open court at 10:15 a.m.)

2               DEPUTY CLERK:  3:15CR-141, *United States of America v.*

3     *Matthew Corder*.

4               MS. GREGORY:  Amanda Gregory and Chris Perras for the

5     United States, Your Honor.

6               MR. MEIER:  Don Meier for Mr. Corder, who is present.

7               THE COURT:  Good morning.  We have, I guess, three

8     different motions.  The U.S. has a 404(b) notice motion, and

9     then we have a couple of motions in limine.

10         Who would like to go first?  We have, I think, all the time

11    we need.  We will take an hour or so, if it takes that long, to

12    get through these arguments.

13         You want to go first on your 404(b)?

14              MR. PERRAS:  Sure, Your Honor.  Your Honor, the

15    Government's 404(b) evidence should be admitted because it is

16    relevant to the central issue in this case.  It's necessary to

17    prove the Government's heightened intent requirement and

18    because its admission is supported by ample precedent in the 242

19    context.

20         The first point is willfulness is the central issue in this

21    case.  The parties, I'm sure, agree that the defendant was

22    acting under color of law when he arrested D.B., the victim in

23    this case.  While the defense may contest the defendant did not

24    violate D.B.'s constitutional rights, I submit to you I think

25    it's fairly clear from the video evidence in this case and from

the case law that the defendant violated D.B.'s constitutional rights in several different ways.

As the Government will submit in its trial brief to Your Honor, there's two Sixth Circuit cases that are directly on point.  One of them is *Kennedy v. City of Villa Hills*.  That's a case in Kentucky in which a civilian got into an argument with a police officer.  The civilian called the officer a fat slob and other choice words.  The officer then arrested the civilian for disorderly conduct, and the civilian sued the officer under 1983 for false arrest.

In that case the Sixth Circuit looked at the situation and said that under Kentucky law no reasonable officer could have arrested this person for disorderly conduct.  It's clear under Kentucky law and under the Constitution you can't arrest someone for swearing at you.

*Smith v. Stoneburner*, a different case, is a case in which a person committed a misdemeanor offense.  I think he stole a car charger from a convenience store.  The person then went to his house.  A police officer came to his house to investigate.  They had a voluntary conversation on the suspect's porch.  The suspect then decided to end that voluntary conversation and go back into his house.  The officer followed him into the house, grabbed him, struggled with him, and then arrested him.

In that case the Sixth Circuit -- this is, I think, 2015 or 2016 -- Judge Sutton writing for the Court said that no

1    reasonable officer would have entered that person's house under

2    the circumstances without a warrant without consent.  Those two

3    situations are factually analogous to this case, Your Honor.

4        So I submit to you that while the defense may contest the

5    deprivation of a constitutional right element in this case, the

6    real issue is willfulness, and that basically is did this

7    defendant use his authority as an officer to retaliate against

8    the victim D.B. in this case, or was the defendant acting in

9    good faith?  In other words, if he violated D.B.'s

10   constitutional rights, was he just mistaken about the law?

11       The Government's 404(b) evidence is relevant evidence of the

12   defendant's intent.  In other words, the fact that the defendant

13   previously harbored a similar retaliatory intent in similar

14   circumstances where a civilian disputed his authority or made

15   him angry in some sense makes it incrementally more likely that

16   he harbored the same intent here.  Or to put it differently, it

17   makes it less likely that the defendant violated D.B.'s rights

18   by mistake.

19       The second point, Your Honor, is the 404(b) evidence is

20   necessary in this context.

21           THE COURT:  Let me just ask you about the intersection

22   of mistake or lack of mistake and willfulness.  How does that

23   impact the analysis that I have to do here in determining

24   whether the 404(b) evidence is properly admitted?

25           MR. PERRAS:  Well, under 404(b) there's several

1    exemptions for which the proponents of the rules said that this

2    sort of evidence is allowable.  Intent and absence of mistake

3    are both written in there.  They are sort of two sides of the

4    same coin.

5        For example, evidence of prior instances is commonly

6    admitted to show proof of specific intent for specific intent

7    crimes, for example, possession with intent to distribute to

8    distinguish from mere possession.  So under Sixth Circuit and

9    plenty of other cases, it's commonly admitted a prior instance

10   in which a defendant was selling that drug or a similar drug to

11   show that it was more likely that he wasn't just merely

12   possessing the drug in this instance; he also had the intent to

13   sell it.

14       On the flipside -- sometimes it's the flipside of the coin;

15   sometimes it's a different situation.  If there's a situation

16   where as in this case -- I anticipate one of the defenses in

17   this case will be the defendant will say, "Well, even if I did

18   violate his rights by going in without a warrant, I didn't know

19   that; I'm not a lawyer; it was a mistake."  So in cases where

20   that's a plausible defense, the United States has the right

21   under 404(b) to introduce evidence to rebut that mistake and

22   show that it's less likely that that was mistaken.

23       Is that responsive to your question, Your Honor?

24            THE COURT:  I think in part.  In those cases is that

25   then limited to admission in rebuttal -- in your rebuttal case?

1          MR. PERRAS:  No, Your Honor.  The case law that I read

2     said what the Government can't do is introduce evidence calling

3     it absence of mistake if mistake is never going to be a

4     plausible defense in this case.  Willfulness is an element of

5     our burden of proof that we have to prove beyond a reasonable

6     doubt.  Mistake is sort of the flipside of that.

7          So by proving -- like for proving willfulness, one way we

8     prove willfulness in all 242 cases is to show the training the

9     officer received.  Training is to show his intent, but it's also

10    introduced to rebut that he was mistaken about what he did.

11    This is sort of the same.

12         But I can submit more evidence or more precedent on that

13    particular point if Your Honor would like.

14         THE COURT:  Well, you are getting to my follow-up

15    question in part.  When you talk about the evidence of training,

16    is that essentially an alternative source of proof to show lack

17    of mistake?  If you are able to demonstrate by these witnesses

18    that I think at one point were experts, and now they are fact

19    witnesses, to demonstrate the defendant's training, isn't that

20    adequate to show lack of mistake without having to deal with the

21    potential admission of evidence for which the unfair prejudice

22    outweighs the probative value of the proof?

23         MR. PERRAS:  Two responses.  The first is yes, that

24    is alternative evidence to prove willfulness, and Ms. Gregory

25    will speak to that point in her motion, that that willfulness

 1    is sort of what that evidence is being offered to prove and to

 2    rebut.

 3        I would say that in most 242 cases there's sort of a wide

 4    spectrum of evidence offered to prove willfulness.  Training is

 5    sort of the baseline to that, but typically there's also

 6    inculpatory admissions of the defendant officer bragging to

 7    other officers, that sort of thing, consciousness of guilt

 8    evidence where the officer is falsifying reports, where the

 9    officer is destroying evidence, destroying body cameras,

10    destroying stuff like that.  There's sort of a wide variety of

11    things that the Government in our section in these cases

12    typically offer to prove an officer's willfulness.

13        To get to sort of my next point, though, willfulness is sort

14    of the highest mens rea requirement in federal law.  The case

15    law typically distinguishes between general intent crimes and

16    specific intent crimes.  Specific intent crimes are much harder

17    to prove.

18        Willfulness is sort of even above that because we would have

19    to prove in these cases not only that the officer had the

20    specific intent to violate someone's constitutional rights, but

21    also that he knew what those rights were and how they applied in

22    this particular situation.  It's similar to how -- the only

23    other context I know of it is in tax prosecutions where the

24    Government has to prove the same sort of willful violation of

25    the tax laws.  That's such a high burden of proof.

1          THE COURT:  That sort of gets me back to my question

2     about the intersection of lack of mistake and willfulness.  The

3     tax cases, I think, illustrate that issue probably as well as

4     any that I have looked at.  There's an intersection there -- in

5     the case law there's an intersection there of the discussion of

6     this willfulness or this heightened level along with rebutting a

7     mistake defense or a misunderstanding defense or a lack of

8     knowledge defense.

9          MR. PERRAS:  That's right, Your Honor.

10          THE COURT:  That's why I'm curious as to whether this

11     proof -- this proposed 404(b) proof from the Government's

12     perspective, it covers both of these issues?  Is that the

13     essential argument?

14          MR. PERRAS:  Yes, Your Honor.

15          THE COURT:  If it does, is it possible then that

16     the -- well, I'll just go with your "yes."  I'll hold my

17     follow-up for now.

18          MR. PERRAS:  Okay.  So as I was getting to sort of the

19     heightened mens rea requirement, that's why you see in the 242

20     context, and even in a tax context, 404(b) evidence commonly

21     admitted.  In tax fraud, it's prior instances where they didn't

22     file income taxes.  In 242 cases, it's prior similar

23     occurrences, whether it's similar in the sort of MO of how the

24     officer would do something and try to get away with it or

25     whether it's offered to prove willfulness and intent, whether

1    the officer was harboring a similar kind of intent.

2        The Government listed several of those cases in its 404(b)

3    brief.  The defense has not tried to distinguish or respond to

4    any of those cases and explain how this case is different from

5    those cases.

6        Another reason why 404(b) evidence is especially necessary

7    in this context in this case is that the defendant's intent

8    can't be readily inferred from his conduct in this case.  That's

9    not always true in 242 cases.  You can imagine a case where a

10   police officer takes a person into his custody and then sexually

11   assaults that person.

12       Now, the defense in that case is not going to be, "I didn't

13   know that sexually assaulting a person was wrong."  It's going

14   to be, "It never happened."  That's going to be a case that's

15   going to rest on the second element of this, which is whether

16   there was a constitutional deprivation.

17       This case is different.  The baseline assumption, I think

18   all of us think, is that an officer in arresting someone is

19   going to have pure motives.  So just like *Huddleston*, the

20   Supreme Court case that was possession of stolen property, the

21   court recognized in that case that in situations where a

22   person's intent can't be readily inferred from his conduct,

23   404(b) evidence is especially probative and valuable.

24       Lastly, Your Honor, as I mentioned before, there's just a

25   wealth of case law supporting the admission of 404(b) evidence

in the 242 context.  I listed them in our brief.  A couple of

particular situations, in the *Rodella* case in the Tenth Circuit,

I think it was last year that the Tenth Circuit saw that case,

it was a road rage incident where an officer was angry about a

person cutting them off and then flipping them off.  The officer

followed that person, eventually pulled them over, dragged them

out of the car, and smacked them across the face with their

badge.

In that case the defense was -- willfulness was one of the

two defenses, and the prosecution offered several similar, like

incidents.  They weren't on all fours.  Two of them weren't

high-speed chases.  Neither of them used -- neither of them had

allegations of excessive force, but they tried to get into the

mind of that defendant officer in showing that he had a similar

sort of retaliatory intent when a civilian either questioned his

authority or angered him.

This is the exact same situation.  The question is -- the

Government's theory of the case is that D.B. swore at Defendant

Corder, Defendant Corder was mad at him, so Defendant Corder

barged into his house, arrested him, and wrote him up for

several crimes to get back at him for swearing at him.  These

previous incidents exhibit the exact same retaliatory intent.

In the road rage incident, he arrests somebody.  The person

uses the same expletive to Defendant Corder.  Defendant Corder

says, "Oh, yeah," and pepper sprays him right in the face in

1    view of several witnesses.

2        In the second incident, the repossession incident, there is

3    evidence that one of the repossession agents was questioning his

4    authority.  In that case Corder was angry that his authority was

5    being questioned, that somebody was talking back to him, so he

6    arrested him for disorderly conduct, the same crime he arrested

7    D.B. for in this case.

8        Not only that.  In both of those situations, Defendant

9    Corder did not say anything in the report about there being --

10   about there sort of being what the evidence of public alarm was

11   that supported the disorderly conduct.  In both of those cases,

12   once he got in trouble for that, Defendant Corder said, "Oh, I

13   saw a light go on in one of the neighbors' homes," the same

14   excuse.  That comes close to MO evidence, MO evidence of the

15   coverup he used to sort of cover up his actions in these

16   cases.

17       For all those reasons, Your Honor, the evidence is relevant

18   to a central and decontested issue in this case, I submit, it's

19   necessary to meet the Government's high burden in this case, and

20   its admission is supported by ample precedent.

21           THE COURT:  All right.  I think that the analysis has

22   to go one more level, though, right?  You've argued that it's

23   probative of material issues, but I still have to determine

24   whether that probative value is outweighed by unfair prejudice.

25       What we have got, I guess, are two incidents.  One is what,

1    seven years old, nine years old, and the other --

2            MR. PERRAS:  They are both fairly old.  I don't know

3    the exact number of years.  I'm sure defense counsel has those

4    at the ready.

5            THE DEFENDANT:  It was 2002 on the repo and 1997 on

6    the traffic.

7            THE COURT:  19 and 12.  So how does the -- I know that

8    there is no bright orange line here so that we say anything

9    more than 10 years is too old, but there is a reasonableness

10   standard that most courts employ when looking particularly at

11   older cases.  It seems to me that that's got to be a concern, is

12   that you are pointing to an incident -- a discrete incident

13   that's 19 years old and suggesting that knowledge was carried

14   forward.

15      So how do we consider that?  When the Court looks at the

16   third prong -- I think it comes out of -- *U.S. v. Jenkins* is the

17   Sixth Circuit case that talks about the three levels of

18   analysis.  When we look at that third level, don't I have to

19   consider a 19-year-old case to be pretty remote?

20           MR. PERRAS:  You absolutely do, Your Honor.  But the

21   Sixth Circuit and other circuits have distinguished between

22   situations where that 19 years, or however long the amount of

23   time is, passes uninterrupted where the person would have been

24   able to commit the same sort of crime the whole time or whether

25   there's breaks in that.

```
1        There are a couple of different types of cases.  One was the
2    case we cited in our brief where the defendant was locked up for
3    10 of the years in between, or however long, and it was an older
4    prior bad act.  The Court said, "Well, we can't just look at
5    this in the absolute sense because the defendant was in jail.
6    He couldn't have been committing the same type of crime."  So we
7    sort of take that out and use the amount of time that was sort
8    of left over.
9        The same is true in a vote buying case.  I forget which
10   circuit it was --
11            THE COURT:  You don't have elections all the time.
12   Although in Kentucky, we have had them typically every year.
13   But the defendant here has not been in jail, and this isn't an
14   election case.  How do we fit that into this analysis?
15            MR. PERRAS:  He was only a full-time officer for a few
16   of those years because he was hired and fired from several
17   different police departments in the interim.  He can only --
18   Defendant Corder can only commit this offense of depriving
19   somebody's rights under color of law if he's a police officer.
20            THE COURT:  So in the intervening 19 or 18 years, how
21   many years did he spend in a sworn position?
22            MR. PERRAS:  He was fired shortly after the
23   repossession incident.  He was not working as a police officer
24   for a long time.  I can get you the exact number of years --
25            THE COURT:  I suspect Mr. Meier will be able to
```

address that.  My point is even if you apply the analysis in

that manner and reduce the 18 years of time down to 10 years of

service where he could have repeated that incident, it seems to

me that's still a concern that would need to be carefully

analyzed under this standard that talks about unfair prejudice,

especially in light of the fact that you have other evidence you

intend to offer on that same point about his trainers, his lack

of mistake, his knowledge, all of which go to that intersection

of proof on lack of mistake and willfulness.

MR. PERRAS:  I'll respond in a couple of ways, Your

Honor.  The defendant was hired and fired from three different

police departments.  He was fired from the Louisville Metro

Police Department shortly after the repossession incident.  He's

hired, I don't know, seven years later at the Audubon Park

Police Department.  He works there for six months before he's

fired there.  He only has six months of work there.  Several

years passed.  He's then hired at the Bullitt County Sheriff's

Office.  He's only there for a couple of years.  The total

number of years isn't 10.  It's more like two and a half in

between.

I recognize this is a tough issue, and there's no bright

line.  You have to look at sort of -- again, you have to weigh

how probative is this evidence given what it's being offered to

prove versus the prejudicial effect.

With respect to your point about we have other evidence, I

1  can tell you from experience as someone who just does federal

2  color of law cases, they are incredibly difficult to prove.

3  Even if we have surveillance video, even if we have clear

4  training evidence, we typically are going to require much more

5  than that to prove that a police officer willfully violated

6  someone's constitutional rights.

7      In all of those cases we cited, the *Mohr* case out of the

8  Fourth Circuit, all of the cases cited in our brief in which

9  404(b) evidence was offered in the 242 context, in all of those

10 cases training evidence was offered.  It's offered in pretty

11 much all of our cases.  The reason those courts offered that,

12 notwithstanding the fact that there was other evidence of

13 willfulness, Your Honor, it's such a hard burden to meet for the

14 Government.

15         THE COURT:  Well, that doesn't really help me applying

16 the analysis that it's a hard burden for you to meet.

17         MR. PERRAS:  That's the first sort of prong as to how

18 important is it in the context of this case, how relevant and

19 how important.  That's something the Sixth Circuit has said.

20     As for the prejudice prong, I'll note that the defendant

21 doesn't really articulate how -- what prejudice arises from

22 these incidents apart from the legitimate probative force of the

23 evidence.  So the Government is offering these incidents to show

24 his retaliatory intent.

25     The defense hasn't offered in what ways that this is

1    prejudicial -- taking out the legitimate probative force of that

2    evidence, what other ways these are prejudicial.  I'll note that

3    these are less prejudicial arguably than the charged incident

4    where -- the charged incident is caught on video.  It's pretty

5    vividly captured.  In the charged incident the victim D.B. loses

6    his liberty.  He's sent to jail.  He's in jail for weeks.  He

7    loses his house.  He loses his job.

8         THE COURT:  I'm aware of the facts.  I expect that

9    Mr. Meier will address why the prejudice is unfair, but I still

10   have that obligation to weigh the two.  I'm not sure that the

11   difficulty that the statute imposes on the United States is

12   within that balancing that I am supposed to do.  Is it?  Does a

13   case say that because it's difficult on the Government we should

14   tilt in favor of admission of 404(b)?

15        MR. PERRAS:  Yes, Your Honor.  The courts have said

16   with respect to sort of the probative value of the evidence

17   consideration, that is one of several considerations courts

18   should consider, you know, alternative evidence, what it's being

19   offered to prove.

20     For example, in specific intent drug cases where the

21   Government has to prove specific intent to distribute, generally

22   404(b) evidence is usually admitted in those cases to prove

23   intent to distribute.  But there are a few cases out there where

24   courts have said, "Look, Government, you had itemized baggies of

25   cocaine, you had scales, you had all this other indicia of

1    intent to distribute, and so because you had all that other

2    evidence -- overwhelming evidence of intent, adding this little

3    thing doesn't really move the needle as much as it would if you

4    didn't have that evidence."  That's responsive to like the

5    amount of evidence the Government has in this case.

6        As to the burden the Government has and how difficult it is

7    to prove the particular charge at issue, I think courts have

8    recognized in the tax context that's one reason why prior

9    unfiled tax returns, which are 404(b), almost will always come

10   in in those cases because it's such a high burden for the

11   Government to meet.

12       In fact, the Fourth Circuit case, I believe it's *Mohr*,

13   M-O-H-R, has a quote in there, it's a 242 case where 404(b)

14   evidence was introduced, and that court said that the nature of

15   the Government's burden in a 242 case is such that 404(b)

16   evidence is especially probative and should be admitted in this

17   case.

18               THE COURT:  You said that was a Fourth Circuit case?

19               MR. PERRAS:  That's correct.  To the best of my

20   recollection, Your Honor.

21               THE COURT:  That court still did the balancing

22   analysis, right?

23               MR. PERRAS:  Of course.

24               THE COURT:  Okay.  Thank you.

25               MR. PERRAS:  Thank you.

1          THE COURT:  Mr. Meier.

2          MR. MEIER:  Thank you, Judge.

3      I think there are a myriad of reasons why these two

4  unrelated and remote incidents should not be admitted into

5  evidence in this trial.

6      As the Government indicates, this case is a relatively

7  simple case.  It is caught on camera, a good part of it.  Not

8  all of it, but a good part of it.  It's caught on camera.  We

9  have the facts there.  They have -- whatever evidence they need

10 for their side, you know, appears to be there.  Obviously, we

11 are contesting much of it.  And as the Government says, intent

12 is going to be an issue.

13     But let's back up for a minute and take a look at the big

14 picture about what it is the Government's theory is and what it

15 is these two unrelated cases tell you about that theory.  The

16 theory that was mentioned in the Government's reply, it sort of

17 changed.  At the beginning they were talking about how this is

18 remarkably similar, these two cases.  When I pointed out they

19 weren't, the reply was, "Well, they don't really have to be

20 remarkably similar."

21     But quoting from page 2, the Government's theory of the case

22 is that Defendant Corder seized and arrested D.B. for not

23 fleeing or being disorderly -- or not for fleeing or being

24 disorderly, but for swearing at him, committing what is known

25 colloquially as contempt of cop.  The issue is he deprived him

1    of a right, that is, he arrested him, because he was

2    disrespected or cursed at or whatever.

3        Now, let's look at these two cases.  First of all, case

4    number one, that is the 1997 case, that is a case where there is

5    no issue of whether there's probable cause that I can see.  I

6    don't think it was brought up in any civil suit.  The issue was

7    after the person had been arrested, there was a use of force

8    that a person who is being arrested disputed.  There was no

9    criminal charges as to that.  As far as Mr. Corder knows, there

10   was no reprimand for that.  None of his supervisors ever said

11   anything was wrong with that.

12       There was a traffic tie-up on the Snyder Freeway going to

13   where it goes into I-64, and Officer Corder was preventing

14   people from going in the emergency lane, using that to get

15   around the traffic tie-up.  You are not supposed to do that.

16   And this one particular driver not only went around the

17   emergency lane, but actually got out into the grassy area to get

18   around him.  He got out and before a word was spoken was

19   stopping the person.  He saw his hands drop, according to the

20   depositions in the case, and pulled out his gun before a word

21   was spoken.

22       So factually, it goes to -- and then later after the guy got

23   mouthy, he had set him inside the car, he made the decision to

24   handcuff him, then they are talking about the issue of whether

25   the force was legitimate, whether he used too much force,

excessive use of force.  It's a totally different issue.  The

prejudice is obvious.  It makes him look like a bad guy, but the

issue here is, is this relevant to the issue in this case, and

it's not.  It's a different intent.

The Government cites cases that because an incident is

remote in time, it doesn't necessarily have to -- it's not

necessarily fatal.  That doesn't mean it doesn't weigh

heavily -- it doesn't weigh heavily in the defense favor because

a case is remote is still a factor, and it's an important factor

on the defense side.  So yes, there may be a case that says by

itself that's not going to defeat it because there could be

unusual circumstances.

Like this vote buying, an election only occurs every four

years or once a year or whatever, so you can't do it very often.

Whether it was 19 years or whether it was 10 years or whether it

was -- it was more than two and a half years because the 1997

incident happened at least five years before he was released

from the Jefferson County Police Department.  So that's a

five-year period.  Then he was a couple of years in Bullitt and

then six months -- we are talking about seven and a half, eight

years.

So we are talking about seven and a half, eight years of

being a police officer where he had the opportunity every single

day, multiple times a day probably in some instances, to

encounter people and make a decision on whether or not to arrest

them.  So we are probably talking about literally thousands of

encounters with citizens where a decision was made to arrest or

not arrest or use force or not use force.

Likewise, there's -- he was acquitted -- it is important

that he was acquitted of this tow truck incident.  It was a

trial, and he was acquitted.  Now, the Government cites a case,

and I agree it's absolutely the law, that alone doesn't defeat

the use of that as 404, but that doesn't mean it's not an

important factor still.  It is something the Court should

consider.

So it's akin to saying, "I'm looking for a new car right

now, and if I see a Ford Escape in two different lots and one of

them is cheaper in lot A than lot B," that's an important factor

that I have to consider.  But it may not be the only factor, so

you could say, "Yes, two identical cars; I may not buy it at the

place it's the cheapest.  There are certain circumstances where

I wouldn't buy it at the cheaper place because the other place

might have a better service department or I like the salesmen

better."

So there are reasons -- and then the case law says that

there are certain cases that may exist, but the fact of the

matter is these two incidents are remote.

Before I go on, let's talk about the tow truck incident

likewise in terms of -- just to understand what the incident is.

There again, this is not -- Mr. Corder was separated from his

wife at the time and had not been living at the residence where his wife lived.  As part of their separation agreement, she continued payments on this Lincoln Navigator, this car.  He had a police vehicle at that time.  He was in the Crimes Against Children Unit, so he had a police vehicle.

He was dropping off some clothing for one their children late at night, 11:30 or so at night, and looks out and sees individuals with a tow truck and a pickup truck in the driveway, and they are getting ready to remove this Navigator.  So he goes out the door.  As he's going out the door, one of the persons runs around the truck, the other person reaches into his pocket, the other person does something else, I forget what, but he has his gun out and says, "Get on the ground.  I'm going to find out what's going on."  Not a word was spoken.

Again, his actions were totally as a result of what he saw, what he observed out in his driveway.  There's arguments back and forth, you know, at the trial whether he knew that this car was going to be repossessed or was in that danger or whatever.  That was a crucial issue at trial.

But that is a smoke screen for the actual fact of whether there's relevance here.  There's no relevance here because he was not depriving anybody of their constitutional rights on the basis of being mad at them, on the basis of contempt of cop.  He observed what he observed out in the driveway.  He observed their actions after he came out.  Nobody spoke a word, and he

1     came out and he detained them briefly.

2           THE COURT: But there are more facts to that story,

3     right, than just the initial he comes out with his gun and tells

4     them to get on the ground?

5           MR. MEIER: Well, there are many more facts, but they

6     get even farther away from the relevance to this case. There's

7     an issue over whether or not some kind of deal was struck

8     regarding, "I'll let you go if you don't tow the car." He

9     denies that.

10          THE COURT: And if you don't tell Internal Affairs.

11          MR. MEIER: Right. Interestingly enough, I'll talk

12     about it in a minute, Internal Affairs, that's why he was fired.

13     He was actually cleared and exonerated by Internal Affairs for

14     what they called his *Terry* stop for putting the person in

15     handcuffs and putting them down on the ground and putting them

16     into the seat of his car handcuffed. He was exonerated for that

17     behavior. He was exonerated for pulling the gun. He was

18     exonerated by Internal Affairs on those. He was fired --

19          THE COURT: Which police department was this?

20          MR. MEIER: Louisville, LPD.

21          THE COURT: This was the city -- the old city police

22     department?

23          MR. MEIER: Were they joined at that time?

24          THE DEFENDANT: Not at that time.

25          MR. MEIER: Yes. So the other part of that particular

fact scenario is this:  The Government indicates -- well, okay.
There's the remoteness.  There's the fact that they aren't
similar.  There's the fact that the relevance doesn't go to
what it needs to go to.  There's the fact that really it's not
the -- the purpose is to show that he's a bad guy, that he's a
bad character, which is exactly what 404(b) doesn't want to
happen.

The 404 violation -- I will talk about why it's a 403
violation, but let me say that it's not just unfair prejudice.
403 also talks about misleading the jury and undue delay.  One
of the things that's going to happen with this case -- it was a
four-day trial.  Granted, it wouldn't be four days to deal with
it here because there was jury selection and I'm sure closing
arguments.

But it was a four-day trial.  And unlike a situation where
there's a guilty plea or that there's a finding of guilt by the
jury or some kind of concession or finding of guilt by anybody,
the Government says, "Well, we can just put on three or four
witnesses and summarize it, and we will save a lot of time that
way."  Well, that would be fine if you had a fact -- if it was a
fact this was a conviction, you were found guilty of this act
and we don't need to retry it, you know, it's on paper.  This
was an acquittal.

While I concede, yes, there's different standards of proof,
because of that everything is still on the table because these

1   witnesses were cross-examined.  There was a police officer, I

2   can't think of his name right now, but the first Louisville

3   police officer that made the scene, and he gave a statement, and

4   he said, "I would have reacted the same way."  So --

5            THE COURT:  I understand where you are going with

6   that.  That goes to really the first prong, which is whether

7   the evidence is sufficient -- the evidence of the prior bad act

8   is sufficient, and so it's a little bit of a spin on that

9   prong.  I get that.  What would the proof be of the prior bad

10  act and how expansive would the trial within a trial be on that

11  issue?

12      Is my understanding correct, or am I conflating the two

13  incidents?  Was your client terminated as a result of the

14  incident?

15           MR. MEIER:  In the tow truck incident?

16           THE COURT:  Yes.

17           MR. MEIER:  Yes, he was.

18           THE COURT:  Where there was a trial and he was

19  acquitted.

20           MR. MEIER:  He was terminated as a result of that, but

21  as I said --

22           THE COURT:  Despite the acquittal?

23           MR. MEIER:  Despite the acquittal.  He was not

24  terminated -- there were findings -- I believe this goes to why

25  he was terminated, but there were findings and conclusions of

the Office of Professional Standards, which I believe is

Internal Affairs, and there was findings -- and I'm reading from

discovery, page 4250 -- he was exonerated under the use of force

provision.  He was exonerated under the stop and frisk.

Now, this is not a jury.  This is the Internal Affairs'

exoneration.  It was sustained as to abuse of authority and I

assume truthfulness, although that was -- that's been excised.

So to the issue as to why it's relevant in this case, he was

specifically exonerated.

In terms of the 1997 case, the reckless driving stop,

Mr. Corder does not recall and I could not find -- maybe I

overlooked it, but I could not find any evidence of any

reprimand.  He does not recall being reprimanded.  He does not

recall having a superior indicate to him that his conduct was

unacceptable and put on notice of any kind.

THE COURT:  So he suffered no adverse consequences as

a result of the '97 incident?

MR. MEIER:  No, which goes to a whole other issue.

The Government noted in their first motion that, gosh, it's very

important and they spent some time about how important this is

that he was put on notice and that it was strikingly similar.

On page 15 of their brief it says, "Evidence that Defendant

Corder previously had been fired and even criminally prosecuted

for falsely arresting a person for disorderly conduct shows that

he was on notice of the elements of disorderly conduct and knew

1  that arresting a person for that offense without supporting

2  evidence was against the law."

3      So, first of all, that's just not true.  He was not on

4  notice.  He had a different --

5              THE COURT:  You mean not on notice as a result of that

6  incident?

7              MR. MEIER:  Either of these incidents.

8              THE COURT:  He's not going to deny his police

9  training, though.

10             MR. MEIER:  He is definitely not going to deny that he

11 knows that you are not supposed to arrest somebody without any

12 evidence.  That's kind of mixing apples and oranges here.  Yes,

13 he knows you are not supposed to arrest somebody without any

14 evidence, that you are not supposed to as a police officer just

15 walk up to somebody and say, "I don't like the way you look; you

16 are under arrest."  He knows that.  We are not going to contest

17 that.

18     But the issue is did these prior instances in 1997 and 2002

19 shed light on the fact that he specifically was -- that he

20 specifically knew that particular conduct was illegal?  In both

21 of these cases, the one case he suffered no repercussions

22 whatsoever --

23             THE COURT:  That's the '97 incident?

24             MR. MEIER:  The '97 case.  The 2002 tow truck

25 incident, the jury found him not guilty, and he was fired not

1    for any of the reasons that are relevant to this case.  So

2    that's just like, "Yeah, he's a bad guy; well, we fired him for

3    lying about some of this instance."  Well, that's -- you know,

4    that's just making you look bad.  That's just making you look

5    like a liar.  But it's totally extraneous, totally unrelated to

6    this case.

7        So there is the unfair prejudice.  It's obvious what the

8    unfair prejudice is of these cases.  They are just making him

9    look like a bad guy, making him look like a liar.

10       And then you can also add the undue delay and the fact that

11   it's going to mislead the jury because it is apples and oranges.

12   These were not arrests that were made because -- these were not

13   violating somebody's constitutional rights by arresting them as

14   a result of contempt of cop, being disrespected.  That's just

15   not what these cases were about.  But they certainly don't cast

16   him in a good light.  There's no doubt about that.

17       The bottom line is -- I think the best example is actually

18   what was put in the Government's brief about the welfare fraud.

19   On page 11 of the brief, again, they are talking about the high

20   degree of similarities of these two instances and how important

21   that is and how that makes it relevant because these two

22   occurrences are so strikingly similar.  And then they use the

23   example -- after talking about that, they say, "For example, in

24   a healthcare fraud case, evidence that the defendant committed a

25   single act of tax fraud would not be especially probative of his

1   intent to commit healthcare fraud; it would show that he was a

2   man capable of fraud, but not much more."

3       That's exactly what you have here.  It would be like if he

4   was in a disciplinary proceeding for showing up late for work

5   and they were going to discipline him for some reason and they

6   brought in evidence, "Well, we have evidence that two or three

7   times you came in in an improper uniform and you violated the

8   dress code provision, and what that shows is an intent on your

9   part to disregard the laws of -- the regulations of the

10  department.  We are trying to show that you acted intentionally

11  by showing up late here for work, and we are going to decide to

12  throw in this evidence that you didn't dress properly" --

13          THE COURT:  I appreciate that illustration, but that's

14  not what we have here.  More broadly speaking, what we have here

15  are two prior questionable arrests, and I think it's fair to say

16  you have raised an important point that the Court has to

17  consider as to relevance.  You've raised an important point as

18  to unfair prejudice.  But I wouldn't go so far as to say they

19  are trying to show that the differences between the prior

20  incidents, the '97 and '02 incidents, is to that degree of a

21  uniform violation.  I don't view it that way.  So I'm not sure

22  that it's helpful to the analysis I need to do.

23      If there is a distinction between the '97 and '02 incidents

24  and the underlying case here, it's a much finer distinction.  It

25  may be one that's important -- it may be one that leads to

1    exclusion.  I don't know yet.  But I think it's a finer

2    distinction than that.

3              MR. MEIER:  I would agree with that, Judge.  I

4    understand -- for the purpose of illustration, I'm trying to use

5    an extreme example to get my point across.  Quite frankly, the

6    fact that it is a finer line makes it even more dangerous to the

7    jury and actually emphasizes the part of 403 that prohibits

8    misleading -- or at least you are supposed to weigh the fact

9    that it could be misleading evidence to the jury.

10      As I say, their theory is stated pretty succinctly that he's

11   violating D.B.'s constitutional rights by arresting him and

12   seizing him on the basis of his reaction.  In those two cases,

13   that just wasn't the case.  They were arrested and seized before

14   any of that type of interaction occurred, and the questionable

15   conduct occurred later and was of a different sort, excessive

16   force.

17      You know, excessive force here, which is kind of an

18   interesting point because here the excessive force -- if someone

19   under the color of law is arresting you, even if it's a wrongful

20   arrest, you have to submit.  So nobody has really raised any

21   question, yes, there was a struggle in the doorway and the Taser

22   was used, but this was after he was demanding that he submit to

23   authority.  The issue is how did it get to that point and

24   whether that's illegal.

25      So really there's no excessive use of force issue here in

1     this case.  Certainly the jury is going to see it, but again,

2     that emphasizes how easily these two different concepts can be

3     confused through just unrelated fact situations.

4            THE COURT:  It will put a burden on all of us, right?

5     It will put a burden on the United States and on counsel for the

6     defendant and the Court to make sure that we are as precise as

7     we can be in our communications with the jury on all of these

8     issues.  I think that is certainly a point on which we can all

9     agree that these are important issues that are going to have to

10    be carefully considered.

11        All right.  Thank you.  We have time for a little bit of

12    rebuttal argument, if you want to --

13            MR. PERRAS:  Yes, Your Honor.

14            THE COURT:  -- address anything specific.

15            MR. PERRAS:  First, responding to the similarity

16    point, I think defense counsel raised first that the Government

17    stated in the first brief that these events were remarkably

18    similar, and the reply briefs sort of clarified the relevant

19    similarities, so all 404(b) incidents have to be similar in some

20    respects, some more than others.  But the relevant similarity

21    when 404(b) evidence is offered to prove intent is the

22    similarity of the state of mind, not the factual circumstance.

23        So the Government is pointing out basically that these

24    events are remarkably similar because the defendant is using his

25    authority as a police officer to retaliate against someone who

1    has either swore at him or questioned his authority.  That's the

2    relevant similarity in that.

3         THE COURT:  You heard Mr. Meier's argument, as I did.

4    He points out that with respect to the tow truck incident, which

5    I believe is the 2002 incident, the gun was drawn before anybody

6    said anything.  So is that a distinction -- a factual

7    distinction that makes a difference in the legal analysis?

8         MR. PERRAS:  No, Your Honor.  The relevant interaction

9    is with the tow truck driver.  There were three repossession

10   agents.  Defendant Corder, undisputed, comes out of the house

11   with his gun drawn, orders everybody on the ground.  One of the

12   repossession agents, the tow truck driver, is -- at least in his

13   testimony he's afraid.  He wants someone to call the police.

14   Defendant Corder says, "I am the police."  He's concerned that

15   this guy is not a police officer.  He's got a gun in his face,

16   so he's hollering to his supervisor, "Call the police; call the

17   police."  At that point Corder places this man under arrest,

18   puts him in cuffs, puts him against the police car for

19   disorderly conduct.

20       So that's the relevant interaction that is being offered in

21   this case because that's very similar to what happened in this

22   case.  D.B. swears at Defendant Corder.  Defendant Corder goes

23   and arrests him for disorderly conduct.  In both of those cases,

24   after he's getting in trouble for it, he claims, "Oh, there was

25   public alarm because I saw a light go on in a neighboring

1     house."

2         Those two interactions are pretty similar.  So that's -- the

3     Government is not looking at each of these incidents sort of

4     from start to finish.  You have to look at the -- we are

5     offering the repossession incident for that main interaction

6     he's having with the tow truck driver.

7         With respect to the acquittal, as the Government pointed out

8     in its brief, in its investigation the Government has found

9     newly-discovered evidence that was not presented at that trial.

10    It's pretty powerful and impactful evidence.  The Government

11    hasn't included that in its notice because the Government is

12    concerned about witness tampering and has specific concerns in

13    that respect.  The Government can make a proffer to the Court ex

14    parte if the Court is interested in hearing about that.

15        But I wanted to raise that point that this isn't just the

16    same trial that's going to happen.  It could be very streamlined

17    and get all this 404(b) evidence done in several hours to a day.

18    It's not in the Government's interest to make this three

19    back-to-back mini-trials because that confuses the jury and a

20    confused jury is not going to convict.

21            THE COURT:  I think it's a fair point that Mr. Meier

22    raises about the nature of the evidence that's submitted to the

23    jury.  Is it testimony and does that create then -- and by

24    saying is it testimony, is it merely factual testimony from

25    witnesses, which then creates something of a retrial and a trial

within a trial, as I said earlier?  Is that how the evidence

comes in?  There is no judgment to submit to the jury.  There's

nothing that -- even if they were inclined to agree, there's

nothing to stipulate to necessarily as to any prior official

action to be taken.

MR. PERRAS:  That's correct.  In any case the

Government is admitting 404(b) evidence, generally speaking the

Government is not going to be introducing, "Hey, here's a

conviction," or "Here's a piece of paper saying he did

something."  The Government is going to be introducing factual

testimony, witness testimony about what those witnesses saw on

that particular occasion.  It's similar to any sort of other

404(b) presentation of evidence.

THE COURT:  Well, that's true.  I would disagree with

you a little bit.  Oftentimes, there are prior convictions, and

so there's paper to hold up.  Now, a lot of times that's largely

stipulated away.  But even in those situations where it isn't --

where the prior act is something observed by law enforcement

officers, something along those lines, there isn't necessarily

an adjudication, if you will, and I use that term broadly here

since Mr. Meier has emphasized the Internal Affairs Bureau

analysis, which I don't think would need to be recognized in the

same way as a court proceeding.

But do you understand my point is in those situations where

you are addressing a prior act through testimony, it's most

often not a situation where there is some sort of official, if you will, end point?  As Mr. Meier points out, we have that here.  There was a trial.  There was an internal investigation. Those two proceedings came out in his favor.  So then do you introduce evidence of that and explain why it was wrong, or is that even necessary?

MR. PERRAS:  I'll break that up into a couple of different points.  Evidence of the internal investigation is pretty much never introduced in these cases.  It's not relevant. It's somebody else's determination of whether -- based on the evidence that that person receives, which is evidence that's different that's before the jury in the courtroom, whether that person believes that the defendant violated procedure.

So in 404(b) evidence cases, it's typically -- none of that evidence is going to come in for either side.  So you are looking at either an incident that wasn't resolved via a trial or some sort of proceeding or an incident that was.

As far as incidents that were, there's a long line of cases from the Supreme Court in *Dowling* to since then where incidents that resulted in an acquittal are being used as 404(b) evidence because under the 404(b) standard, the condition precedent to admission is a finding not even -- it doesn't require beyond a reasonable doubt.  It doesn't require clear and convincing evidence.  It doesn't even require a preponderance of the evidence.  It's just a finding that the act occurred.  It's a

1    really low standard.

2        So the fact that a jury acquitted someone, found that it

3    wasn't above 95 percent guilt, doesn't really tell us --

4            THE COURT:  I understand that.  I understand what the

5    differing proof levels are.  I get all that.  Perhaps my

6    question is more of a practical one.  On some level you have to

7    demonstrate to the jury that the incident occurred, right?  And

8    the defense is then going to be able to respond to that.  How

9    far does that go in terms of the proof offered and the rebuttal,

10   I guess, if you will?

11           MR. PERRAS:  Yes, Your Honor.  In the prosecution's

12   case in that state repossession trial, I'm not going to get the

13   exact number of witnesses right, but there was a couple of

14   witnesses who testified about the repossession notices that

15   Defendant Corder had received.  There were three repossession

16   agents.  Each of them testified as to what happened, what they

17   saw.  In one of the trials, Defendant Corder's wife testified.

18   In one of the trials, Defendant Corder testified.  A few of the

19   police officers testified.  The owner of the repossession

20   company testified.

21       The Government is not anticipating calling all those

22   witnesses.  The Government will be calling two, at most three,

23   witnesses, and because of the newly-discovered evidence in this

24   case, believes it is more than sufficient to show that what the

25   Government is alleging happened happened.

1     With respect to the --

2          THE COURT:  So this is newly-discovered evidence with

3     respect to the 2002 incident?

4          MR. PERRAS:  That's correct, Your Honor.

5     With respect to the traffic stop incident, that was not

6     adjudicated.  The victim in that case filed a civil lawsuit

7     against Defendant Corder.  Defendant Corder and all of the

8     witnesses were deposed in that case.  After depositions, the

9     City settled that civil lawsuit so Defendant Corder wouldn't

10    have to go to trial.

11    So to say that Defendant Corder wasn't on notice that he did

12    anything wrong here, he was sued.  He had to be deposed, and the

13    case was settled before trial.  In my experience in talking to

14    police officers, that's a pretty significant moment in their

15    lives.  I can't speak for Defendant Corder, but to suggest that

16    he had no notice that he did anything wrong, I think, is

17    inaccurate.

18    One last point I wanted to make with respect to the

19    training.  I mentioned before training isn't definitive on the

20    issue of willfulness.  One of the things we believe the defense

21    to be in this case is, "Yeah, maybe I received adequate

22    training, but maybe that happened a long time ago, or maybe I

23    forgot, or maybe I wasn't paying attention in class."  The fact

24    that we have a trainer get up there and testify, "These are the

25    things that I taught Defendant Corder; here are the things that

clearly show he should have known what he was doing," that's not going to be dispositive. There are plenty of common sense, reasonable defenses to that. So that's why just training alone is not going to be sufficient evidence of willfulness in this case.

Did you have any other questions, Your Honor?

THE COURT: No, thank you.

MR. PERRAS: Thank you.

THE COURT: Anything further?

MR. MEIER: If I could make a very brief response.

THE COURT: I'll give you just one minute on one point, if you would. Then we need to move on to the other motions.

MR. MEIER: Again, he talks about, "Well, we can summarize the fact that an act occurred." The problem here is, as the Government has said, it's not so much that the act occurred. What actually happened -- there are some disputes, but what actually happened is not in as much dispute as the intent, and the issue here is intent and not whether the act occurred, although there are some disputes about that.

Secondly, to say that he was on notice --

THE COURT: When you say "intent," you mean intent in the present case, or do you mean in the 2002 case?

MR. MEIER: I mean in the old case. That's the only thing that makes it relevant here, that he is arresting people,

depriving them of their rights against being unlawfully seized.

He does that in response to contempt of cop.  So it's the intent

that's important.

Secondly, just to quickly talk about this notice, in another

life I was a grocery store manager, and suits are settled all

the time for nuisance value.  If you are not reprimanded by your

superiors or if you are not told you did wrong, just because the

City settled a suit for some -- he believes it was a small

amount of money, but I don't really know to be honest.  Suits

are settled every day because it would be more expensive to

litigate.  So I don't think that connotes any kind of notice on

his part nor any admission of any wrongdoing, which he does not

believe he did.

THE COURT:  Is it a matter of admission?  It's just

notice, right?

MR. MEIER:  I think it's notice that, yes, your boss

tells you, "Hey, I'm putting a written reprimand in your file,"

or even less than that, "Come into my office, and, hey, Corder,

don't ever let that happen again; what the hell were you

thinking?"  But none of that occurred.

THE COURT:  Let's talk about Docket Number 22, the

motion in limine to prohibit testimony.

MR. MEIER:  Judge, I think we can be briefer on this,

hopefully.

THE COURT:  We need to be.  We are running out of

1   time.

2           MR. MEIER:  Okay.  Let me just say in terms of the

3   first motion as it relates to collateral estoppel or law of the

4   case, I'm willing to submit that based on the briefs that we

5   have.  I recognize the case law that's cited by the Government

6   in that there are different entities.  I still think as a matter

7   of fairness the holding in *Ashe v. Swenson* is relevant and

8   applicable here.

9       There is a finding in this case.  Granted, it was the

10  prosecutor for the state entity and it was the lawyer for D.B.

11  who entered into a stipulation that there was, in fact, probable

12  cause in this arrest.  And the Court, in dismissing the case,

13  noted that stipulation of probable cause.  It was a state court.

14  I recognize this is a different entity.  But I think the factual

15  situation is similar that the law of the case, or at least

16  collateral estoppel, should really prevent that from even being

17  an issue.  It seems that fact has been decided.  I'm not going

18  to argue that further.

19      More importantly -- not more importantly, but what will take

20  a longer time is the expert --

21          THE COURT:  Let's take them one at a time.

22      Ms. Gregory, you want to address just the issue of the --

23          MS. GREGORY:  We will stand largely on the briefs as

24  well.  Defense counsel has argued that either law of the case or

25  collateral estoppel should apply.  These are both principles

with certain requirements, and the requirements are not met in this case because it is not the same case.  The same parties weren't involved.

And even though the basic factual situation that we are looking at is the same, the parties in the *Commonwealth of Kentucky v. D.B.,* aside from being different parties than the United States and Defendant Corder, they had completely different interests at that time.  The State initially was interested in prosecuting D.B., and then once they decided that the arrest was not a good arrest, they were interested in getting that stipulation of probable cause because that's what they need to have immunity from a civil lawsuit.  That's their standard practice.

D.B., obviously his interest at the time was seeing that case dismissed.  The United States' interest in this case in ensuring that officers acting under color of law don't violate individuals' constitutional rights is completely different, and no one was representing our interest in that case.

For those reasons, neither of these principles apply, and that stipulation between the parties, which wasn't even a finding of the Court, it was just a stipulation between the parties, should not be binding.

THE COURT:  Mr. Meier, do you have anything else to say on that motion?

MR. MEIER:  I do not, Judge.

1          THE COURT:  All right.

2          MR. MEIER:  Does the Court want to discuss the expert

3    witness issue?

4          THE COURT:  Yes.  Go ahead.

5          MR. MEIER:  Judge, I received notice of these expert

6    witnesses that were largely training officers and superiors at

7    the Bullitt County Sheriff's Department, and as noted in the

8    Government's brief, we did have a conversation about that.  I

9    was advised that they were not going to elicit these witnesses

10   as expert witnesses under 702 and 703.  I filed the motion,

11   nonetheless, because I did get the notice.  It appears they are

12   conceding that.

13      I'm not going to beat a dead horse other than to say I think

14   the case law is pretty clear on that.  The cases I cited in our

15   brief, *Estes*, *Plymouth*, *Stuart*, and many others, all seem to say

16   that.

17      So what the Government has then done in response to that is

18   actually, I guess, a pretty clever move, but I think it's pretty

19   thinly-veiled in terms of what the actual purpose is.  It seems

20   to me to be an end run to accomplish the same thing.

21      What they want to do is present the same witnesses as fact

22   witnesses to say, "This is the defendant's training," and then

23   furthermore they want to show these fact witnesses the video of

24   the alleged crime, the arrest here in question, because much of

25   it is on video, and then let them opine on how this relates to

1    the training that they received.

2        What is the training?  Well, there's thousands of pages of

3    discovery literally, I know at least five, 6,000 pages of

4    discovery.  Much of it is the criminal justice training.  What

5    that training is is pretty much -- although I would be lying to

6    say I've read every page of it, but I have looked at it a great

7    deal -- it's pretty much a general law school treatise of

8    various laws -- constitutional laws that the police have to deal

9    with every day.  It's the law of probable cause, the law of

10   arrest, the law of search and seizure, entering a home, *Payton*

11   *v. New York*, and in a lot of cases it would be something like

12   you would get at a seminar for continuing legal education, a

13   10 or 20-page outline of various search and seizure law.

14   There's a paragraph, and all these cases are cited, much like

15   you see in law school, much like you would see at a CLE

16   presentation.

17       So what is their training?  The training is going to be the

18   law.  They are trained in the law.  So they are going to get on

19   the stand and say, "Well, this is the law," because that's the

20   training.  And then they are going to have the person view the

21   tape of the alleged crime and compare -- or relate, in their

22   words, the evidence of the crime in this case with the law,

23   which is his training, and come up with an opinion about how

24   they compare, i.e., did he break the law or not?  Is that

25   consistent with the law as they see it?

1        First of all, that's what the jury's function is going to be

2    in this case, and what the law is is the Court's function.  They

3    are essentially going to -- when they compare the law or his

4    training with what they see in this offense, the facts of this

5    case, they are giving an opinion, did he have probable cause,

6    which is exactly what the Rule 700s try to prevent.

7        If you look at the commentary or the advisory notes,

8    whatever you call it, in the statute to Rule 701, which is the

9    lay witness testimony, it says, "Rule 701 has been amended to

10   eliminate the risk that the reliability requirements set forth

11   in Rule 702 will be evaded through the simple expedient

12   proffering an expert in lay witness clothing," which is, I

13   think, exactly what the case is now.

14       So let me just talk a minute about what that's going to

15   cause.  Thousands of pages of training.  They put somebody on

16   the stand and say, "This is the training that Detective Corder

17   received."  I'm assuming, and it looks like from some of the

18   discovery that I looked at, that some of the witnesses that I

19   talked about actually taught this training, and I assume

20   Detective Corder was at that particular training session.  I

21   assume that would be a given that that would have to occur.

22       But basically, all the training is admissible.  For example,

23   one of the cases I had looked up early on in this case just

24   through my own kind of research was a case called *United States*

25   *v. Santana*.  Arguably, it supports our position in this, like a

lot of cases do.  Each side has cases they believe support their

position.  *Santana* is a case where a drug dealer or person

suspected of drugs retreated to the doorway of their house.  The

long and the short of it is -- it's not important for this

argument -- the long and short of it is that seen as a

public place being in the doorway of their house, and,

therefore, if there was probable cause to arrest, the police in

that particular instance were entitled to arrest without a

warrant, like in *Payton*.

That's not so important right now other than to say what

that does is you put somebody on the stand to testify what

training is, and all these thousands of pages, and it's

basically a treatise of the law.  And so the cross can be,

"Well, you also trained him on this case and this case, right?"

The prosecution says, "Yeah.  Well, what about this case where

probable cause is not established when A, B, and C occurs, and

that's not probable cause?"  And then I say, "Well, look, I see

this case is in your training outline, too, on page 7112, and it

says A, B, and C, that the police officer can do that."

And then what you get down to is basically -- you get down

to a situation that you could find any day in district court in

state court where lawyers and judges are looking at the

identical fact situation and citing cases and arguing whether

probable cause exists.  Instead, we are going to be doing that

with a witness up there, and then citing all these cases to him

1   by way of, "Yes, he was trained about this case, too, right?"

2   And then we stand up to the jury in closing and argue the law,

3   which to me seems extremely confusing and basically is not -- I

4   don't believe is going to be the function of the jury.  So as a

5   practical matter, I think it is a complete quagmire.

6       If you look again at the commentary to 701, it's important

7   to note some of the other things they are talking about.  They

8   are talking about a case here.  It says, "In *Brown,* the court

9   declared that the distinction between lay and expert witness

10  testimony is that lay testimony 'results from a process of

11  reasoning familiar in everyday life,' while expert testimony

12  'results from a process of reasoning which can be mastered only

13  by specialists in the field.'"

14      So I have a problem in just declaring that these individuals

15  are not experts.  702 applies if this is evidence that does not

16  require specialized training.

17      Now, granted, I would not be up here if this was brain

18  surgery or rocket science or whatever.  I wouldn't be here.  But

19  I did go to law school.  To make an opinion on whether this

20  conduct in this particular case is consistent or how it relates

21  to, or however you want to phrase it, with the training is

22  making a legal conclusion, and the last I heard that absolutely

23  takes some training.  That's why you can't practice law without

24  a license, because it does take training.

25      So just to say that these individuals are -- just to label

1     them as nonexperts is a misnomer in my opinion, and at a minimum

2     I think they should be precluded from giving any kind of opinion

3     on Mr. Corder's actions in this particular case, even if they

4     are allowed to testify what his training was.

5            MS. GREGORY:  There are two distinct issues or

6     elements of a 242 offense that we are going to have to prove in

7     this case.  One is the issue of whether D.B.'s constitutional

8     rights were actually violated as a matter of law.  But the other

9     issue, which was highlighted during the 404(b) argument, is

10    whether the violation was willful, whether the defendant was

11    acting with a bad purpose, whether he knew what he was doing was

12    bad.

13       A lot of what the defense counsel is raising really goes to

14    the first issue as to the issue of whether rights were violated,

15    whereas we are introducing these witnesses as fact witnesses to

16    testify as to the facts of what training was provided to the

17    defendant, what they told the defendant during this training,

18    and what defendant should have been aware of.  In other

19    circumstances a lot of these witnesses probably could qualify as

20    experts, but they are not offering expert testimony in this

21    case.

22       Their expertise came before this because that's why they

23    were chosen to do these trainings that were given to all law

24    enforcement in Kentucky.  That's why they were chosen to get the

25    supervisory position at the Bullitt County Sheriff's Department.

1    What they are testifying here is the facts of what was conveyed

2    to the defendant, and this type of evidence is routinely allowed

3    in 242 cases.

4         One of the cases that was cited in our brief, *Rodella*, the

5    trainer was allowed to testify about the specific principles and

6    training that were given at the course the defendant actually

7    attended.  As defense counsel surmised, we are offering

8    testimony from the individuals who actually taught the course

9    that Defendant Corder attended.

10        A good analogy for this type of situation would be a type of

11   fraud case where a defendant was raising an advice of counsel

12   defense.  In that case the defendant would be putting the legal

13   advice that the defendant received from a lawyer at issue.  So

14   that person, that lawyer, might have to come and testify and

15   testify about the advice that they gave to the defendant.

16        Well, in that case they are going to be talking about the

17   language of legal principles and legal conclusions, but what

18   they are testifying about is what the defendant was made aware

19   of, what the facts were.  That is clearly something that would

20   be permissible.

21        In that situation the attorney might also be called upon to

22   look at if it was a tax fraud case like a tax return, or another

23   type of fraud case, some sort of letter or something that was

24   written by the defendant, and testify about whether that

25   conforms with the advice they gave them.  That's a way to tailor

1    the testimony.

2         There are ways to address the concerns that the defendant

3    has about the jury conflating testimony that comes from these

4    trainers with the actual law which can only come from the Court.

5    In *Rodella*, one of the ways they dealt with that was a limiting

6    instruction stating that the trainer testimony could only be

7    used for the issue of willfulness.  It couldn't be used for the

8    issue of whether the right was ultimately violated.  It could

9    only be used to look at the defendant's intent and what the

10   defendant knew.

11        We have also discussed with defense counsel the possibility

12   of having a preliminary jury instruction towards the beginning

13   of the case where some basics in terms of elements or in terms

14   of constitutional principles would be provided by the Court, and

15   the Court could state that this is the primary source -- state,

16   "I am the source for the law.  You might hear other people

17   testify on this, but this is the law of this case."  Both of

18   those options could remedy some of the concerns that the

19   defendant has.

20        Addressing just quickly a couple of the points that defense

21   counsel just raised, we did provide thousands of pages of

22   training because what we received when we were going to these

23   law enforcement agencies was the volume of the training the

24   Defendant Corder received over his career, but we are not going

25   to be offering thousands of pages of training.  We are going to

1    be offering them mostly on the Kentucky Penal Code class that he

2    attended and the constitutional law training he received,

3    specifically related to seizures, arrests, entry to homes, so

4    that everything doesn't get bogged down in terms of going

5    through thousands of pages.  Even the actual courses that he

6    attended, even without the pages, I think they were many weeks.

7    Just the constitutional law course was three days.

8        That's why it is helpful to the jury under 701 to have the

9    trainers use the video -- the body cam video as a point of focus

10    so we can ask them questions like, "Does anything that you see

11    on this video -- is it relevant to training that you took in the

12    course?"  That can narrow the questions or narrow their focus in

13    terms of what was covered in a multi-day course.  From there we

14    can also ask questions about whether it is consistent with what

15    they were taught.

16        Again, this is not a legal conclusion.  It's a factual

17    question based on what was taught in the course and what they

18    see in the video and whether it aligns with what was taught in

19    the course.

20        For those reasons, we believe that the fact testimony of

21    these witnesses and potentially other witnesses who provided

22    training to Defendant Corder are clearly admissible to help

23    prove willfulness and as fact testimony admissible under 701.

24                THE COURT:  Anything further?

25                MR. MEIER:  Just briefly, Judge.  Again, because this

is intent testimony, you are going to have somebody -- let's say it was a murder case and the issue was self-defense and it was on tape.  So you call the witness and say, "What kind of training did the defendant have?"  "Well, he was told that he could not use lethal force other than to defend himself."  So there wouldn't be an issue whether the act occurred in terms of these expert -- actually lay witnesses.  So okay, they testify about what training he got.  His training was only use force, lethal force, when it's applied against you or you are threatened with lethal force.  Pretty reasonable training.

"Now, take a look at the crime here.  We got the actual murder.  Is this -- does this look like self-defense to you?" That's pretty much what you are asking, only you are asking it a little differently.  You are saying, "Okay, so you said that self-defense could only be used when lethal force is threatened against you.  Does this action that we are trying here appear to you to conform with that training?"  How thinly-veiled can you get?  You are asking this supposed fact witness to get on the stand and testify as to the intent, whether self-defense was used.  That's exactly what the case is here.  It's just a different sort of intent.

So whether or not this training can get in, what they can testify about how they trained him, et cetera, et cetera, it's a huge leap to go from there and have these supposed fact witnesses then tell the jury how that relates to the training.

1    That's clearly the jury's function in my opinion.

2              THE COURT:  Anything further, Ms. Gregory?

3              MS. GREGORY:  No, Your Honor.

4              THE COURT:  All right.  I appreciate the opportunity

5    to hear you-all on these issues.  I'm going to take all of it

6    under advisement, and we will certainly get an opinion out on

7    the 404(b) issue, and I'll make a determination as to whether we

8    will give you an early ruling on the motions in limine or

9    whether we may defer a bit further.  But we will address both of

10   them in due course.

11      Anything further?

12             MS. GREGORY:  Nothing from the United States.

13             MR. MEIER:  Nothing, Judge.

14             THE COURT:  Thank you, all.

15      (Proceedings concluded at 11:44 a.m.)

16

17

18                    C E R T I F I C A T E

19      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
     THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20      _s/ Alan W. Wernecke_                November 23, 2016
21   Alan W. Wernecke, RMR, CRR
     Official Court Reporter

22

23

24

25