UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,      )      Case No. 3:15-CR-00141-DJH
                               )
          Plaintiff,           )
                               )
     VS.                       )
                               )
MATTHEW B. CORDER,             )
                               )      July 18, 2016
          Defendant.           )      Louisville, Kentucky

                       * * * * *

              TRANSCRIPT OF VOIR DIRE
                    AT JURY TRIAL
          BEFORE HONORABLE DAVID J. HALE
            UNITED STATES DISTRICT JUDGE

                       * * * * *

APPEARANCES:

For United States:       Amanda E. Gregory
                         U.S. Attorney's Office
                         717 West Broadway
                         Louisville, KY 40202

                         Christopher J. Perras
                         U. S. Department of Justice
                         601 D Street, NW
                         Washington, DC 20004


[Defendant present.]

                    Dena Legg, RDR, CRR, CCR-KY
                     Official Court Reporter
                      232 U.S. Courthouse
                     Louisville, KY 40202
                       (502) 625-3778

Proceedings recorded by mechanical stenography, transcript
produced by computer.

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant:          Donald J. Meier
                              Laura R. Wyrosdick
 3                            Western Kentucky Federal
                                 Community Defender, Inc.
 4                            629 S. 4th Avenue, Suite 200
                              Louisville, KY 40202
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Begin proceedings in open court at 9:56 a.m.  Jury out.)

2         DEPUTY CLERK:  3:15-CR-141, *United States of America*

3    *v. Matthew Corder.*

4         MS. GREGORY:  Amanda Gregory and Chris Perras for the

5    United States.

6         MR. MEIER:  Don Meier for Mr. Corder.  Linda Wyrosdick

7    -- Laura Wyrosdick is going to be sitting in at least for jury

8    selection and possibly for a few days.

9         THE COURT:  All right.  Good morning.  I apologize

10   we're starting a little later than we had intended.  We've had a

11   few technical glitches this morning.

12       Here's what I'd like to do:  I'd like to go through the

13   rulings that I've reached on several of the pretrial issues, and

14   then I have a couple of issues that I want to talk about, and

15   then we'll talk a little bit about some housekeeping items.

16       First, with respect to the 404(b) evidence, I'm going to

17   exclude that evidence from the United States' case-in-chief.

18   Let me explain a bit how I reached that decision.  I have

19   carefully considered the parties' briefs and the argument that

20   we heard some weeks back.  In reaching this conclusion, I think

21   it is a difficult evidentiary issue but one that I think in the

22   end I've concluded must come out in this manner.

23       For evidence of prior bad acts to be admissible under the

24   rules of evidence, and in particular 404(b), a trial court must

25   find that it's reasonably likely that the prior bad acts

occurred, that the evidence is offered for a permissible

purpose, and that the probative value of the prior bad acts is

not substantially outweighed by unfair prejudice.  The Sixth

Circuit has set out those factors in *U.S. v. Carter*.

For the first factor, the standard of proof is actually very

low.  The United States need show only by -- only that it is

reasonably likely that the prior acts occurred.  Given the

information provided to the court, it's easy to conclude that

the United States would put forward in evidence testimony,

potentially documentary evidence that would support and

establish under a reasonably likely standard that these

incidents occurred.

Under the second factor, the prior bad act evidence can't be

presented for the purpose of proving the character of the

defendant and that the defendant acted in conformity with that

character, but there are proper purposes for using 404(b)

evidence.  Those include proving the defendant's intent to

commit the charged offense, motive, opportunity, preparation,

plan, knowledge, identity, or absence of mistake or accident.

You-all know those exceptions as well as I do.

The United States has said in briefing and in argument that

it wishes to use the prior bad act evidence to prove the

defendant's specific intent to deprive D.B. of his

Constitutional rights.  At the same time, the U.S. says this

evidence can prove the defendant's lack of mistake and cites to

*Wigmore* for that proposition, explaining that intent and lack of mistake are often intertwined.

But in this instance, I'm just not convinced that the prior bad act evidence that the U.S. wishes to put on actually helps show the defendant's specific intent in this case.  I'm not convinced that the evidence of either of the prior bad acts would tend to prove intent or lack of mistake.  The incidents would demonstrate improper conduct, but there are significant factual distinctions between the two prior incidents and the one for which Mr. Corder is on trial.

Having said that, even if the United States' proposed evidence could survive the second 404(b) factor, the third factor requires the United States to show under Rule 403 that the prior bad act evidence is not substantially more prejudicial than probative.  Even though I'm not convinced that the -- under the second factor that the evidence can actually help prove Corder's specific intent, it is the third factor here that most troubles me and it's dispositive here.  Under this factor, the evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury.

In part of this analysis the court must consider several other factors to determine whether the 403 standard requires keeping the evidence out.  These factors include the amount of time lapse between the 404(b) evidence and the charged incident

1    and whether the parties seeking to put forth the prior act

2    evidence has other sources of proof.

3       The admission or potential admission of this evidence is

4    troubling to me in several ways.  First, there has been a

5    significant time lapse between the prior incidents and the crime

6    charged.  Those prior incidents occurred 17 and 12 years ago,

7    respectively.

8       I'm also worried about unfair prejudice, frankly.  Even if

9    the evidence of these prior acts was probative of lack of

10   mistake, the prior acts evidence is so extremely prejudicial

11   that I conclude that it must be excluded.

12      And then third, I'm concerned that hearing these prior

13   incidents will confuse the jury.  The evidence would, in effect,

14   require two mini trials within this trial, and I believe that

15   this evidence will confuse the issues and potentially mislead

16   the jury.

17      And then I have also concluded from the information

18   submitted by the United States that the U.S. does have other

19   ways to prove Corder's specific intent.  The anticipated

20   evidence regarding his training, the anticipated evidence from

21   the victim, D.B., and the proof that would come from the

22   allegedly false report are just some of the examples of the

23   anticipated evidence that the United States has remaining to

24   prove Corder's specific intent.

25      So given all of this, I've concluded that we will exclude

1    the 404(b) evidence from the United States' case-in-chief.

2        Any questions about that?

3              MR. PERRAS:  None from the Government, Your Honor.

4              MR. MEIER:  Nothing, Judge.

5              THE COURT:  All right.  Now, I think that does away

6    with the issue of Mr. Corder's state court acquittal following

7    the 2002 incident.  Is that correct?

8              MR. PERRAS:  That's correct, Your Honor.

9              THE COURT:  So let's turn now to D.B.'s juvenile

10   conviction.  Is that --

11             MR. MEIER:  Judge, we would withdraw our request.  In

12   light of your ruling, I think to be consistent, we'll withdraw

13   our request.

14             THE COURT:  You withdraw the request.  Well, I was

15   going to deny it.  I think his prior conviction under 609(d) is

16   essentially off limits.  So with your withdrawal, we will

17   resolve that issue.

18       We need to talk about this state court dismissal order.

19   That was Bullitt District Court; is that correct?

20             MS. GREGORY:  Yes, Your Honor.

21             MR. MEIER:  It was.

22             THE COURT:  The United States wants to enter a

23   redacted version of that order.  Am I correct?

24             MR. PERRAS:  Yes, Your Honor.  May I say something,

25   Your Honor?

1          THE COURT:  Please.

2          MR. PERRAS:  Simply, so defense counsel had moved to

3    keep out evidence of expert and fact witnesses from the

4    Government from testifying about whether there was probable

5    cause in this case in their opinion.  And the Government told

6    defense we wouldn't even be asking that because that's a

7    question for the jury.

8        The Government's concern in this case is if this agreed

9    order comes in in unredacted form, it's essentially doing the

10   same thing.  It's telling the jury, "Hey, there was probable

11   cause.  You don't need to consider that."  And because that is

12   one of the key issues before the jury, the Government -- the

13   Government's point is that would be incredibly prejudicial to

14   leave that in.  So that's sort of the reasoning.

15         THE COURT:  Well, you want to jump in now, Mr. Meier,

16   or would you rather --

17         MR. MEIER:  It depends on when -- if you wanted us --

18   I definitely would like to argue the point, yes.

19         THE COURT:  Well, I've reached a conclusion as to your

20   contention that the stipulated probable cause order works as

21   some sort of judicial estoppel or law of the case.  And so

22   perhaps it would better inform the discussion as to the

23   potential exhibit if we talk about that first.  Does that make

24   sense?  I mean, you're welcome to respond to Mr. Perras -- by

25   the way, am I saying your name correctly?  Perras?

1          MR. PERRAS:  That's correct, Your Honor.

2          THE COURT:  -- to Mr. Perras's point.

3          MR. MEIER:  Judge, yeah, that's fine.  I would address

4   the initial -- the initial motion to -- basically, a res

5   judicata type motion.  In looking -- you know, quite frankly, in

6   looking at the issue in more detail since I filed the motion, I

7   still think that's the fair thing to do.  Case law doesn't look

8   all that promising on my side, to be quite candid with the

9   court.

10     I anticipated, quite frankly, that that motion would not be

11  successful on the basis of the law we've seen.  Having said that

12  though, we're still at -- you know, we still have another motion

13  out there in terms of their experts looking at this case, and

14  according to their own motions, looking at the video, comparing

15  training that Officer Corder got and comparing what they see on

16  this video and then making a determination or an opinion.  And,

17  of course, there's argument whether this is an expert opinion or

18  whether it's a lay opinion under 701, 702, 703.  And then the --

19  and then telling that to the jury.

20     Well, clearly in my opinion, if you've gone to law school

21  for three years, while I'm not a brain surgeon, I think I have

22  at least some level of expertise in law.  So I think people that

23  are taking the stand are actually giving expert opinions for the

24  reasons I stated in my brief.

25     That having been said, you know, if people are going to be

1   taking the stand saying he's had this kind of training and this

2   is what the law is on this area, there are two people at least

3   who absolutely have training in this area and absolutely had

4   motivation to look at this case, and it was their job to look at

5   this case.  They had training to look at this case, and they

6   concluded by agreement that this was to be dismissed, you know,

7   without prejudice and that they would stipulate probable cause.

8   So both parties has said there is probable cause.

9       And more importantly, that's part of the order.  So the

10  Government is concerned that, gosh, the jury will be misled into

11  thinking there has to be probable cause.  This would be

12  incredibly prejudicial to us, and I agree, it would be

13  incredibly prejudicial to the Government.  It should be

14  incredibly prejudicial to the Government.  That doesn't mean

15  it's unfairly prejudicial to the Government.

16      The fact of the matter is, just like the witnesses they

17  propose to put on the stand to give an opinion about this tape,

18  the people whose job it was to make an opinion on the tape made

19  an opinion and the court noted that, and that -- and more

20  importantly, that went into the decision to dismiss.

21      So if you talk about misleading someone by an opinion, what

22  misleads them is give them half the order, instead of the full

23  order, because I venture to say, based on experience, that the

24  Government would not have dismissed that case without a

25  stipulation of probable cause.

1    So that -- so if you just erase half of the order, what

2   you're saying is -- you're having the jury believe then that in

3   fact this was dismissed because there wasn't any probable cause.

4   It couldn't even go forward and that's not the case at all.

5   There may have been a concern that, hey, we might not be able to

6   prove this beyond a reasonable doubt, but that's not the

7   probable cause standard.

8    So it goes to the weight of the evidence that the jury's

9   going to hear.  They can be given -- there's all kinds of things

10  the court can do.  The court can instruct the jury that the fact

11  that the state court has no authority to tell -- you know, in

12  this case or that does not mean you have to find probable cause.

13  You are to consider that evidence the same as the other evidence

14  in this case.

15    So there are all kinds of things that the court can do.

16  And, in fact, the true order, what the actual order was is by

17  far the best evidence and in this case it is the fairest

18  evidence and it is not misleading.  And I believe very strongly

19  that it should be put into evidence.

20        THE COURT:  Let me tell you where I've come out on the

21  slightly more discrete issue of -- raised by Mr. Meier as to

22  whether this order works in some form or fashion either through

23  judicial estoppel law of the case to bind this court, and I've

24  concluded that it does not.

25    Now, Mr. Meier, you've said you -- and I appreciate the

candor.  You've said you've recognized that the case law is not in your favor on this issue and you're right.  And so just as an initial matter, I would just note for the record that the Supreme Court has ruled that nonmutual collateral estoppel cannot be applied to the United States in the same way that it's applied against private litigants.

And even if it could, here it does not appear that this case would meet the five factors necessary for collateral estoppel under Kentucky law, looking at the *Miller v. AOC* case, which lists the five factors necessary to collaterally estop a case.

It appears that the -- to lack -- here lack factors one, three, and five.  One, requiring at least one party to be bound in the second case to have been a party in the first case; the third factor, which requires the issues to actually be litigated; and the fifth factor requiring that the decision on the issue in the prior action be necessary to the court's judgment and adverse to the party to be bound.

And here neither of the parties in the state case are parties here.  The issues in the state case were not litigated.  The case was dismissed after settlement negotiations.  There were -- there was no pretense of fact finding, and it was not necessary for the state court to determine that probable cause had existed in order to dismiss the charges against D.B.  Even if that was the policy, even if -- even if it's reasonable to argue that they might not have, it's -- I think in this case,

1    looking at these discrete facts, D.B. having sat in jail, having

2    been denied release, having sat in jail for two weeks, I think

3    it is equally reasonable to argue at least or plausible to

4    conclude that they may very well have dismissed without a

5    stipulation of probable cause, but that's neither here nor

6    there.

7         I think the law of the case argument also fails because that

8    doctrine dictates that a decision at one stage of a case should

9    be given effect in successive stages of the same litigation, and

10   this is not the same litigation as the state court proceeding.

11        And as I mentioned, the order indicating a finding of

12   probable cause was stipulated to and did not follow from any

13   fact-finding.  And so I've concluded that the stipulated

14   probable cause in the Bullitt District Court does not bind this

15   court or the jury that will be seated here to determine whether

16   the United States has proved its case beyond a reasonable doubt

17   as to the defendant's actions.  So I'm going to let the United

18   States put forth evidence, obviously, about whether Corder had

19   probable cause to arrest D.B.

20        Now, there are some issues here that we're going to have to

21   talk about with respect to Rule 701, 702 and the training

22   evidence and the -- how far that evidence will go, which

23   Mr. Meier has just previewed.  And we need to talk about this

24   dismissal order.  Do both sides intend to offer some version of

25   that dismissal order in evidence?  I guess the reason I ask that

```
 1    is because I'd like to know whether it's necessary that that
 2    order go in at all.
 3              MS. GREGORY:  Well, yes, Your Honor.  The ultimate
 4    dismissal of the case is actually one of the elements for our
 5    second count.  For malicious prosecution, we have to show that
 6    the case was resolved in the defendant's favor.  So we do intend
 7    to introduce both the docket and the dismissal order, though --
 8    I mean, we could just introduce that by testimony, but it's
 9    currently our intent to do that via the order.
10              THE COURT:  Right, right.  I understand that you'd
11    like to get it in, but it's not -- it wouldn't be the only
12    evidence you could proffer as to the dismissal of the case
13    against D.B.
14              MR. MEIER:  Judge, obviously, it was our anticipation
15    that the Government would, given their exhibit list, attempt to
16    put the order in.  And then, of course, the issue is whether the
17    other sentence is redacted.  Obviously, if they did not put it
18    in, we would.
19         So, yes, we definitely want the -- want it in because,
20    again, I respect and understand the court's order on the issue
21    of is there collateral estoppel, does that order prevent -- you
22    know, is that dispositive of this issue.  But then there's a
23    separate issue that, you know, if people are going to be talking
24    about probable cause and what probable cause is, I certainly
25    believe there is some weight to that evidence.  It may not be
```

1    dispositive.  So we're definitely asking to have that come in

2    and be considered, along with all the other evidence that the

3    Government is going to bring in that people's opinion that, you

4    know, the arrest lacked probable cause.

5                MR. PERRAS:  Your Honor, for the record, the

6    Government is -- has no intent, as we've informed the defense

7    counsel, of eliciting testimony from witnesses on whether there

8    was or whether there was not probable cause.  We included that

9    in our response to defense counsel's motion on that point.  So

10   we simply ask for sort of a ruling that is the same for both

11   sides.  Neither side gets to put on evidence that there was or

12   wasn't probable cause, other than the actual fact testimony.  No

13   side gets to tell the jury there was no probable cause in this

14   case.

15                THE COURT:  Well, Mr. Meier, frankly, that's where I'm

16   leaning.  Having concluded that the probable cause

17   determination, such as it is, from Bullitt District Court is not

18   applicable here -- it does not bind this court.  It does not

19   bind this jury -- I don't see how we could have evidence of --

20   in the form of an expert, as you point out, in training opining

21   on probable cause.  And I'm concerned about putting into the

22   record a conclusory document like that for the jury to be --

23   now, I also think it wouldn't be that hard to fashion, it seems

24   to me, an instruction to inform the jury that that probable

25   cause finding is not binding on them or this court.  Right?  We

1    could do that, could we not?

2          MR. PERRAS:  The court could do that, Your Honor, but

3    just as the court could fashion an instruction after an expert

4    witness has testified that in their opinion that probable

5    cause -- there was no probable cause, the court could say

6    something after they said that to instruct the jury you don't

7    have to hold that opinion, but I think it would have the same

8    effect.  They're being -- they're looking at an official court

9    document that purports to be between -- an agreement between the

10   Commonwealth of Kentucky and Deric Baize.  Deric Baize was never

11   informed about this stipulation of probable cause.  And I think

12   the effect would have it, well, he agreed to it then so he can't

13   go back on it now.  That's why it's so prejudicial in this case.

14         MR. MEIER:  Judge, we've argued this and I don't want

15   to beat a dead horse.  The Government can characterize it

16   however they want, however they want to characterize it.  What

17   they want to do is have people get up and give an opinion on

18   probable cause.  They could have somebody get up and tell you,

19   this is the law and the -- and I've looked at the video and this

20   doesn't comport with the law.  They're saying, "Oh, no, we're

21   not doing that.  That would be an expert opinion."

22       So instead they're going to say, "This is the training."

23   Now, what's the training?  I've seen the training.  It's a

24   treatise on the law.  This is the training and I've looked at

25   the video, and this doesn't comply with the training.  That is

1    the same thing.  I mean, that's not even camouflaged.

2       So, you know, it can be characterized however you want.

3    They're putting someone up, in their request, to basically tell

4    the court what the law is, which is the training -- he was

5    trained on the law -- and whether I've looked at this -- this

6    arrest, and it doesn't comport with this training.  It doesn't

7    comport with the law.

8            THE COURT:  You're not suggesting they can't put

9    evidence of his training on?

10           MR. MEIER:  Well, I mean, if they -- well, I mean --

11           THE COURT:  I mean, does your objection go that far?

12           MR. MEIER:  -- trained but what I'm saying is --

13           THE COURT:  Hold on.  Does your objection go that far

14   as to argue that they should not be able to put evidence on of

15   his training?

16           MR. MEIER:  I think they can put what his training was

17   without commenting on --

18           THE COURT:  All right.

19           MR. MEIER:  -- on whether this comports with his

20   training.  But, you know, when you do that -- well, all -- what

21   we're saying here is, basically, Deric Baize's attorney and the

22   attorney for the Government, who had competing interests in this

23   case, agreed that probable cause existed.  And I understand that

24   doesn't -- that's not dispositive, but I think it should be

25   looked at.

1    These are real world people.  These aren't people that have

2    been brought in specifically to testify in this case.  These are

3    people who are working on this case and had reason to do that.

4    And certainly, you know, when I make a statement, oh, they

5    probably wouldn't have -- it certainly -- it's part and parcel

6    to the whole order.  It's part and parcel to the agreement.  And

7    so it absolutely makes the -- when you just take it in half, it

8    basically takes the court order out of context.  And the

9    Government is worried that, gee, if you get the whole court

10   order, the jury is worried that we have to follow that.  And

11   what I'm saying is with half the court order, it makes the

12   dismissal look like something that it is not, an agreement that

13   there wasn't probable cause or that it was a bad arrest.  So

14   that's all I'm saying.

15         MS. GREGORY:  Just one more issue touching upon the

16   competing interest that Mr. Meier is talking about.  The reason

17   this case was dismissed is that Mr. Corder's supervisors at the

18   Bullitt County Sheriff's Department looked at the video, looked

19   at the citation and determined themselves that there was no

20   probable cause.  So people at the Bullitt County Sheriff's

21   Office then requested that the county attorney dismiss the

22   charges.

23   So to the extent that the stipulation for probable cause

24   comes in, I think that opens up the door to testimony about why

25   the charges were dismissed on their behalf, like what their

1    thoughts were, whether the Bullitt County Sheriff's Office

2    actually thought that there was probable cause.

3        And as is highlighted in just a footnote and as Mr. Perras

4    said, Mr. Baize was unaware of this stipulation.  His attorney

5    did not consult him.  He actually did not know this case was

6    dismissed until January when the pretrial conference was set.

7    He had showed up to court that today, because no one had told

8    him it was dismissed, and had to sit through proceedings and

9    then was told his case was dismissed.  So he was never consulted

10   about the stipulation of probable cause.

11       And the language in the order is misleading because it does

12   say the defendant, meaning Mr. Baize, stipulates to probable

13   cause when he did not.

14         THE COURT:  There's nothing in the record to indicate

15   that the court questioned the defendant as to stipulating

16   probable cause?

17         MS. GREGORY:  No.  He wasn't present at that hearing.

18         THE COURT:  All right.  Well, I'm going to take a

19   little bit of the time we've got left -- it's 10:25.  We've got

20   the jury pool coming in at noon.  I'm going to think a little

21   bit more about this.

22       I'm concerned about a couple of things.  One, I'm concerned

23   about the inconsistency between my finding that the probable

24   cause order is not binding on this court or this -- the jury

25   that will sit here.  So I'm concerned that having that

1   information before the jury is inconsistent and potentially

2   misleading.

3      I'm also concerned, frankly, though perhaps not to the

4   degree with the -- with my former concern, but I am concerned

5   about submitting to the jury a document that's redacted, is not

6   labeled as redacted, contains a stamp which says this is an

7   accurate and true copy of a court record when, in fact, it

8   contains a sentence that's been removed.  So perhaps that

9   concern is misplaced, but I am a bit concerned about that.  And

10  so I want to sort through those competing concerns a bit before

11  I advise you what my ultimate ruling would be.

12          MS. GREGORY:  Your Honor, if I may just comment on

13  that second concern.  I believe that the document that we had

14  attached to the motion related to the order did not make it

15  clear that a portion had been redacted, but the exhibit that we

16  intend to introduce and the one that is in the exhibit binders

17  that we will give to the court and the clerk, it does have a box

18  that makes it clear that something has been redacted.

19          THE COURT:  Let me see that.  You-all have seen that

20  proposed exhibit?

21          MR. MEIER:  Yes, Judge.

22          THE COURT:  Thank you.

23          MR. MEIER:  Judge, my problem -- that was actually on

24  my list of things to discuss, depending on your ruling.  My

25  problem with that is that's even worse.  I mean, here you have

an order that this be dismissed without prejudice.  The first
thing I would think of when I saw something like that is he's --
the judge -- she is explaining why it was dismissed.  That's
not -- obviously, you don't know that.  But, I mean, that is
certainly -- I mean, I think that just -- that leads to all
kinds of speculation and -- I mean, I think if I looked at a
document without knowing it, that's kind of what I'd think.
It's hereby ordered, you know, this matter is dismissed without
prejudice and then give a -- some kind of short explanation why
this case was no good.  You know, again, I don't know that, but
I think that's even -- that's even misleading.

          THE COURT:  Well, I don't agree with that.  I don't
conclude that it's as misleading.  I think -- I think what we
have here are we have concerns about being transparent to the
jury but not confuse them, particularly in light of the fact
that I've concluded that this probable cause finding in the
order doesn't bind this court.

     And so to reach that conclusion and then to turn around and
let -- and let that information be argued to the jury that there
is somehow some value to them in deciding this case because that
court signed off on an order -- and that's not necessarily an
extraneous issue.  So then that begs the question of, you know,
are we then going to be parading the lawyers in front of the
jury to explain if -- even if they can remember whether this was
a considered decision or a ministerial act, and I just don't see

1    that as helpful to the jury.

2        I think it could very well be misleading.  So it seems to me

3    that we either offer the order for what it is, which is evidence

4    that the case against D.B. was dismissed, which nobody argues is

5    a fact in dispute, or the parties could reach some sort of

6    stipulation to be read to the jury about the dismissal of the

7    case against D.B. in Bullitt District Court, or we go along with

8    a redacted order like that.

9        So I think Hunter passed out to you -- or have you had a

10   chance to do that?  We have -- let me ask you to take a look at

11   a draft case description to be read to the jury pool.

12       Okay.  We have two paragraphs here.  What would you like to

13   talk about?

14           MR. PERRAS:  A few things, Your Honor.  We used

15   Mr. Baize's initials, D.B., in the filings, because those are

16   public filings.  We do intend to use his full name at trial.

17           THE COURT:  That's fine.

18           MR. PERRAS:  We would be okay with "a man named Deric

19   Baize" and then "Deric Baize" inserted for the other.

20           THE COURT:  And you spell that B-A-Y-S?

21           MR. PERRAS:  It's D-E-R-I-C B-A-I-Z-E.

22           THE COURT:  B-E -- I'm sorry -- B-A-I-Z-E?

23           MR. PERRAS:  That's correct, Your Honor.  There's a

24   few other things.  It says "came home from work."  He had gone

25   to work that day, but he had come from another event so I would

1    propose "came home one night."

2        With respect to the second sentence that reads "D.B. went up

3    to the patrol car and began a conversation with the officer

4    sitting inside of it," I think the evidence will show that

5    Mr. Baize was standing on his front porch while the officer was

6    standing in the road and they had a conversation.  So I would

7    propose, "Deric Baize, who was standing on his front porch,

8    began a conversation with the officer."

9             THE COURT:  Okay.

10            MR. PERRAS:  Right.  So in addition to the bodily

11   injury, Count 1 alleges that Defendant Corder used a dangerous

12   weapon.  And so we would ask, if the bodily injury part is

13   included, that it would also include that -- the allegation that

14   the Defendant Corder used a dangerous weapon.

15            THE COURT:  Okay.  How do you want that to read?

16            MR. PERRAS:  The factors are what trigger the --

17            THE COURT:  Keep in mind, this is just the

18   preliminary -- this is just the preliminary description of the

19   case to the jury so -- I mean, we can read the indictment, which

20   is kind of the standard issue process, but I think that a more

21   conversational description, if both parties can agree, is better

22   than reading the indictment.

23            MR. PERRAS:  Sure.  In that case, we would just take

24   out the "caused bodily injury to D.B."  That way it's just clear

25   that he impermissibly entered the home and he arrested D.B.

1    without cause, because those are the two main constitutional

2    violations alleged.  Other than that, that looks good to us.

3              THE COURT:  Mr. Meier.

4              MR. MEIER:  Judge, in looking at it and showing it to

5    Mr. Corder, I don't have any problem with the second paragraph.

6    I don't know that the court needs to go in -- we have some

7    disagreements with just, I think, minor characterizations here

8    that I really don't think we need to be going into at this time.

9    So our request would be that you just read the second and third

10   paragraphs, just -- I don't know that you need the description.

11   And I know like the Government has some minor disagreements.  We

12   do as well.  I would ask that you just start with "The United

13   States alleges the defendant impermissibly used his authority,"

14   finish that paragraph, say that he denies he committed these

15   wrongs and that's what we would ask.  We would ask that you just

16   delete paragraph one.

17             THE COURT:  In its entirety?

18             MR. MEIER:  Yes.

19             THE COURT:  You're not denying that it occurred in

20   October of 2014?

21             MR. MEIER:  Well, no.  Okay.  Well, that's true.  I

22   think something much more general, if you're going to do that,

23   October 13th -- or October 2014, Deric Baize -- Officer Corder

24   arrested Deric Baize for disorderly conduct in front of his

25   trailer and then move on to the second sentence or second

 1   paragraph.

 2          THE COURT:  Okay.

 3          MR. PERRAS:  Your Honor, the Government would be okay

 4   with just doing the second and third paragraphs but would oppose

 5   just that Defendant Corder arrested him for disorderly conduct

 6   and then these other things happened.  I think it's fine as is,

 7   the first paragraph with the recommendations that the Government

 8   has made, but if the defense objects to that, I'm fine with just

 9   using the second and third paragraphs.

10          THE COURT:  All right.  I'm just going to say that the

11   United States alleges that in October 2014, the defendant,

12   Matthew Corder, impermissibly used his authority as a sheriff's

13   deputy to enter Deric Baize's home and to arrest Deric Baize

14   without probable cause to believe that he committed a crime.

15   And then you can see -- I'll leave the rest of it the same.

16      All right.  Have you-all had any discussion -- do you have

17   anything to bring to the court regarding the preliminary

18   instructions that each side submitted?

19          MR. PERRAS:  I have comments on the defense's

20   instructions submitted.

21          THE COURT:  All right.

22          MR. PERRAS:  If Your Honor would like to listen to

23   those.

24      With respect -- tell me when you're ready.

25          THE COURT:  Go ahead.

1          MR. PERRAS:  With respect to the first instruction,

2     presumption of innocence, burden of proof, reasonable doubt,

3     that instruction is from the Sixth Circuit pattern instruction

4     except for a sentence that was added in to the fourth paragraph.

5     The Government would not oppose giving that instruction as it's

6     written in the pattern jury instructions, but it would oppose to

7     adding things on to that.

8          The sentence that's added on is the last sentence of

9     paragraph four.  "The jury views the evidence in the case as

10    reasonably permitting either of two conclusions, one of

11    innocence, the other of guilt.  The jury should, of course,

12    adopt the conclusion of innocence."  The Government would

13    propose going with the standard Sixth Circuit jury instruction.

14         The second instruction, credibility of witness, that's the

15    second pattern instruction.  The Government does not have an

16    objection to that.

17         The third instruction, deprivation of rights under color of

18    law, the Government believes there's a few mistakes in there.

19    For one, referring to things as a legal seizure, the actual term

20    in the Constitution is "unreasonable seizure."

21         The second sentence, "It is against federal law for a law

22    enforcement officer to violate someone else's rights while

23    carrying out his official duties."  That's incorrect.  That's

24    leaving out the willfulness element.

25         Where it's -- where it reads, first, that Mr. Corder seized

1    D.B. without probable cause to do so and illegally entered

2    D.B.'s home, it's incorrect -- the Government does not need to

3    prove both of those violations.  The Government just needs to

4    prove one or the other so that would be an "or."  The Government

5    believes that its recitation of the deprivation of rights factor

6    is more accurate in the Government's proposed instructions.

7        With respect to the next one, deprivation of rights under

8    color of law, again, I'm assuming this refers to Count 2.

9    That's unclear to me.

10        With respect to the third instruction on deprivation of

11    rights under color of law, the first element, that Mr. Corder

12    charged D.B. with the offense of disorderly conduct, second

13    degree, and fleeing and evading police without probable cause to

14    believe D.B. committed those crimes.  In the second part of

15    that, "and knowingly included false and misleading information

16    in the charging document."  That's an allegation but that's not

17    required proof for a malicious prosecution charge.  So that

18    would be adding an additional element that is not there.

19        With respect to the defense's definition of willfully, the

20    next instruction, while some of that is technically correct, the

21    word willfully has a different meaning according to context as

22    that meaning is explained in case law on that topic.  The

23    Government's instruction on that lays out the specifics of that.

24        With respect to the next instruction, opinion testimony, the

25    experts testifying to both fact and opinion, we would just ask

1    that the court wait until hearing what the evidence is.  If

2    there is no opinion testimony given, we would request that those

3    instructions not be given.

4        With respect to the next one, number of witnesses, the last

5    sentence has a typo.  It should read, "what is more important is

6    how believable," not "now believable."  The Government doesn't

7    object to that particular instruction though given that it is a

8    pattern instruction.

9        Defendant's failure to testify, Government does not object

10   to that.

11       Other acts of defendant, that is no longer relevant given

12   the court's ruling.

13            THE COURT:  All right.  Mr. Meier, you want to

14   address -- and at this stage, we can just address the

15   preliminary instructions.  We don't need to go through --

16            MR. MEIER:  Right.  Judge, I don't know what authority

17   the Government's relying on for this pretrial instruction, but

18   quite frankly, to the defense it looks more like an opening

19   statement than a pretrial instruction.

20       Instructions are what the jury has after they've received

21   the evidence so that they understand how it is they are to

22   process the evidence they receive from the stand, process that

23   evidence and fit it into the decisions that they have to make.

24   An instruction prior to any evidence we completely object to.  I

25   object to the entire instruction and object to giving that

1    instruction.

2            MR. PERRAS:  Your Honor, may I respond?

3            THE COURT:  Yeah.  I would like to know why we need to

4    get into the Kentucky state elements in a preliminary

5    instruction particularly.

6            MR. PERRAS:  So defense counsel has said sort of as a

7    pattern throughout the pretrial litigation in this case that the

8    jury should be receiving the law from Your Honor, not from the

9    Government's witnesses.  So the Government attempted to put

10   together a statement of the law that the jury would be able to

11   understand and while they see the evidence so they get the law

12   from Your Honor and not from our witnesses.

13      A lot of the -- this isn't a case like a bank robbery where

14   everybody knows what a bank robbery is and they can understand

15   what that is.  This is a case involving a lot of nuance things,

16   whether there's probable cause to arrest somebody for a

17   particular criminal offense.  And so if the jury is to watch all

18   of the evidence in this case, watch the video, listen to

19   testimony of the witnesses and they don't know what the actual

20   elements of the crime are that the court is going to instruct

21   them on later, it would be confusing.  Whereas, if the court

22   simply gives the instructions that the court would be giving

23   later on in the case, it would be a lot clearer for the jury to

24   understand the evidence.

25      And so the Government -- typically in a 242 case, in an

excessive force context, we don't give a preliminary instruction

because it's common sense.  People know what excessive force is.

It's too much force.  We have had a case like this one where it

was a false arrest/false condemnation case.  In that case, our

section proposed a similar preliminary instruction outlining the

law for the jurors, so when they see the evidence, they have

some sort of baseline or understanding of what the fact -- what

the law is that they can apply to this evidence.

And, Your Honor, to the extent that defense counsel is

concerned about the jury confusing Mr. Corder's training,

evidence of his training from what the actual law is, if the

court gives the law first, there will be no confusion.

THE COURT:  Do you have anything further, Mr. Meier?

MR. MEIER:  Judge, nothing further.  I mean, the court

can take judicial notice.  There's any number of ways that the

proof can come in.  What the statute is, I fully anticipate

there's going to be testimony, if not judicial notice, of

what -- what a statute says.  I don't see any problem in getting

that information in front of the jury during the trial.

Disorderly conduct is 525.060.  It's -- you know, it's there in

black and white and nobody's going to dispute what the statute

says.

You know, but when you start getting into how the case law

has -- you know, anything -- once you get past the statute --

and there may well be testimony about, you know, you can't be

1    arrested for disorderly conduct for conduct that annoys only the

2    police.  Well, that is in fact -- you know, there is case law on

3    that and there's no question the case law says that, but you're

4    going down a dangerous road when the court is now going to start

5    not only telling the jury what the law is but also making some

6    kind of summary about how the case law has construed that.

7    That's going to come out during trial.  The statutes involved,

8    I'm sure, are going to come out during the trial.  The court

9    can --

10             THE COURT:  You think the case law is going to come

11   out during trial?

12             MR. MEIER:  I don't know -- or I think -- well, that

13   depends on your ruling from -- I mean, if these people talk

14   about training, the discovery that I received is actually pretty

15   good, something that will probably go into my file.  It's got a

16   lot -- it, basically, consists of summaries of constitutional

17   cases regarding search and seizure, regarding knock and

18   announce, regarding any number of subjects.

19             THE COURT:  So do I understand you then that your

20   issue with the proposed preliminary instruction is not so much

21   the instruction on the language of the statute but on the

22   commentary, the proposed commentary that would go along with it?

23             MR. MEIER:  That's part of it.  And, again, I don't

24   think it -- I don't -- I object to the vehicle.  I don't know

25   that it should be a preliminary instruction.  It's going to

 1    be -- I mean, it's evidence that can come in at trial, all this
 2    evidence.  It's --
 3         THE COURT:  Evidence of what?  Of what the law is in
 4    Kentucky?
 5         MR. MEIER:  Yeah.  Why won't that come in -- that's
 6    what we're talking about in this case.  We're talking about in
 7    this case --
 8         THE COURT:  Well, now I am a little confused about
 9    your position, because I thought you wanted me to instruct the
10    jury on what the law is.
11         MR. MEIER:  I mean, the disorderly conduct -- well, I
12    want you to instruct the jury in the instructions, in the
13    instructions for what this federal case is, but the factual
14    basis of this case is -- and that's why I agree, it's totally
15    confusing -- but the factual basis of this case is, did Deputy
16    Corder have probable cause under the Kentucky statute to make an
17    arrest?  And there's going to -- there's going -- for the jury
18    to make that factual determination, they have to know what the
19    law is, and I can't imagine that not coming out in the proof.
20    This is disorderly conduct.  You know, so I mean --
21         THE COURT:  I'm still having trouble connecting your
22    dots on how there is harm to the court instructing the jury as
23    to what a Kentucky statute at issue here says.
24         MR. MEIER:  Well, any -- at this point --
25         THE COURT:  I mean, no one's arguing, are they, the

```
1    contents of that particular statute that was in effect in 2014?
2            MR. MEIER:  No.  I'm assuming we're not arguing over
3    that.  It's pretty -- it's in the book.  Nobody's going to argue
4    that, but I -- what I'm saying is --
5            THE COURT:  No one's arguing relevance.  So I'm
6    just -- I'm not sure -- I mean, maybe in a preliminary
7    instruction at the start of the case that's not the best place
8    for it.  Maybe it should come at another place during the course
9    of the trial, but I don't really see -- I don't really see any
10   harm.  I see no prejudice to the defendant or any harm to the
11   process, no potential confusion for the court to simply instruct
12   the jury as to what the requirements of the statute under which
13   Mr. Baize was arrested might be.
14           MR. MEIER:  I'm sorry.
15           THE COURT:  Go ahead.
16           MR. MEIER:  A person -- I'm looking down here, "Police
17   officer" -- this is on page three of their motion.  I don't
18   know.  I guess it's probably page two of the instruction.
19   "Police officer may not enter a person's home to arrest the
20   person unless one of three things are true:  The officer gets an
21   arrest warrant authorized by the judge; a person gives the
22   officer consent to enter his or her home; or, three, there is an
23   emergency situation."  That is conclusions of the law.  There's
24   no law that says that.  That's their position.  We have case law
25   that refutes that, quite frankly.
```

1        And so, you know, I think giving a jury in a vacuum, before

2    they've heard any evidence, an instruction, you know, is -- you

3    know, if you're going to -- we could argue at the end of the

4    case after all the proof is in what additional instructions the

5    jury may or may not need, but I don't think the appropriate time

6    to do it is at the beginning of the trial when they haven't had

7    any -- heard any evidence at all.  And this is basically -- it's

8    basically evidence.

9            THE COURT:  Well --

10           MR. MEIER:  I mean, I don't have any problem with the

11   court --

12           THE COURT:  I'm not going to quibble with your

13   objection.  I have no issue with that, but it's -- an

14   instruction from the court on a Kentucky state statute is not

15   evidence.  It is instruction from the court.

16           MR. MEIER:  And limited to just that, the court

17   telling the defendant has to have -- the defendant -- the

18   statutes involved here are disorderly conduct, attempting to

19   elude -- and I don't know, there's a resisting arrest charge

20   that doesn't -- I don't think that bears a -- I don't think

21   they're saying there was no probable cause for that.  If the

22   court wants to tell the jury what the elements of those offenses

23   are, I have no problem with that or just read the -- you know,

24   read to the jury, I'm willing to stipulate that.  I'm willing to

25   have the court take judicial notice.  And I'm fine with the

1   court doing it in the form of a preliminary instruction,

2   although I don't really think that's the appropriate or best

3   way.

4      It's this other -- my main objection mainly goes to the

5   instruction of the law that's been -- you know, that's been

6   added to the --

7           THE COURT:  I understand that and I asked you earlier,

8   notwithstanding the editorials, what was the issue with

9   informing the jury of the state statute at issue?

10          MR. MEIER:  Okay.  I apologize, Judge.  I have -- I

11  have no problem with the court giving -- reading or entering in

12  some manner the statutes that are involved.  Just a verbatim

13  reading of the statute is -- I have no objection to that.

14          MR. PERRAS:  Your Honor, if I may just respond.  With

15  respect to the editorializing or the other stuff added, that's

16  just how jury instructions are.  If you look at any jury

17  instruction, it's not just the elements.  It's the explanation

18  from the courts on how those things are applied so that the jury

19  can understand them.

20          THE COURT:  But you wouldn't have an issue with the

21  court informing the jury of the -- which I -- frankly, I think

22  for the jury to understand that they're going to hear a lot of

23  discussion, a lot of, to Mr. Meier's point, evidence about the

24  application of that statute or actions taken by Mr. Corder under

25  that -- those statutes, you wouldn't have any issue with the

1    court simply informing the jury of the nature of the statute at

2    issue and then saving the instruction as to how they are to

3    apply it to the end of the case with the other substantive

4    instructions?

5         MR. PERRAS:  I wouldn't generally have an

6    instruction -- or an objection to that.  I just think it would

7    be more helpful to the jury if they're to get that up front so

8    they have that in their heads when they can see the evidence.

9    They're going to get it anyway.  I don't see the harm in putting

10   it up front, but that's my position.

11        THE COURT:  I'm not sure it would be particularly

12   helpful for a jury that's just been seated and is still getting

13   their bearings, but I'll take a look at it.

14      Anything else with respect to the preliminary instructions?

15        MR. PERRAS:  Not from the Government.

16        MR. MEIER:  Nothing, Judge.

17        THE COURT:  All right.  We've got about an hour before

18   they're going to bring the jury pool in.  Any questions as to

19   the process we're going to follow?

20        MS. GREGORY:  Your Honor --

21        THE COURT:  It should be familiar to everybody.

22        MS. GREGORY:  -- I think that we're -- are we still --

23   are you holding off on the decision regarding training or are

24   you giving your order regarding that as well?

25        THE COURT:  The training?

1          MS. GREGORY:  Yeah.

2          THE COURT:  I thought we talked about that.  Did we

3     not?

4          MR. MEIER:  Well, I think you were -- you may have

5     decided you were going to further consider --

6          THE COURT:  With respect to the order.

7          MR. MEIER:  -- with how the order was going to be

8     done.

9          THE COURT:  The training, we can talk some more about

10    that when it comes up in trial.  I'm going to allow testimony

11    regarding -- I think I alluded to that, even if I wasn't

12    explicit.  I'm going to allow evidence of the training that

13    Mr. Corder received.  I think we will have to perhaps have a

14    bench conference at the time to discuss how far the testimony

15    goes under Rules -- if I'm remembering correctly -- 701, 702.

16      Okay.  With respect to jury selection, do you have any --

17         MR. MEIER:  Judge, I can tell the court -- I don't

18    know if this is the appropriate time or we wait -- I've had some

19    conversations with Mr. Perras and Ms. Gregory, and we agreed

20    preliminarily that we would agree on four jurors to be struck.

21         MR. PERRAS:  That's correct, Your Honor.  We would

22    argue that four jurors should be struck for cause.  Jury 82

23    claimed that she hates and then listed a bunch of epithets for

24    minorities.  We think that would be inappropriate, whether

25    that's true or not, putting that on a juror questionnaire.

1    Juror Number 72 indicated that in her opinion all courtrooms

2    are crooked.  Both her sons were railroaded.  She had a bad

3    experience with the police and that judges and prosecutors rig

4    trials.

5        Juror Number 63 is disabled due to chronic pancreatitis.

6        Jury 48 has a broken tailbone and is unable to sit for long

7    periods of time.  We've conferred and agreed that those four can

8    be struck for cause if Your Honor agrees.

9        THE COURT:  We'll take that up when we get the pool

10   here.  We'll want to make sure that those four are all actually

11   here.  They may not actually be here as far as I know.  I

12   haven't seen the list so -- of who's here.

13       MR. MEIER:  I guess I do have a question in terms of

14   how the court conducts voir dire.  Is your practice going to be

15   to have the attorneys conduct any of the actual questioning in

16   front of the panel or is it --

17       THE COURT:  No, I don't think so.  I'm going to do the

18   voir dire.  I've reviewed your questions.  I'm picking and

19   choosing a few from each side.  I will at the very beginning

20   have you introduce yourselves, as well as your -- the folks who

21   will be sitting at counsel table with you as part of that

22   preliminary questioning of the jury to make sure they don't know

23   you or anything along those lines.  I think that will be

24   sufficient.

25       MR. MEIER:  Thank you.

1          MR. PERRAS:  There are a few answers to the questions

2     on the supplemental questionnaires that we found confusing for

3     just a few of the jurors.  Would it be permissible to conduct a

4     little follow-up at the bench?

5          THE COURT:  Yeah, we'll just do a bench conference on

6     any of those that either side has.  You can remind me.  We'll

7     address those as we get towards the end of sort of the standard

8     litany of questions.

9          MR. PERRAS:  Yes, Your Honor.  And because I'm new in

10    this district, how many strikes does each side get?

11         THE COURT:  I don't know that it's district specific,

12    is it?  Ten and six, I believe.

13         MR. MEIER:  Seven and ten, I believe.

14         THE COURT:  We'll have a pool of about --

15         DEPUTY CLERK:  Roughly 60.

16         THE COURT:  -- of about 60.  And then we've got these

17    four that you've all -- you-all have already identified as being

18    subject to excuse.  And then we'll -- so we'll go through the --

19    we'll go through the questions and then the strikes.

20       We can talk about at the time, but obviously, these have

21    been shuffled.  They're random.  I think we have a multicounty

22    division here.  They're drawn very widely from those counties so

23    it's -- it will be, I believe, a diverse pool and the lists, et

24    cetera, are all driven randomly by the wheel, the electronic

25    wheel.

1      So anybody has any questions about that at the time, we can

2  address them.  Anything else?

3          MR. PERRAS:  Yeah, just a quick timing issue, Your

4  Honor.  We have law enforcement officers here that we're

5  holding, one of whom is the chief of the entire department.  Are

6  we going to be having them today or are we going to be starting

7  fresh tomorrow?

8          THE COURT:  Well, I think it's just a matter of how

9  far we go or how quickly we go.  We're going to start with jury

10  selection at noon.  I think it's going to depend in large part

11  on the responses we get from the jury as to -- the pool as to

12  how quickly we can get a jury seated.

13      Let me tell you, I intend to seat 14 so that -- I think 13

14  probably is adequate, but on the off chance that we might go a

15  weekend, I think it's probably a safe thing to have 14 seated.

16  So if we can get the jury seated and get through opening

17  statements, I think it's conceivable you could get a witness on.

18          MR. PERRAS:  Okay.  What are the hours that Your Honor

19  will be planning on doing court?

20          THE COURT:  Well, I think we'll hear from the jury

21  pool on that.  Why don't you-all tell me.  How long do you think

22  this is going to take?

23          MR. PERRAS:  The Government, I would anticipate that

24  we would only have two days max of evidence.

25          THE COURT:  So I'll tell the jury -- what -- three to

```
 1   four days, Mr. Meier?  Is that fair?
 2            MR. MEIER:  My estimates are notoriously
 3   underestimated, but I don't see this going more than three days,
 4   but --
 5            THE COURT:  Well, that's -- I'll tell the jury three
 6   to four days but that they need to be prepared to have to come
 7   back on Monday if some unexpected event occurs or there's --
 8   you-all burden me with difficult legal decisions to make during
 9   the course of the trial requiring more time.
10       Okay.  Anything else?
11            MR. PERRAS:  Just a housekeeping matter.  Would you
12   like us to state the basis for our objection, if we're called to
13   object, or just the rule?
14            THE COURT:  Yes, that's a good question.  I prefer --
15   if it's an obvious objection, if it's leading, if you just say
16   objection, if it's otherwise obvious, I'm going to give you a
17   quick "overruled" or "sustained."  For everything else, I want
18   you to approach.  If it's worth getting up, I'd rather you just
19   stand up and say, "May we approach," and then as quickly as you
20   can state your objection.
21       It can be crowded up here.  You've got to come from around
22   the table.  You've got to pass by the clerk's table, pass by the
23   reporter's table.  I would prefer -- I'm not going to enforce
24   this as a hard and fast rule.  I would prefer that the lawyer
25   making the objection be the lawyer that comes up.  I don't think
```

1    we need to wait until an assembled group comes up here.  I think

2    that slows things down and it's typically not necessary.

3        So my preference would be, if you have an objection

4    that's other than a simple straightforward one, that you simply

5    stand, ask to approach, come up, state your objection.  I'll

6    hear from the other side before I -- typically before I say

7    anything and then we'll move on.

8            MR. PERRAS:  Yes, Your Honor.  Just one final thing.

9    When addressing the jury during opening, is it permissible for

10   me to be here?

11           THE COURT:  Yes.

12           MR. PERRAS:  And I admit I sometimes walk back and

13   forth.  Is that okay?  I won't go in front of the jury.  I'll

14   just stay right here.

15           THE COURT:  I will not offer stylistic critiques.  My

16   preference would be that you just be within an arm's length of

17   the podium.  That's a generous podium.

18           MR. PERRAS:  Yes, sir.  I'm not going to be walking --

19           THE COURT:  I mean, that's pulling the driver out of

20   your bag to get the longest -- it's a golf reference, if --

21           MR. MEIER:  Judge, my preference would be he be back

22   in the --

23           THE COURT:  I understand.  I'm going to ask you to be

24   at the same podium, Mr. Meier, if you can.

25       Anything else?  If any questions come up along those lines,

1   you're welcome to just ask to approach and you can ask.  I'm

2   still developing my preferences, but having tried cases myself,

3   having sat behind those tables more frequently than I've sat

4   behind this bench, I have a good feel for how this courtroom

5   works and for what is generally the best way to go about

6   interacting with the jury.  So at the end of the day what we

7   want to make sure is that we treat the jury as best we can, use

8   their time wisely, and give them the information that they need

9   to make a fair decision with respect to the charges against

10  Mr. Corder.  Anything else we need to talk about?

11       All right.  I'll see y'all back here in an hour.  Thank you.

12       (Recess at 11:07 a.m. until 12:19 p.m.  Jury out.)

13       THE COURT:  The jury will be in in about three minutes

14  so we have a couple of minutes to go over the remaining

15  preliminary issues.

16       I told you I would flesh out a bit more my decision with

17  respect to the anticipated witnesses on Mr. Corder's police

18  training, and I think I had indicated to you that I intended to

19  let the United States offer that evidence and so I'm going to

20  allow that.  I will tell you now that that evidence will be

21  permitted, but I'm going to defer until we've heard at least

22  part of that testimony a decision on how far those witnesses can

23  go under evidence Rule 704(b).  And there -- obviously, there

24  are some issues with respect to opinion testimony offered from

25  lay witnesses and so forth.  If we need to take a break at that

1    point and flesh that out a bit more, we will.

2        I'm going to -- consistent with my earlier discussion with

3    you-all on the issue of the probable cause determination in

4    Bullitt District Court, I'm going to allow the United States to

5    offer its redacted order in the form that they've suggested.

6        I think that it would be inconsistent with my ruling on the

7    impact of the probable cause determination by the Bullitt

8    District Court to have the jury receive information that that

9    court made that determination and have argument about that so

10   we're going to exclude that.

11       Let's see.  I have a proposed sentence.  I recognize

12   Mr. Meier's signature on this.  Is that your signature there,

13   Mr. Perras?

14            MR. PERRAS:  Yes, Your Honor.

15            THE COURT:  So you-all have agreed to give the jury

16   pool the following information:  Many of you in your

17   questionnaires brought up racial issues in your answers to

18   questions about policing.  I just want to tell you now that both

19   the officer and Mr. Baize, the man he arrested, are of the same

20   race.  And that's agreed to.

21            MR. MEIER:  It is, Judge.

22            MR. PERRAS:  Yes, sir.

23            THE COURT:  And we would give that to the jury pool

24   along with the little summary that we discussed earlier this

25   morning.  Does that make sense?

1          MR. PERRAS:  Yes, Your Honor.

2          THE COURT:  All right.  Okay.  Everybody has their

3   lists?

4          MR. MEIER:  We do, Judge.

5          THE COURT:  And you-all have the four that you've

6   already talked about.  We'll save that discussion or the follow-

7   up on that discussion until we get a little further into the

8   voir dire.

9       So we can have the jury pool brought in now, unless there's

10  anything else we need to talk about.

11         MR. MEIER:  I just had one brief question.  I believe

12  I know the answer.  I just want to clarify.  You are sustaining

13  their motion to be able to redact from the order the stipulation

14  of probable cause sentence.  I am assuming from that order

15  they -- they're also requesting that I be not permitted to bring

16  that up through other means.  So is that your ruling as well?

17         THE COURT:  That's right.  That's it, yes.

18         MR. MEIER:  I assumed that, but I just wanted to make

19  sure.

20         THE COURT:  No, that's fine to clarify, yes.

21         MR. PERRAS:  Your Honor, I just have one point of

22  clarification as well.  You're letting in the training and the

23  policies; correct?

24         THE COURT:  Say again.

25         MR. PERRAS:  The Government is planning to admit both

1  the stuff he was trained on as far as the rules, as well as the

2  policies of his own department as evidence of his willfulness.

3          THE COURT:  Yes.

4          MR. PERRAS:  I just wanted to clarify that both of

5  those things will be allowed.

6          THE COURT:  I think the rub here is going to be when

7  you ask the follow-up question that you've previewed already for

8  the court as to whether the actions that Mr. Corder took in

9  October of 2014 are consistent with that training.  That's where

10  we're going to need to pause and have a discussion before that

11  testimony is elicited.  All right?

12          MR. PERRAS:  Yes, Your Honor.

13          THE COURT:  All right.  You understand the extent of

14  the ruling?

15          MR. MEIER:  I understand.

16          THE COURT:  All right.  Let's bring the jury in.

17      Do we have everybody on the list?

18          DEPUTY CLERK:  Yes.

19          MR. MEIER:  Judge, do you know, are the jurors going

20  to be seated in this order going across?  Do we know or --

21          THE COURT:  You're getting to a level of detail that I

22  try to avoid.  It's a good question.  I'm glad to know it myself

23  but...

24      Mr. Meier, if you-all would like to move the podium to have

25  a better view...

1            MR. MEIER:  We would appreciate that, Judge.

2            THE COURT:  Just move it over near Hunter.  He likes

3    sitting and standing next to the podium.

4        (Off-the-record.)

5        (Jury in 12:33 p.m.)

6            THE COURT:  Ladies and gentlemen, welcome to U. S.

7    District Court for the Western District of Kentucky.  Let me

8    first, well, commend you.  I think it is important for you to

9    understand that you have -- while you've been compelled to be

10   here, that your participation is worthy of a commendation.  And

11   the reason is is because jury trials are fundamental to the

12   American system of justice.  And so merely by participating,

13   even if you're not ultimately selected to serve on the jury

14   panel, by participating you are contributing to that process.

15       It is a solemn and important civic duty and so I thank you.

16   I thank you for being here.  I thank you for waiting.  I thank

17   you for filling out the forms and putting up with all of the

18   bureaucracy that is attendant to your service, but most of all,

19   I thank you for serving, for being here today and participating

20   in this very important process.

21       The first thing that we must do, now that you-all are

22   assembled here, is we must have you sworn.  And so I'm going to

23   ask the clerk to give you the oath of service as a jury panel.

24       (Oath administered to the jury.)

25            THE COURT:  Next we have to go through a process that

1    has a couple of different names.  You might hear it referred to

2    as "voir dire."  That is the French-Latin phrase.  With a good

3    Kentucky accent it might be called "voir dire," but it's jury

4    selection.

5        And what this process does is it enables the court and the

6    parties to determine whether any of you-all need to be excused

7    for any number of reasons.  There might be a reason for cause.

8    That is that you can't serve for some reason, and we'll talk

9    about what those reasons might be.

10       Also, it enables the counsel for the parties to exercise

11   their individual judgment with respect to peremptory challenges.

12   That is challenges for which no reason needs to be given.  The

13   rules that govern trials such as this one afford each side the

14   opportunity to simply select folks that they would like to

15   excuse from service.

16       Let me start with -- before we get to the questions with a

17   little bit of instruction about how this process will work.

18   There are a significant number of you-all.  I think 60; is that

19   right?  And at the end of this process, we hope to seat in the

20   jury box there 14 of you-all to begin hearing this case.

21       We believe that the case -- the evidence is expected to take

22   about three to four days.  And so one of the first questions

23   that I'll ask you is whether that poses any sort of special

24   problem or difficulty for you.  But before I ask you to respond

25   to that question, let me tell you that, as I ask you questions,

1    I'm going to ask you, if have you a response, to simply raise

2    your hand and stand and give your number.  At this stage we

3    don't need you to identify yourself by your name.  Just give

4    your number.  And if it is a simple answer, yes or no, you're

5    welcome to stand in place and give your answer.

6        If it's something more personal and you would rather not

7    discuss it widely, that's fine.  Our process accommodates that.

8    That's typically how it works.  And so you can come up to the

9    bench, and the lawyers will join you up here and we can have a

10   very brief discussion about your answer to my question.  All

11   right?  Does that make sense?  If so, everyone can kind of nod

12   and let me know.

13       Just so you know, my name is Judge Hale and I sit on the

14   court here in Louisville.  My chambers are just down the hall

15   and from time to time we'll take breaks.  I will leave and I'll

16   be in my office and you'll go back to your jury room.  The

17   lawyers -- well, they'll do whatever the lawyers do.  They'll

18   stay here or they'll find the rooms outside to work in.

19       Let me say at the beginning, because this is a larger pool,

20   we might not finish before we take a break.  And so let me tell

21   you that if we do take a break here in about an hour, that I

22   will not want -- I will want you to avoid talking about any of

23   the questions that you've heard or any of the information about

24   the case that you've heard with, frankly, anyone.  All right?

25       As I said, I'll just -- on a break, I'll be down the hall.

1    The lawyers will be working and then when we come back, we'll

2    pick right up where we left off.

3        All right.  Now, as to that first question, we think -- and

4    these predictions are -- this is an old courtroom, as you can

5    tell, and yet for all the years we've been trying cases here, we

6    rarely get right a prediction about how long a trial will last.

7    We think this is about a three to four-day trial, which would

8    have it concluded before the week is up, but there is no

9    guarantee of that.  Unforeseen circumstances can arise.

10   Difficulties can cause any number of delays in a trial.  And so

11   I would want you to be prepared for the possibility that you

12   might have to return after the weekend for the case to be

13   concluded.

14       So let me ask you, does that potential length of time cause

15   any hardship for any member of the panel?  We'll start with this

16   section to my right, and we'll just go from my right to left.

17   Anybody in that section?  Does a three-to-four but possibly in

18   the next week trial cause you any problems?

19       No?  Good.  Thank you.  I'm sorry.

20       Then this next section here.  Yes, sir.

21           A JUROR:  My mother --

22           COURT SECURITY OFFICER:  Stand and give your number,

23   please.

24           A JUROR:  Oh, 128.

25           THE COURT:  You're the first one to have to stand and

1   have to give your number so thank you for that.  You set the

2   pattern now.

3           A JUROR:  My mother has Alzheimer's and it's getting

4   to the point where I'm close to making a decision of taking her

5   out of her house so --

6           THE COURT:  Do you have like appointments set this

7   week or --

8           A JUROR:  I'm her caregiver.

9           THE COURT:  I see.  Okay.  All right.  Well, we'll

10  make note of that.  I appreciate the answer and we'll circle

11  back to you on it.

12      Yes, ma'am.

13          A JUROR:  I apologize -- Juror Number 010020.

14      I apologize, but I had made prior commitment to teach Zumba

15  fitness for an hour at the Muldraugh City Hall for Communicare,

16  and they are working with kids that are high risk for being in

17  the justice system and some are currently involved.  They also

18  have CPS involvement and the program is important for keeping

19  them out of trouble.  It is important that I keep this

20  commitment because the kids have been looking forward to it, and

21  I appreciate if that would be considered --

22          THE COURT:  Okay.

23          A JUROR:  -- because they can't replace me.  There's

24  no one else to do it.

25          THE COURT:  Tell me again.  You're going to teach --

1    I'm sorry.  I didn't quite make that out.

2              A JUROR:  What was it?

3              THE COURT:  What is it that you're teaching?

4              A JUROR:  It's Zumba fitness.

5              THE COURT:  Oh, fitness, okay.

6              A JUROR:  Zumba fitness, uh-huh, and it's for the kids

7    at Communicare.

8              THE COURT:  All right.  We'll keep that in mind.  I

9    should have also told you-all that we won't be able to give you

10   on-the-spot answers.  We'll have to go through and listen to

11   everything, and then we'll have to go back and sort of

12   prioritize the folks that we're able to excuse and not able to

13   excuse.  We'll do the best that we can and those are both

14   important things for the court to know.

15       And, ma'am, your number around your -- on your lanyard

16   there?

17             A JUROR:  20.

18             THE COURT:  20.  Thank you.

19             A JUROR:  Yes.

20             THE COURT:  All right.

21             A JUROR:  Thank you.

22             THE COURT:  All right.  Anybody else in that section?

23   No.

24       Okay.  How about this next section?  There in the first row,

25   yes, sir.

1          A JUROR:  Number 36.  I apologize to the court.

2    Subsequent to being called, I received an invitation to be in

3    Columbus, Ohio, for the day on Friday.  It is a personal event,

4    but I'd like to be there with some friends who have invited me.

5    And I would have noticed it had I known beforehand.

6          THE COURT:  Okay.  You're not playing golf there, are

7    you?

8          A JUROR:  May I approach the bench?

9          THE COURT:  You just have a smart looking golf shirt

10   on and there are some quite good golf courses up that way so --

11   all right.  That's a -- I will tell you, I think that's a valid

12   reason.  We'll consider it along with the others.

13     Go ahead.

14         A JUROR:  Sir, I'm Number 68.  I have training for my

15   job that starts next Monday in Kansas so -- you know.

16         THE COURT:  All right.  You want help avoiding that or

17   you think you might need to be there?

18         A JUROR:  No, sir, I would like to attend, if

19   possible.

20         THE COURT:  All right.  Fair enough.

21     All right.  Yes, sir.

22         A JUROR:  Yes, my number is 116.  I'm having

23   gallbladder surgery next week.  Monday I have to go through

24   prescreening.  I'm actually having some -- a bad weekend with

25   the gall stones.  So I'm not sure how well I'm going to do the

```
 1    rest of this week, but if it is going to end this week, I'm on

 2    board.

 3              THE COURT:  All right.  Fair enough.  Thank you for

 4    that.

 5         Anybody else in that section?

 6         All right.  And then finally over here.  Okay.  Half the

 7    section over here needs to -- okay.

 8              A JUROR:  I'm perfectly willing to -- 131.

 9              THE COURT:  Okay.

10              A JUROR:  I'm perfectly willing to serve and this is

11    more of an inconvenience than a necessity.  My son just

12    graduated from high school.  I bought three tickets to a concert

13    in Indianapolis that's Wednesday at 6:30.  It's $90 a ticket.

14    I'd like to take him and his friend, but if that's not valid,

15    I'll make other arrangements.

16              THE COURT:  All right.  All right.  Thank you.  No, I

17    understand what that's like, believe me.  Thank you.

18              A JUROR:  Number 46.  I have a diabetic management

19    appointment on Thursday, the 21st.  And then, also, we got the

20    call over the weekend that my 89-year-old mother had taken a

21    turn for the worse, and they've told us that she could go at any

22    time.  She's down at Bowling Green.

23              THE COURT:  All right.  I'm very sorry to hear that.

24    Thank you for the information.

25              A JUROR:  Thank you.
```

1          THE COURT:  Yes, ma'am.

2          A JUROR:  Number 1.  My sister is having surgery on

3  Thursday, and I'm arranged to take her that day.

4          THE COURT:  All right.  Is that local, ma'am?

5          A JUROR:  She's in Brooks, Kentucky.

6          THE COURT:  Okay.  Thank you.  Anybody else?  Yes.

7          COURT SECURITY OFFICER:  She wants to approach.

8          THE COURT:  Yes.  Okay.  If the lawyers would

9  approach.

10     (Bench conference on the record outside the hearing of the

11  jury.)

12          THE COURT:  Yes, ma'am.

13          A JUROR:  I'm Juror 110 and I just recently finished a

14  lawsuit in a courtroom, and just being in here is emotionally

15  upsetting to me.  And it's financially a hardship because I'm

16  commission, and every day I'm in here I'm losing a sale.  And

17  it's a physical hardship.

18          THE COURT:  Okay.  And where was your lawsuit?

19          A JUROR:  It was in Jefferson County.

20          THE COURT:  Was it in circuit court --

21          A JUROR:  Yes.

22          THE COURT:  -- down there?  And how recent was that?

23          A JUROR:  Four months ago.

24          THE COURT:  Were you a party or --

25          A JUROR:  Yes.

1           THE COURT:  -- were you a witness?

2           A JUROR:  I was -- I was the plaintiff.

3           THE COURT:  All right.  And what was the outcome of

4    the trial?

5           A JUROR:  It's pending.  We may have to go -- it may

6    all have to be redone.  They're appealing it.

7           THE COURT:  Okay.  So there was a jury verdict?

8           A JUROR:  Yes, there was a jury verdict, but they're

9    appealing it.

10           THE COURT:  What was the nature of the case?

11           A JUROR:  Discrimination and retaliation.

12           THE COURT:  Okay.  In the employment context?

13           A JUROR:  Yes.

14           THE COURT:  And you were the -- were you the only

15    plaintiff?

16           A JUROR:  Yes, I was.

17           THE COURT:  And what was the verdict?

18           A JUROR:  It was a -- it came out for me.

19           THE COURT:  Okay.  But the other side is appealing it?

20           A JUROR:  Yes, but it was a long -- there was a lot of

21    depositions.  I mean, it was eight hours of three-day

22    depositions and a week long -- a week long in the court.  I

23    mean, I was on the witness stand myself for the full day.

24           THE COURT:  All right.  Okay.  Thank you for letting

25    us know this, and we'll take it under consideration as we work

 1    through this process.

 2              A JUROR:  Okay.  Thank you.

 3              THE COURT:  Okay.  Thank you.

 4        (Juror exiting bench.)

 5              THE COURT:  You-all need to just stay here.  We got

 6    one more.

 7              MS. WYROSDICK:  Did you want to put her number on the

 8    record, sir?  It's 110.

 9              THE COURT:  I thought she did, yes, 110.

10        (Juror approaching bench.)

11              Yes, ma'am.

12              A JUROR:  Number 82.  I have anxiety attacks and I

13    don't drive.  My husband has to drive me and that's how I got

14    here today.  And he's a truckdriver for Dayton Freight, and he

15    can't lose his job for this.  I can't -- I don't even know if

16    I'm going to make it through this.

17              THE COURT:  Okay.  Well, first of all, let me reassure

18    you that all we're doing is asking questions right now.  Okay?

19        Do you -- do we need to get someone to help you?  You seem

20    to be struggling just a bit.

21              A JUROR:  I got to get out of here.

22              THE COURT:  Okay.  I'm going to ask the --

23              A JUROR:  I've got to go.  I want to go.

24              THE COURT:  Okay.  I'm going to -- listen to me just

25    one second.  I'm going to ask the CSO to take you out into the

1    hallway, and we'll -- you can take whatever time you need.

2    Okay?

3        I think...

4            A JUROR:  I got to go.

5        (Off-the-record.)

6            MR. PERRAS:  She's one of the three people we already

7    agreed upon to be struck for cause.

8            THE COURT:  Oh, I thought it was four.

9            MR. PERRAS:  Well, he didn't show up.

10           THE COURT:  Okay.  We'll go ahead and -- she was --

11   what -- Number 82?

12           MR. MEIER:  82.

13           THE COURT:  All right.  We'll go ahead and strike her

14   for cause.  She is visibly shaking and I think that my real

15   concern now -- and I sent Natalie out to have someone check on

16   her.  My real concern is not her jury service.  I think it's her

17   physical condition.  I think they're going to need to call

18   somebody to check on her, but we will strike her for cause.

19   Your earlier agreement is confirmed by what I observed.  Yeah,

20   she's in no shape to serve on a jury.  I'm concerned about her

21   getting home in one piece.  I hope that she's able to recover a

22   bit.

23       (End of bench conference.)

24           THE COURT:  Ma'am, before I have you come up, let me

25   just let the jury pool know that the last juror who came up is a

1    little under the weather, and so for that reason, she's being

2    excused at an earlier point in the process.

3        Ma'am, go ahead and come on up, Number 46.

4        (Bench conference on the record outside the hearing of the

5    jury.)

6            THE COURT:  Yes, ma'am.

7            A JUROR:  I realized I have been to your office.

8    You're the one that took care of our daughter's divorce back in

9    2007.  Right after that divorce she had a nervous breakdown.

10           THE COURT:  Who's your daughter?

11           A JUROR:  Christa Smith.

12           THE COURT:  I don't think that was me.  I didn't do

13   any domestic work.

14           A JUROR:  Did you have an office on Dixie Highway?

15           THE COURT:  No.

16           A JUROR:  Okay.  That wasn't you then.  There's

17   another Donny Hale.

18           THE COURT:  There are a few folks named Hale, yes, and

19   I was in private practice in 2007, but I didn't do domestic work

20   and my office was downtown.

21           A JUROR:  Okay.  Well, after that divorce she had a

22   nervous breakdown, and since then she's had to be put in Our

23   Lady of Peace.  Since then she's been diagnosed bipolar

24   schizoaffective.  I'm her caretaker and I have to take her to

25   all of her appointments.  She doesn't drive anymore.

1          THE COURT:  I'm very sorry to hear that.  I appreciate

2     you bringing that to our attention.  We'll keep track of that as

3     we go through this process.  Thank you.

4          (End of bench conference.)

5          THE COURT:  Anybody else -- anybody else that would

6     like to talk about any issues up here?  No?

7          Okay.  I'll ask the lawyers to step back.

8          Let me tell you -- just before we begin the next round of

9     questions, let me tell you a little bit about this case.  The

10    United States alleges that in October 2014, the defendant,

11    Matthew Corder, impermissibly used his authority as a sheriff's

12    deputy to enter the home of Deric Baize to arrest him without

13    probable cause to believe that he committed a crime.

14         The United States also alleges that Defendant Corder

15    impermissibly used his authority as a sheriff's deputy to charge

16    Mr. Baize with two different crimes, even though Mr. Corder did

17    not have probable cause to believe that Mr. Baize had actually

18    committed those crimes.  The defendant, Mr. Corder, denies that

19    he committed these wrongs.

20         And let me also say that -- let me also add this.  Many of

21    you in your questionnaires brought up racial issues in your

22    answers to questions that were posed to you about policing, and

23    I want to tell you now that both the officer, Mr. Corder, the

24    defendant, and Mr. Baize that I just mentioned, the man he

25    arrested, are of the same race.  And I think it might be helpful

1    for you to have that information as we go through these

2    questions.

3         Now, having heard the very basics of this case, do any of

4    you have any information about the case?  Have you heard about

5    it?  Have you read about this case or about either of the

6    individuals that I mentioned?  We'll start on this side this

7    time.  Anybody -- and we've lost our --

8              COURT SECURITY OFFICER:  Renee went to get a CSO.

9              THE COURT:  Okay.  We have good acoustics in here so

10   you can just stand, and you can come as close to shouting as you

11   would like.

12        Anybody in that first section over there?  Have you heard

13   about this case, read anything about the case or know or heard

14   about either of the individuals whose names I just mentioned?

15        No, nobody in that section.

16        How about over here in this section?  A lot of heads shaking

17   no.  Nobody's heard anything.

18        Okay.  How about here in this section?  Have you heard

19   anything about the case?  No.

20        Okay.  And how about over here?

21        All right.  Let me now -- I'm going -- at this point, I'm

22   going to now ask the lawyers for each side, beginning with the

23   United States, to introduce themselves to you and the folks that

24   are sitting at counsel table with them.  And then when they're

25   done, we're going to talk about whether you know them, anybody

1    seated there, if you've ever done business with them or had any

2    occasion to work with them.  And I'm also going to ask each

3    side, if they would, to give the names of anticipated witnesses

4    to you so that you can also see if you recognize any of those

5    names.

6        All right.  Mr. Perras, you or Ms. Gregory.

7            MR. PERRAS:  Good morning.  My name is Chris Perras.

8    I'm a prosecutor with the Department of Justice.

9            MS. GREGORY:  Hello.  My name is Amanda Gregory.  I'm

10   also a prosecutor.  Right here we have our FBI agent, Paul

11   Sparky, and our paralegal, Mary Kennedy.  Some of the witnesses

12   in this case, their names, I'm going to go over those in case

13   any of you have heard of them.  Wendell Kevin McBride, Shawn

14   Herron, Deric Baize, Billy Allen, Tara Geary, Matthew Brown,

15   John Cottrell, and Tara Blair.

16           THE COURT:  All right.  Ladies and gentlemen, I'll

17   start in the middle here.  Anybody in this section, center

18   right, heard or are you familiar with any of the folks seated at

19   the counsel table?

20       All right.  And how about, in that same group, anyone

21   familiar with or know or had any dealings, business dealings or

22   any other similar personal or professional connection with any

23   of the individuals that Ms. Gregory named as potential

24   witnesses?  No.

25       Okay.  Let me go to the other middle section here and the

1   same questions for you.  Anybody in this section familiar with

2   either the prosecutors or the folks that are working with them

3   on this case?  Yes, ma'am.

4           A JUROR:  Juror Number 16.  Can I ask a question about

5   one of the witnesses, if -- who they work for to know if that's

6   exactly who I think it is?

7           THE COURT:  Yes.

8           A JUROR:  I'm able to do that?  Does John Cottrell

9   work with the sheriff's department, Shepherdsville Sheriff's

10  Department, Bullitt County Sheriff's Office?

11          MS. GREGORY:  Yes, that is the correct one.

12          THE COURT:  So you know Mr. Cottrell?

13          A JUROR:  Yes, I do.

14          THE COURT:  And what's the -- and you're welcome to

15  come up here and answer if that would make you more comfortable,

16  but what we'd like to know is what the nature of your

17  familiarity with Mr. Cottrell is.

18          A JUROR:  I'm not close personal friends with him.  I

19  know who he is.  My husband and I coached his son many, many,

20  many years ago in basketball, and he was a student at my school

21  many years ago.  So I'm not a close personal friend with him.  I

22  do say hi to him in passing, but I am not a close personal

23  friend of his.

24          THE COURT:  All right.  And would that basic

25  familiarity with Mr. Cottrell make it more difficult for you to

1    weigh the evidence as it is presented to you and follow my

2    instructions?

3             A JUROR:  No.

4             THE COURT:  Would it make it more difficult for you in

5    hearing testimony if Mr. Cottrell did, in fact, testify?  Would

6    you -- would it be more likely that you would believe his

7    testimony or not believe him because you're -- you have this

8    familiarity with him?

9             A JUROR:  It wouldn't matter to me either way.

10            THE COURT:  It wouldn't affect you either way?

11            A JUROR:  No.

12            THE COURT:  All right.  Thank you.

13       Anybody else with respect to either the folks at the table

14   or the potential witnesses that they've named?  No one.

15       And then, finally, over here on the left?  Yes, sir.

16            A JUROR:  I'm Juror 112.  I think I worked with

17   someone named Shawn Herron maybe 25 years ago.

18            THE COURT:  All right.  You haven't kept in contact

19   with him?

20            A JUROR:  No.

21            THE COURT:  And if it turns out that the Shawn Herron

22   that might testify here is someone that you were -- that had

23   been your colleague 25 years ago, how would that affect your

24   view of his testimony?

25            A JUROR:  I don't think it would.

1      THE COURT:  So your experience with him was not

2  particularly negative or so positive that you would either

3  believe him over others because of your prior association or

4  disbelieve him because of your prior association?

5      A JUROR:  No.  I may have the whole thing wrong,

6  because I thought it was a she.

7      MS. GREGORY:  It is, Your Honor.  It's not a male.

8      THE COURT:  Okay.  So that would not cause you any

9  problem in assessing that person's testimony the same as you

10  would any other witness that would appear here during the trial?

11      A JUROR:  It would not.

12      THE COURT:  All right.  Thank you for your answers.

13  Anybody else?

14  All right.  Mr. Meier, would you -- I'm sorry.  There is one

15  more.

16      A JUROR:  I'm Number 107, Number 107.  I'm a retired

17  fire captain from Louisville Fire and Rescue.  I don't know

18  anybody involved in the trial, but I have worked closely with

19  law enforcement on the streets of Louisville.  I don't know

20  whether that would disqualify me for this, but I wanted you to

21  know.

22      THE COURT:  All right.  We probably will ask some

23  questions along those lines in a few minutes, so we'll make a

24  note and we'll expect to circle back to you on that topic.  All

25  right?  Thank you.

```
1          Mr. Meier, you want to introduce the folks at your table and
2     list any witnesses that you know at this point.
3               MR. MEIER:  Thank you, Judge.
4          Good afternoon, ladies and gentlemen.  My name is Don Meier.
5     It's my pleasure to represent Matt Corder, who is seated right
6     here.  Assisting me will be Laura Wyrosdick.
7               MS. WYROSDICK:  Good morning.
8               MR. MEIER:  And seated in the back is Jim Holwidell,
9     an investigator with our office.  We don't anticipate additional
10    witnesses.  I expect we would call any of the witnesses you just
11    heard if for some reason the Government does not.  Mr. Corder
12    may testify as well.  Thank you.
13              THE COURT:  Ladies and gentlemen, let me start again
14    on my right.  Does anybody know Mr. Meier or any of the -- or
15    the defendant, or any of the other folks that he introduced to
16    you?
17         All right.  And then the next section here?  No.
18         And then the next section there?  No.
19         And then, finally, the section on the far left.  Anybody
20    know Mr. Meier, or his colleagues, or the defendant, Mr. Corder?
21         All right.  Let me now shift a bit and ask you some
22    questions about your prior personal experiences.  Has anyone
23    here ever served as a juror in a criminal or civil case or as a
24    member of a grand jury in either federal or state court?
25         All right.  It looks like we've got a few over here.  We'll
```

```
 1    start on the left side this time.  If you want to...
 2              A JUROR:  You just need to know what kind of jury I
 3    served on?  I had jury duty in Hardin County -- 111 -- in the
 4    fall.
 5              THE COURT:  That was -- I'm sorry?  When?
 6              A JUROR:  In the fall, last fall.
 7              THE COURT:  This past year.
 8              A JUROR:  Yes.
 9              THE COURT:  And was it civil or criminal?
10              A JUROR:  It was a property dispute sort of thing.
11              THE COURT:  And you served as a member of the jury
12    that decided the case?
13              A JUROR:  Yes.
14              THE COURT:  And do you recall what the outcome of the
15    case was?
16              A JUROR:  Well, they countersued and we found against
17    the person -- I guess the plaintiff.  We found against her.
18              THE COURT:  All right.  And from that experience, do
19    you have strong views one way or the other about service on a
20    jury?
21              A JUROR:  It was fine.  I mean, the lady was -- she
22    defended herself and it was sort of a frivolous lawsuit, but
23    that was about -- I mean, she sued the judge.  She sued the
24    attorney on the other side, and she sued lots of people so that
25    sort of skewed my opinion just a little, but that's different
```

1    than, I think, a criminal trial would be.

2           THE COURT:  And when you say it skewed your opinion a

3    little, how do you --

4           A JUROR:  It sort of felt like a joke.

5           THE COURT:  Okay.  And is that your only experience on

6    a jury?

7           A JUROR:  Yes.

8           THE COURT:  And did that case involve -- that case was

9    entirely civil so it did not involve any law enforcement folks.

10           A JUROR:  No.

11           THE COURT:  All right.  And you said Hardin County;

12    right?

13           A JUROR:  Hardin County, yes.

14           THE COURT:  All right.  Thank you.

15           A JUROR:  Okay.

16           A JUROR:  Juror 110.  I was on jury duty down at the

17    District -- excuse me -- Jefferson County for two weeks, served

18    on some family disputes where we took away civil liberties.  I

19    also was just recently involved in a lawsuit where I was the

20    plaintiff.

21           THE COURT:  All right.  And at this point, let me just

22    ask you about your service as a juror.  Was that a civil or

23    criminal case in Jefferson Circuit Court?

24           A JUROR:  Family.

25           THE COURT:  It was in family court?

1          A JUROR:  Yes.

2          THE COURT:  And do you recall how the jury decided the

3   case?

4          A JUROR:  We decided to take someone's civil liberties

5   away from them and give guardianship to his parents.

6          THE COURT:  Okay.  So it was in Jefferson District

7   Court?

8          A JUROR:  Yes.

9          THE COURT:  This was a guardian case.  This was a

10  six-person jury; is that right?

11         A JUROR:  Yes.

12         THE COURT:  And as a result of that experience, did

13  that color your view of jury service or of the court system?

14         A JUROR:  I believe that my view is colored anyway

15  now --

16         THE COURT:  All right.

17         A JUROR:  -- by recent events.

18         THE COURT:  Thank you.

19         A JUROR:  Juror 112.  I was called to serve in January

20  for -- in Jefferson County and -- but the criminal case was

21  settled before a jury was seated.  And about 15 years before

22  that, I served on a civil jury also in Jefferson County in which

23  there was a property dispute and the jury found for the

24  plaintiff.

25         THE COURT:  And was there anything from that

1    experience that would make it difficult for you to listen to the

2    evidence and hear the instructions of the court and decide the

3    case here solely on the basis of the evidence received in court

4    and the instructions from the judge?

5              A JUROR:  No, there was not.

6              THE COURT:  All right.  Thank you.

7         Yes, ma'am.

8              A JUROR:  Juror Number 52.  I served on a criminal

9    trial in Jefferson County about 35 years ago, and we found the

10   defendant guilty of murder.

11             THE COURT:  All right.  Do you -- I think you just

12   said.  What was the nature of the case?

13             A JUROR:  It was a murder trial, a criminal murder

14   trial.

15             THE COURT:  All right.  And that was 35 years ago?

16             A JUROR:  About 35 years ago.

17             THE COURT:  And anything from that experience that you

18   took away that colored your view of the court system or of the

19   process of serving on a jury?

20             A JUROR:  I thought the process was very thorough and

21   it was interesting.

22             THE COURT:  And anything that you learned in that

23   experience -- is there anything that you learned in that

24   experience that would make it more difficult for you to sit and

25   be fair to both sides, to listen to the evidence and the

1   instructions of the court and --

2          A JUROR:  No.

3          THE COURT:  -- decide based only on the evidence

4   that's been presented to you here?

5          A JUROR:  No, I would be fine.

6          THE COURT:  All right.  Thank you.

7          A JUROR:  Juror Number 79.  It was a couple of years

8   ago here in Jefferson County.  I served on a jury for a DUI case

9   and a public disturbance, I think, was the charge.

10         THE COURT:  And that was here in Jefferson District

11  Court?

12         A JUROR:  Yes.

13         THE COURT:  And how did the jury find in that case?

14         A JUROR:  Not guilty of the DUI but guilty of public

15  disturbance.

16         THE COURT:  All right.  And as a result of that

17  experience, did you develop any strong views about either folks

18  who are charged with crimes or the police that arrest them?

19         A JUROR:  No.

20         THE COURT:  Anything from that experience prevent you

21  from deciding the case fairly, being fair to both sides,

22  listening to the evidence, hearing the instructions and deciding

23  the case based solely on the evidence that's presented here in

24  this trial?

25         A JUROR:  No.

1              THE COURT:  All right.  Thank you.

2        Anyone else?

3              A JUROR:  Number 42, sir.  October of -- excuse me --

4    February of 2006, I served on the grand jury, Jefferson County,

5    for the month.

6              THE COURT:  So you spent a month hearing cases.  And

7    do you recall what -- what the instructions from the court to

8    you were about the role of a grand juror?

9              A JUROR:  Uh --

10             THE COURT:  Do you remember what your job was?  That's

11   different than sitting in a -- what we call a petit jury and

12   hearing evidence and deciding a case.  Sitting on a grand jury's

13   different.  Do you recall what instructions you received

14   about that?

15             A JUROR:  Yes, sir, somewhat.  We were told to listen

16   to the evidence on cases that were presented by police officers

17   and other people and lawyers, and we were to determine whether

18   this case was worthy enough to set up for indictment.

19             THE COURT:  All right.  Do you recall how you were to

20   go about making that determination?

21             A JUROR:  Yes.  We went around -- there was 12 of us

22   and we each gave our opinion --

23             THE COURT:  All right.

24             A JUROR:  -- as to which way we were going.

25             THE COURT:  All right.  And as a result of that

1    service -- and I thank you and everyone else who has served on a

2    jury.  Let me repeat what I said at the outset.  It's important

3    civic service and I want you to know that all of us involved in

4    the system, whether it be in the state or here in the federal

5    system, appreciate that dedicated service.

6        Anything that you took away from that time on the grand

7    jury -- you've heard the questions that I've asked others.

8    Anything that you've taken away from that service that would

9    make it difficult for you to be fair here if you were to be a

10   member of this jury?

11           A JUROR:  Not at all.

12           THE COURT:  Anything that you took away gave you

13   strong feelings about the criminal justice system that would --

14   that would make it difficult for you to be fair to both sides,

15   to listen to the evidence here and the instructions from the

16   court and decide this case based solely on that evidence?

17           A JUROR:  No.

18           THE COURT:  All right.  Thank you very much.

19           A JUROR:  Number 36.  I also served in Jefferson

20   County and was on a jury for three different guardianship

21   related cases.

22           THE COURT:  All right.  And, again, by now my

23   questions are sounding repetitive so -- you-all have heard me

24   ask them.  Anything about that experience, Juror Number 36, that

25   would make it more difficult for you to serve here and to be

 1  fair and decide this case based on the evidence that's presented

 2  here and not based on something you learned from your prior jury

 3  experience?

 4          A JUROR:  No, Your Honor.

 5          THE COURT:  All right.  Thank you.

 6          A JUROR:  I'm Number 130.  I served in Fayette County

 7  about 28 years ago.  I had one criminal case and several civic

 8  cases having to do with guardianship and having people remain in

 9  a psych ward against their will.  Nothing about that experience

10  colored my view as to -- I feel like I could be fair and I'm a

11  very evidence-based person.

12          THE COURT:  All right.  And setting aside the

13  guardianship type cases, I think you mentioned a civil case as

14  well.  Is that right?

15          A JUROR:  Well, I'm not sure how they would be

16  phrased.

17          THE COURT:  Okay.

18          A JUROR:  But there were guardianship and also having

19  people remain in the psych ward against their will.

20          THE COURT:  I see.  Okay.  All right.

21          A JUROR:  For 72 hours or something.

22          THE COURT:  Right, right.  Those, I think, fall in

23  that same -- I think I understand in the state court those are

24  similarly decided.

25          A JUROR:  And there was one criminal case.

1           THE COURT:  Okay.  Tell me a little bit about the

2    criminal case.

3           A JUROR:  A woman had allegedly stolen a pair of

4    shoes.

5           THE COURT:  And was that in Fayette District or

6    Fayette Circuit Court?  Do you recall?

7           A JUROR:  I have no idea.

8           THE COURT:  Taxing your memory, I know, from that long

9    ago.

10          A JUROR:  Yeah.

11          THE COURT:  Okay.  And you've already said, in

12   anticipation of my question I believe, that nothing from that

13   experience would make it more difficult for -- excuse me -- for

14   you to be fair here and to decide this case based solely on the

15   evidence that you've heard in the instruction from the court.

16          A JUROR:  That's correct.

17          THE COURT:  Thank you.

18          A JUROR:  Juror Number 71.  It's been so long ago, I

19   don't remember, but I did serve on Jefferson County.  And it was

20   a case where a lady was suing the police officer for damages.

21          THE COURT:  All right.  And you've heard me describe

22   this case that involves a police officer.  Can you tell me a

23   little bit more about that case?  It was a civil case, was it?

24          A JUROR:  I think so.  I was on the jury.  I didn't

25   deliberate because I was number 13.  I don't remember the

1    outcome either.

2              THE COURT:  So you were the person that had to sit

3    through the whole trial and then --

4              A JUROR:  And let go.

5              THE COURT:  -- had to leave before the decision was

6    made.  Well, is there anything about that experience, ma'am,

7    that you heard during the course of that trial that would make

8    it more difficult for you to sit on a jury that -- where you're

9    going to hear evidence about the actions of a police officer?

10             A JUROR:  I don't believe so.

11             THE COURT:  All right.  Do you believe that you can be

12   fair to both sides, to the defendant and to the prosecution and

13   hear the evidence, reserve judgment until the very end, and

14   follow the court's instructions, make your decision based solely

15   on the evidence that you've heard here in this courtroom?

16             A JUROR:  Yes.

17             THE COURT:  All right.  Thank you.

18             A JUROR:  I'm Juror Number 58 and I've served twice.

19   I don't know the years.  I know in 1980 I was on grand jury,

20   like him, and --

21             THE COURT:  Did you spend -- like he did, did you

22   spend about a month in service on that jury?

23             MR. PERRAS:  Yes.  I was lucky to have the month of

24   February.  It was shorter, but I --

25             THE COURT:  And you had to be inside anyway; right?

1          MR. PERRAS:  Yeah.  I did, you know, enjoy that time.

2     I learned a lot.

3          THE COURT:  All right.

4          A JUROR:  You know, I wasn't aware of the process and

5     all that but, you know, I enjoyed that.

6          THE COURT:  Well, let me ask you the same questions

7     that I asked -- I'm sorry.  I forget your number, sir, the other

8     grand juror.

9          A JUROR:  42.

10         THE COURT:  Yes.  Let me ask you the same questions

11    that I asked him about that process.  Anything from that process

12    change the way that you viewed the criminal justice system or

13    police officers who appear before the grand jury?  Anything

14    about that that you take away that would make it difficult for

15    you to be fair in this trial?

16         A JUROR:  No, I can't think of anything.

17         THE COURT:  All right.  Thank you.

18         A JUROR:  The other -- the other jury I was on was --

19    I guess you call it civil.  It was a car accident.  It was

20    obvious who was at fault.  The only problem I had there was,

21    when we had to figure up the compensation stuff, I had a problem

22    with the amount, you know.

23         THE COURT:  Right, right.  And as a result of that

24    experience, did that change your views or color your views of,

25    say, lawyers or the folks that are -- or, heaven forbid, judges?

1    Anything about that process make it difficult for you?

2            A JUROR:  No.  The only thing I had the problem was

3    the amount they got for the little of the injury but, no,

4    anything else, it was okay.

5            THE COURT:  Okay.  And, again -- and this is really

6    the operative question -- anything from that experience make it

7    more difficult for you to be fair in this trial?

8            A JUROR:  I don't think so.

9            THE COURT:  All right.  Thank you.

10      Yes, sir.

11           A JUROR:  Yes, I'm Juror 116.  It's been quite some

12   time ago I had to serve as a juror.  It was the Commonwealth of

13   Kentucky.  It was a murder trial.  I actually can still remember

14   the person, but I won't tell you who it is.  But, anyway, it was

15   complicity to murder.  It had prostitution in it, money

16   laundering.  It was really bad.

17      It got to the point where we couldn't come up with a

18   verdict.  We had to be put up at the Galt House.  That's -- was

19   very trying.  We thought we had a full conviction of guilty, and

20   two of the members just would not -- they would not weigh one

21   way or the other.  It was -- we were afterwards polled by the

22   Commonwealth, because they were quite upset, but the whole jury

23   was -- it was really, really difficult.  It lasted about two

24   weeks and it took a toll for quite some time on me.

25           THE COURT:  All right.  What's your -- sir, what's

```
 1    your juror number again?

 2           A JUROR:  116.

 3           THE COURT:  Okay.  If you wouldn't mind, sir, why

 4    don't you approach.

 5       Let me have the lawyers come up.

 6       We'll just ask you a follow-up question or two about that.

 7    It might be best out of the hearing of the rest of the jury

 8    pool.  Just give him a second to get up here.

 9       (Bench conference on the record outside the hearing of the

10    jury.)

11           THE COURT:  It sounds like you had a rather difficult

12    prior jury experience.

13           A JUROR:  I did.

14           THE COURT:  Is it fair to say that it was frustrating?

15           A JUROR:  It was more than frustrating.  It was -- it

16    became a race issue.

17           THE COURT:  I see.

18           A JUROR:  It was an African-American on trial.  His

19    name was Hammond.

20           MR. MEIER:  I'm sorry?

21           A JUROR:  Hammond.  I don't know if you remember the

22    trial.  But anyway, the two jurors, we wanted to give him life

23    without parole, and we ended up giving him 25 years.

24           THE COURT:  All right.

25           A JUROR:  And that was really difficult for me because
```

```
1    I felt like it was not fair.  I felt like the jury failed.

2              THE COURT:  All right.

3              A JUROR:  That's how I feel.

4              THE COURT:  All right.  And tell me when that was

5    approximately.

6              A JUROR:  Gosh, probably --

7              THE COURT:  Within the last couple of years?

8              A JUROR:  No, it was probably 30 years ago.

9              THE COURT:  Okay.

10             A JUROR:  I mean, this was really bad where the guy

11   that was on trial, he was actually getting other people to kill

12   others.  And there was prostitution involved and lots of money,

13   drugs.

14             THE COURT:  Very difficult trial?

15             A JUROR:  It was very -- it was all over the place.

16             THE COURT:  Now, have you served on a jury since then?

17             A JUROR:  No.

18             THE COURT:  And anything that you take away from that

19   experience that would make it more difficult for you to be on a

20   jury again?

21             A JUROR:  I think it was just the person that was

22   there.

23             THE COURT:  Okay.

24             A JUROR:  He was intimidating.

25             THE COURT:  I see.
```

1          A JUROR:  And I felt like he was almost looking right

2    through you, and it was really hard for some of the jurors to

3    take that.

4          THE COURT:  I see.  And as a result of that, do you

5    think it would make it more difficult for you to be fair to both

6    sides in this trial?

7          A JUROR:  No.  I think I can be fair.  I just don't

8    like -- it didn't turn out the way it really should have.  And,

9    of course, that's why we have jurors and I understand that.

10          THE COURT:  Yes.  Trials can be messy.

11          A JUROR:  Yeah.

12          THE COURT:  And even civil trials -- what you've

13    described is a very involved criminal trial, but even civil

14    trials can occasionally be really difficult and taxing on

15    jurors.  So I appreciate you bringing this to our attention.

16          A JUROR:  Okay.

17          THE COURT:  Let me ask the lawyers, first, Mr. Meier,

18    do you have anything that you would like to follow up on?

19          MR. MEIER:  Is your frustration then -- am I right, is

20    your frustration more with the other jurors or are you

21    frustrated in some way with the attorneys or the process itself?

22          A JUROR:  I thought the evidence was clear and I think

23    everybody was -- it's just that they -- there was several people

24    did not want to see him go to life in prison without parole.

25    And they said they wouldn't -- they just weren't going to do it.

1          THE COURT:  So would your answer to Mr. Meier's

2    question be you were sort of frustrated with the process?

3          A JUROR:  With the process.

4          THE COURT:  Okay.

5          A JUROR:  Yes.

6          THE COURT:  All right.  Do you-all have any -- any

7    significant follow-up?

8          MR. PERRAS:  Not on this issue, Your Honor.

9          THE COURT:  Okay.  All right.  Thank you very much.  I

10   appreciate it.

11     Why don't you-all stay up here for just one second.

12     (Juror exiting bench.)

13         THE COURT:  I should have said at the outset that I

14   assume you-all are keeping very good notes.  If there are any

15   individuals, rather than stop and bring them up here and do this

16   -- now, I did with him, even though I didn't intend to do that,

17   I did it with him at this point just because it seemed like we

18   needed to follow up fairly quickly on that, given the nature of

19   his report.

20     But before we finish the questions completely, I'll ask you

21   if you have any significant follow-up questions for any of the

22   jurors on -- well, really, just about anything that we need to

23   talk about.  And I'll consider bringing them up here and letting

24   you-all ask a question or two, if we need to.  I'd like to avoid

25   that, because it takes a long time, but we occasionally get

 1    these very interesting responses that I think merit some follow-

 2    up discussion.  All right?

 3            MR. PERRAS:  Your Honor, would it be more efficient,

 4    if someone comes up to answer a question that you give them, if

 5    we have follow-up questions that we wanted to ask them, ask them

 6    at that time or do you want to do it at the end?

 7            THE COURT:  If I think that we really need it.  I

 8    mean, if somebody just comes up and says, "I was on a jury and

 9    here's my experience and, no, I can be fair to both sides," and

10    they answer those sort of obligatory questions the way that we

11    anticipate them, I don't really want to belabor the process with

12    the follow-up.  That last fellow, I think, was an example though

13    of how we need to make sure we follow up and cover our bases.

14    So I wouldn't do that with everyone.

15            MR. PERRAS:  Yes, sir.

16            THE COURT:  But if you-all have, in the course of

17    the -- your note taking, if you-all identify some that you think

18    merit follow-up, then we'll consider those.

19            MR. PERRAS:  Yes, Your Honor.

20            THE COURT:  Okay.

21        (End of bench conference.)

22            THE COURT:  We'll keep going on this question.  Who's

23    next?  Yes, ma'am.

24            A JUROR:  Juror 109.  I was on a jury trial a few

25    years ago.  It was three murder cases, which he was sentenced to

1    life without parole and now he's out on the streets.

2              THE COURT:  And where was that, ma'am?

3              A JUROR:  Jefferson County.

4              THE COURT:  Do you recall how long ago that service

5    was?

6              A JUROR:  I can tell you his name and, you know --

7              THE COURT:  Well, that's okay.  I don't necessarily

8    need to know the name but --

9              A JUROR:  Maybe three --

10             THE COURT:  -- you can ball park it.

11             A JUROR:  Maybe three or four years.

12             THE COURT:  Three or four years ago.

13             A JUROR:  Uh-huh.

14             THE COURT:  And it was a single case involving three

15   murders?

16             A JUROR:  Three murders, yes.

17             THE COURT:  And was the defendant convicted?

18             A JUROR:  Yes.

19             THE COURT:  And from that experience did you change

20   your view of the criminal justice system or of the process for

21   jury trials?

22             A JUROR:  Yeah, it has.

23             THE COURT:  All right.  Well, why don't you also

24   approach and we'll ask the lawyers to return.

25        (Bench conference on the record outside the hearing of the

 1    jury.)

 2              THE COURT:  Yes, ma'am.  You're Juror 109; is that

 3    correct?

 4              A JUROR:  Uh-huh.

 5              THE COURT:  And tell me what has changed.

 6              A JUROR:  What has changed, really, going through all

 7    that and then him getting sentenced like that and served a

 8    couple of years and he's out on the streets, I don't -- you

 9    know, I really don't have a whole lot of faith in the system.

10              THE COURT:  All right.  And does it change your view

11    to understand that -- well, let me just ask you generally, by

12    saying you've lost faith or have less faith in the system, does

13    that mean that it's more difficult for you to be fair if you

14    were to sit on a jury?

15              A JUROR:  No, I don't guess it would, no.

16              THE COURT:  All right.

17              A JUROR:  I guess it's just the point of just putting

18    them in -- or convicting them and then just letting them back

19    out on the street.

20              THE COURT:  All right.

21              A JUROR:  I think that's my biggest thing.

22              THE COURT:  But before we get to a discussion about

23    penalties or sentences, the process requires the jury to

24    determine whether the United States has proven beyond a

25    reasonable doubt that the defendant is guilty.  Do you think

1    that you can be fair in that process?

2            A JUROR:  Yeah.

3            THE COURT:  You can be fair to the defendant as well

4    as to the prosecution and weigh the evidence that you hear only

5    in this room?

6            A JUROR:  Right.

7            THE COURT:  Do you think that your prior experience

8    would make you more likely or less likely to find someone

9    guilty?

10           A JUROR:  I think I'd be fair.

11           THE COURT:  You don't think it would make you more or

12   less likely?

13           A JUROR:  No, uh-huh.

14           THE COURT:  All right.  Mr. Meier, do you have any

15   follow-up?

16           MR. MEIER:  Was this a -- it was a state court case, I

17   assume.

18           A JUROR:  Uh-huh.

19           THE REPORTER:  I'm sorry.  I can't hear you.

20           THE COURT:  Here, you just need to speak in here.

21           A JUROR:  I'm sorry.

22           MR. MEIER:  Is it all right to give the names of the

23   case?

24           THE COURT:  I guess so.

25           THE REPORTER:  Ma'am, I'm sorry.  I can't hear you.

1           THE COURT:  You have to speak into...

2           A JUROR:  I'm sorry.  Lloyd Hammond.

3           MR. MEIER:  That's where I was curious because you

4    said he was out on the street.

5           A JUROR:  Yes.

6           MR. MEIER:  So that case -- you understand that was

7    overturned on appeal and that's what's frustrating to you?

8           A JUROR:  Yes, very.

9           MR. MEIER:  Okay.  Are you willing or are you -- more

10   appropriate, are you able to set the penalty aside?  In other

11   words, what happens, just like the judge sentence and come up

12   with an opinion on whether proof has been given beyond a

13   reasonable doubt or not?

14          A JUROR:  Yeah, I think, yes.

15          THE COURT:  All right.  Mr. Perras?

16          MR. PERRAS:  Nothing, Your Honor.

17          THE COURT:  All right.  Thank you, ma'am.

18       (End of bench conference.)

19          THE COURT:  We have a lot of experienced jurors in

20   this room.

21       Okay.  Next up.

22          A JUROR:  Juror Number 11.  I served on grand jury in

23   Hardin County, 2009 or 2010.

24          THE COURT:  And did you have a month long service like

25   a couple of the other jurors have mentioned?

1           A JUROR:  Service was two months.

2           THE COURT:  Two months?

3           A JUROR:  We served once, sometimes twice a week for

4     two months.

5           THE COURT:  And as a result of that service, did it

6     change your views on the criminal justice system or on the

7     police or prosecutors?  Would that service make it more

8     difficult now --

9           A JUROR:  No, sir, I don't believe so.

10          THE COURT:  -- for you to decide a case fairly?

11          A JUROR:  No, I don't believe so.

12          THE COURT:  And what type of cases did you have come

13    before you while you were on that grand jury?

14          A JUROR:  Drug cases, child neglect, dog attacks,

15    things of that nature.

16          THE COURT:  A fairly wide variety.

17          A JUROR:  Theft, yeah.

18          THE COURT:  And in your consideration of those cases,

19    again, did that experience or would that experience make it more

20    difficult for you to weigh the evidence that -- and only the

21    evidence that you hear in this room and make your decision

22    solely on the basis of the evidence that you hear in the trial

23    and the instruction you receive from the court?

24          A JUROR:  I don't believe so.

25          THE COURT:  All right.  Thank you, ma'am.  Anybody

1    else?

2              A JUROR:  Juror Number 30.  I served about 10 years

3    ago in Bullitt County on a criminal case.  It was a resentencing

4    case.  He had been convicted of murder and they forgot to give

5    an option of -- I think it was life without parole or whatever

6    for it, and he had been sentenced.  We actually sentenced him to

7    death again.

8              THE COURT:  And you were on the jury that decided the

9    case to begin with or just the sentence?

10             A JUROR:  No, the sentencing.  They sentenced him

11   before and they didn't give the option of life without parole.

12   So we were brought in to do -- hear the trial again completely

13   and do the resentencing on that.

14             THE COURT:  I see.

15        And what was the nature of the charge?

16             A JUROR:  It was murder.

17             THE COURT:  Murder.  And from that experience, did you

18   develop strong feelings about the criminal justice system or

19   about the roles of the lawyers in the process or the witnesses?

20   Anything that you take away from that process that would make it

21   more difficult for you to be fair to the -- to both sides in

22   this trial?

23             A JUROR:  No, sir.

24             THE COURT:  All right.  Thank you.

25             A JUROR:  Juror Number 74.  I served on Meade County

1    court jury.  It's been several years ago.  I don't know,

2    probably 20, 25 years ago.  It was a murder case.  We found the

3    defendant not guilty of self-defense.

4            THE COURT:  You said it was Meade Circuit?

5            A JUROR:  Yes.

6            THE COURT:  About 25 years ago.  Do you -- as a result

7    of that experience, did you develop any views --

8            A JUROR:  About that I'd like to approach.

9            THE COURT:  -- about the fairness of the system?

10   Okay.  All right.  Why don't you come up and I'll ask the

11   lawyers to return as well.

12      (Bench conference on the record outside the hearing of the

13   jury.)

14           THE COURT:  Okay.  Tell me, do you have some concern

15   about your ability to be fair?

16           A JUROR:  Yes, I do.

17           THE COURT:  Okay.

18           A JUROR:  I have spent more time in the last four

19   years in courtrooms, and I see all the injustice that goes on.

20   And I have a son that's in jail right now and a daughter-in-law

21   and one that just got out for things that they shouldn't have

22   been in there to start with.  And I am no -- I just don't think

23   it's -- I think it's all just a joke.

24           THE COURT:  All right.  And so this is really more of

25   a -- it has to do with the legal troubles of family members, as

1  opposed to your service on that prior jury?

2           A JUROR:  Well, the service on the prior jury was

3  fine.  You know, everything was fine.  I don't know.  It seems

4  like the court nowadays, it's just not the same as it used to

5  be --

6           THE COURT:  All right.

7           A JUROR:  -- or I don't think it is.

8           THE COURT:  Okay.  In what way?

9           A JUROR:  I feel like now it doesn't matter what the

10  jury has to say.  The judge and the lawyers, they make -- they

11  make the decision.  It's -- it doesn't matter what anybody says.

12  I don't know why we even do it.  And in my opinion, people

13  are -- you know how it used to be.  You were innocent until

14  proven guilty.  It's not anymore.  You're guilty.  That's just

15  the way it goes.  If you got enough money, you can get out of

16  it, but if you don't, you're in trouble.

17           THE COURT:  Well, I am very sorry to hear that you

18  feel that way.

19           A JUROR:  I do and it's getting worse all the time.

20           THE COURT:  In this court you are innocent until

21  proven guilty.

22           A JUROR:  I know, probably the only one around here

23  then.

24           THE COURT:  Well, I would like to think not, but I

25  thank you for your honesty.

1      Mr. Meier, is it necessary to ask this juror any follow-up
2  questions?
3           MR. MEIER:  No, no, I have no questions.
4           THE COURT:  Mr. Perras?
5           MR. PERRAS:  No, Your Honor.
6           THE COURT:  Thank you very much.
7      (Juror exiting bench.)
8           THE COURT:  You-all want to stay up here for just a
9  minute.
10          MR. MEIER:  She was one of the agreed ones.
11          THE COURT:  It's funny how those things work out,
12  isn't it?  All right.  Just keep that in mind until the end.
13  Thank you.
14     (End of bench conference.)
15          THE COURT:  All right.  Anybody else with prior jury
16  service that would like to talk about?  Yes, sir.
17          A JUROR:  Juror Number 15, Your Honor.  I served on
18  two separate occasions in Breckinridge County, once on the grand
19  jury under the commonwealth attorney, criminal cases, drugs and
20  child neglect, once on a petit jury, a land dispute situation.
21          THE COURT:  That was a civil case, the land dispute?
22          A JUROR:  I'm not sure, Your Honor.  I was dismissed
23  from that one.
24          THE COURT:  All right.  And from your grand jury
25  service, was there anything that you took away from that service

1    that would make it more difficult for you to be fair to both

2    sides in this case, to listen to the evidence and to base your

3    decision solely on the evidence that you hear in this courtroom

4    and the instruction that you receive from the court?

5            A JUROR:  No.

6            THE COURT:  All right.  Thank you, sir.  Anybody else?

7        (Security officer conferring with the court off the record.)

8            THE COURT:  Actually, here what's what we're to going

9    to do:  We've been at this a little over an hour.  I mentioned

10   that we would try and take a break every hour or so roughly, and

11   so this would be a good place to pause at the conclusion of

12   those questions.  So we'll take a 10-minute break, and I'll see

13   you-all back here in 10 minutes.

14       (Jury out 1:39 p.m.)

15           THE COURT:  All right.  Let's also take about a

16   five-minute break.  And to the extent you can use the other five

17   minutes or so roughly to be cataloging your proposed follow-up

18   questions and tracking your arguments on cause, we'll want to do

19   that as well.  This has been a little slower than I had hoped it

20   would be, but I think it's unavoidable.  So we'll power through

21   it.

22      Any questions?  Any issues thus far?

23           MR. PERRAS:  No, Your Honor.

24           THE COURT:  All right.  Thank you.

25       (Recess at 1:41 p.m. until 1:55 p.m.  Jury out.)

1          THE COURT:  The jury will be back in just a minute.

2     Let me talk with you-all for just a minute about process.  I

3     think I mentioned to you that I intend to seat a 14-person jury.

4     We have -- we started with 60.  I think we're now down to 59.

5     We excused the one person for her health-related problems.

6          So I think what we'll do is we'll get through the questions.

7     At the end of the questions that I have, I'm going to have

8     you-all come up, as I indicated earlier, with whatever -- and

9     it's not going to be a free-for-all.  So we'll -- I'll ask you

10    on the front end to be judicious in identifying the folks and

11    identifying the questions that you think are necessary in

12    follow-up for me to ask, but we'll have a brief bench conference

13    about that.

14         Once we complete that process, I'll let the jury pool go

15    back to their assembly room, and then we'll take up strikes for

16    cause and peremptories.  All right?  Does that make sense?  Any

17    questions or objections to the process?

18              MR. PERRAS:  No, Your Honor.

19              MR. MEIER:  No, Judge.

20              THE COURT:  Can you bring them in.  Thanks.

21         (Jury in 2:03 p.m.)

22              THE COURT:  Thank you, ladies and gentlemen.  We're

23    back from our break now, and we're going to continue with the

24    voir dire questions.

25         The next question is, have you, any member of your family,

1   or any close friend ever been employed by a law enforcement

2   agency?  We'll start over here on the right side.

3       All right.  Got a lot of experienced jurors and a lot of

4   folks with law enforcement connections, it appears.

5               A JUROR:  Juror Number 30.  I have some friends that

6   are law enforcement, actually high school friends.  I have one

7   fraternity brother that was also in law enforcement on the

8   Metro.

9               THE COURT:  And is your association with any of these

10  folks such that it would -- it would cause you to either believe

11  or disbelieve the testimony of someone associated with law

12  enforcement?

13              A JUROR:  No, sir.

14              THE COURT:  I was going to say -- or I should have

15  said, to a greater degree as a result of your association with

16  these folks?

17              A JUROR:  No, sir.

18              THE COURT:  And are you -- do you think you could

19  still be fair to both sides and decide the case solely on the

20  evidence and the instructions that you receive?

21              A JUROR:  Yes.

22              THE COURT:  All right.  Thank you.

23              A JUROR:  Juror Number 76.  Yeah, dad, stepdad, three

24  uncles, a cousin and, of course, friends.  So to answer his

25  questions, I mean, yes, I believe that I would be impartial

1    and -- but I'm sure that's probably going to be hard to believe,

2    given the nature...

3            THE COURT:  That's like the *Blue Blood* show; right?

4       So are they currently employed?

5            A JUROR:  No, my dad's retired and the other ones

6    still are currently employed, Bullitt County Sheriff's

7    Department, Shepherdsville, Louisville Metro, and chief of

8    J-Town police.

9            THE COURT:  All right.  I'm sorry.  You're number

10   what?

11           A JUROR:  76.

12           THE COURT:  76.  Actually, Juror 76, if you wouldn't

13   mind just to approach for a minute.

14      Let me ask the lawyers to join you up here.

15      (Bench conference on the record outside the hearing of the

16   jury.)

17           THE COURT:  Thank you for answering the question and

18   giving us a candid answer.  You mentioned the Bullitt County

19   Sheriff's Office; is that right?

20           A JUROR:  Right.

21           THE COURT:  That's why I wanted to have you come up

22   and have some brief follow-up questions.  Do you know the

23   defendant?

24           A JUROR:  No, I do not.  My uncle's retired from

25   Bullitt County Sheriff's now so --

1          THE COURT:  All right.  How long has he been retired?

2          A JUROR:  Probably a few years.  And plus, I guess,

3    when he come home -- you know, when family comes home, the last

4    thing we want to talk about is work.  So we didn't really spend

5    too much time, I guess, you know, with --

6          THE COURT:  Right.  I know I've asked you this before,

7    but just so I follow up, you're not familiar with the

8    circumstances of this case?

9          A JUROR:  No.

10          THE COURT:  And none of your relatives talked to you

11    about that with you or anything like that?

12          A JUROR:  No.  Like I said, usually when they get

13    home, the last thing anybody ever wants to speak about is that

14    kind of stuff.

15          THE COURT:  Right, right.  You yourself have never --

16          A JUROR:  No.  I almost did when -- but once I

17    graduated college, I went a different route.

18          THE COURT:  All right.  And anything about your

19    experience, other than the obvious, which is that you have

20    policemen in your family, would anything about that experience

21    make it difficult for you to be fair to someone who disagrees

22    with the police?

23          A JUROR:  Right.  I mean, personally, I would say no,

24    to be honest, even if it was my own family.  If they did

25    something wrong, you know, they should be held accountable for

```
 1    it.  Of course, I've always -- I could also give my mother her
 2    own ticket though so I'm kind of rare like that.  But like I
 3    say, I know it's probably hard to believe -- just given the
 4    circumstance, it's probably going to be hard to believe that I
 5    would be impartial, even though that really would be the truth.
 6              THE COURT:  You're confident you could be fair to both
 7    sides?
 8              A JUROR:  Yes, sir.
 9              THE COURT:  All right.  Any brief follow-up?
10              MR. MEIER:  Are there people that you know on the
11    Bullitt County Sheriff's Office right now?
12              A JUROR:  No, no.  My uncle was the only one and he's
13    retired now.
14              MR. PERRAS:  No follow-up.
15              MS. GREGORY:  Actually, you mentioned the
16    Shepherdsville Police Department.
17              A JUROR:  Yeah.  He's also retired now.
18              MS. GREGORY:  Do you know Officer Billy Allen there?
19              A JUROR:  No.  Mike Miller was the only one I knew.
20              THE COURT:  Okay.  Thank you very much.
21         (End of bench conference.)
22              THE COURT:  All right.  Next up, same question.
23              A JUROR:  Juror Number 89.  My brother-in-law is a
24    military police officer, U.S. Army Reserve.  And my place of
25    employment, our security guards are off-duty police officers.
```

1    And so I guess those wouldn't be close friends but casual work

2    acquaintances.

3            THE COURT:  With respect to your brother-in-law, where

4    does he do his military police work?

5            A JUROR:  Fort Knox, Your Honor.

6            THE COURT:  And have you had occasion to talk with him

7    about his work?

8            A JUROR:  Not in detail at all, just, you know, how

9    did your day go, that kind of thing.

10           THE COURT:  Knowing that your brother-in-law is a

11   military policeman, would that -- would that mean you would be

12   more likely or less likely to believe someone who tells a story

13   different than a policeman?

14           A JUROR:  I don't believe that would affect me one way

15   or another, Your Honor.

16           THE COURT:  So having a brother-in-law that's -- and

17   you get along with your brother-in-law?

18           A JUROR:  Yeah, we get along pretty good.  He's kind

19   of a --

20           THE COURT:  I should have asked that, because some of

21   us are blessed with good brothers-in-law and...

22           A JUROR:  I know.  We do pretty good.

23           THE COURT:  All right.  And you could be fair to both

24   sides and base your decision solely on the evidence that's

25   presented here in the court's instruction?

1           A JUROR:  Yes, Your Honor.

2           THE COURT:  All right.  Thank you.

3           A JUROR:  Thank you.

4           THE COURT:  By the way, I know I sound like a broken

5    record when I ask that question, and I'll ask it again --

6    unfortunately, you'll hear it more often -- but keep that in

7    mind because that's important.  That's a question that needs to

8    be asked with respect to any of these specific issues.

9        Yes, sir.

10          A JUROR:  106.  I'm a U.S. Customs and Border

11   Protection Federal Officer.

12          THE COURT:  You are currently?

13          A JUROR:  Yes, sir.

14          THE COURT:  All right.  Why don't we ask you to

15   approach.

16          A JUROR:  Yes, sir.

17          THE COURT:  I've enjoyed getting to meet many of you

18   so I'm happy to see you up here.

19       (Bench conference on the record outside the hearing of the

20   jury.)

21          THE COURT:  How are you?

22          A JUROR:  Good.

23          THE COURT:  Good.  You work out at the airport?

24          A JUROR:  Yes, sir.

25          THE COURT:  Okay.  And you're with CPB?

1          A JUROR:  Customs and Border Protection, yes, sir.

2          THE COURT:  And how long have you been with them?

3          A JUROR:  '99, sir.

4          THE COURT:  Okay.  Mr. Perras, there's at least one

5    witness, I believe; is that right?

6          MR. PERRAS:  Yes, sir, Wendell Kevin McBride.  He's a

7    trainer for U.S. Customs and Border Patrol at Glynco.

8          A JUROR:  It doesn't sound familiar at all to me.

9          THE COURT:  Don't know him?

10         A JUROR:  That was a long time ago, Your Honor.

11         THE COURT:  Okay.  Would the fact that you're a

12   current member of federal law enforcement make it more difficult

13   for you to serve on a jury, a federal criminal jury?

14         A JUROR:  Well, I've got opinions that are ingrained

15   in me, but I'd go by and do as fair as I could, of course.

16         THE COURT:  You've had training on -- you went through

17   Glynco?  And while there, you learned about how to make an

18   arrest and what the circumstances are when you're permitted to

19   make an arrest.

20         A JUROR:  Yes, sir.  I did 20 years in the military as

21   an MP and an SP too, Your Honor.

22         THE COURT:  So you have even more significant law

23   enforcement experience.

24      Well, let me just ask you the general question that I've

25   asked everybody.  Do you think that despite that training,

1    despite that insight, can you --

2              A JUROR:  Yes, sir.

3              THE COURT:  -- decide the case fairly to both sides

4    based solely on the evidence that's presented here?

5              A JUROR:  Yes, sir.

6              THE COURT:  Do you -- let me ask it this way:  Would

7    you feel like you're part of some federal law enforcement team

8    that would make it difficult for you to find against the

9    Government in this case?

10             A JUROR:  No, sir.

11             THE COURT:  All right.  Mr. Meier, you have any

12   follow-up?

13             MR. MEIER:  No.

14             THE COURT:  Mr. Perras?

15             MR. PERRAS:  Just briefly.  When the judge asked you

16   about your law enforcement experience, you mentioned that you

17   had opinions ingrained in you.  What sort of opinions ingrained

18   in you are you referring to?

19             A JUROR:  Well, law and order.  You know, it's my job

20   to protect and serve.

21             THE COURT:  Okay.

22             MR. PERRAS:  All right.

23             THE COURT:  Thank you.

24             A JUROR:  Yes, sir.

25        (End of bench conference.)

1          THE COURT:  Next up.  Yes, sir.

2          A JUROR:  Number 19.  I have a family friend that's

3     retired from the Louisville Police Department, my best friend's

4     dad's retired from the Louisville Police Department, and my

5     wife's uncle is retired from the police department.

6          THE COURT:  All right.  And so the same questions.  Do

7     any of those relationships make it more difficult for you to be

8     fair, to consider the evidence and only the evidence that's

9     presented here in making your decision?

10          A JUROR:  No, sir.

11          THE COURT:  And I have a feeling that we're going to

12     have a number of folks that are going to answer this question,

13     and we're going to go through -- because the -- both parties

14     need to know who has these types of relationships, but the same

15     question's going to apply.  So I want you to think about it even

16     before you stand up to give me the specific information.

17          If your relationship is such that it would make it difficult

18     for you to either rule against or rule for a police officer, to

19     believe or disbelieve a police officer solely because of that

20     status, then that's what I want you to bring to our attention.

21     If you need to come up here and talk about it, if you have a

22     relationship but it's a difficult one and that colors your view

23     one way or the other, then that's what I want to let you know --

24     or you to let us know about.

25          Thank you, sir.

1          A JUROR:  Juror 121.  I had a cousin who is retired

2     from the Metro Police Department and worked for a period of time

3     with the Bullitt County Sheriff's Department.

4          THE COURT:  All right.  And when do -- do you know

5     when they worked for the Bullitt County Sheriff's Department?

6          A JUROR:  I think he left about -- maybe a year ago.

7          THE COURT:  And do you talk with him about his work

8     life?

9          A JUROR:  No.

10         THE COURT:  You haven't had occasion to talk to him

11    about individual cases or how about his colleagues?

12         A JUROR:  No.  The last time I spoke with him about a

13    case, there was an accident in front of my driveway and --

14    involving a school bus and he worked that accident scene.

15         THE COURT:  And nothing in this relationship would

16    make it difficult for you to be fair to both sides in this case;

17    is that correct?

18         A JUROR:  No, sir.

19         THE COURT:  All right.  Thank you.

20         A JUROR:  Juror 15, Your Honor.  I work for the -- I

21    worked for the Corps of Engineers as a ranger, Rough River Lake,

22    and currently or part-time anyway serve as a deputy fire warden

23    with the Kentucky Division of Forestry.  And I have two

24    brother-in-laws both worked as deputies.  One retired as sheriff

25    of Breckinridge County and the other one now currently is the

1    chief of police in Hardinsburg at the county seat.

2             THE COURT:  And those were brothers-in-law that served

3    as chief of police and sheriff; is that right?

4             A JUROR:  Yes, sir.

5             THE COURT:  Well, let me just ask you, do you talk

6    with them about the nature of their work?  Do you have occasion

7    to sit down with them and talk about cases that they work on or

8    difficulties that they may have?

9             A JUROR:  Well, we've just swapped war stories, but

10   nothing that's ongoing as discussed.  I mean, the nature of a

11   case that's --

12            THE COURT:  All right.

13            A JUROR:  These are from many years past, generally

14   speaking.

15            THE COURT:  Fair enough.  And anything in that

16   experience or with them or your relationship with them, or your

17   own professional experience, make it difficult for you to be

18   fair in this case, to consider the evidence that you hear in

19   this courtroom and only that in reaching a verdict?

20            A JUROR:  No, sir, I'm going to do what's fair and

21   righteous.

22            THE COURT:  All right.

23            A JUROR:  If at all possible.

24            THE COURT:  Thank you, sir.

25            A JUROR:  Thank you.

1            A JUROR:  Juror Number 65.  Friends and family.

2    Friends on Louisville Metro and friends on Shepherdsville Police

3    Department.  And then family would be my husband's uncle that is

4    retired from Jefferson County.

5            THE COURT:  And you mentioned Shepherdsville Police

6    Department; is that right?

7            A JUROR:  Uh-huh.

8            THE COURT:  Is it someone who's currently there?

9            A JUROR:  Yes.

10           THE COURT:  All right.  Well, let me invite you --

11           A JUROR:  Okay.

12           THE COURT:  -- to come up here, and we'll ask you a

13   quick follow-up.  Thank you.

14      (Bench conference on the record outside the hearing of the

15   jury.)

16           A JUROR:  We went to church together, too.  Do you

17   remember that?  Spring Creek Christian.

18           THE COURT:  You look familiar.

19           A JUROR:  I don't know if that made a --

20           THE COURT:  You look very familiar.  That's been a

21   while, hasn't it?

22           A JUROR:  Yeah, it has.

23           THE COURT:  Well, let me ask you --

24           A JUROR:  Okay.

25           THE COURT:  -- first, with respect to the person that

```
 1   you know in Shepherdsville -- you have a potential witness from

 2   there; is that right?

 3              MS. GREGORY:  Yes, Billy Allen.  Do you know him?

 4              A JUROR:  I don't think I know that name.

 5              THE COURT:  Okay.  Anything about your relationships

 6   with the folks that are currently or previously have served as

 7   law enforcement officers that would make it difficult for you to

 8   be fair here?  Would anything in that experience suggest to you,

 9   for instance, that you would tend to believe a police officer

10   more than someone else or less than someone else?

11              A JUROR:  Right.  See, I work at Shepherdsville

12   elementary so we have a lot of officers that come in our

13   building so that's how I know them.  So they come in quite

14   frequently into my room, you know, just talk about --

15              THE COURT:  Resource officers?

16              A JUROR:  -- chitchat and stuff, yeah.

17              THE COURT:  Okay.

18              A JUROR:  So there's quite a few of them that come in

19   and out.  So that's how -- that's how I know them, but it

20   shouldn't make any issue, you know.

21              THE COURT:  All right.  And then I think the lawyers

22   heard you say that many years ago we attended the same church

23   together.

24              A JUROR:  Yeah.

25              THE COURT:  So she knows me as an upright person,
```

1    Mr. Meier.

2           MR. MEIER:  You're out of here.

3           A JUROR:  No.

4           THE COURT:  Anything in that --

5           A JUROR:  No.

6           THE COURT:  -- that would --

7           A JUROR:  I just thought I should say something just

8    in case.

9           THE COURT:  No, I appreciate you did.  You looked

10   familiar as you walked up here, but I was having trouble.  Any

11   follow-up questions?

12          MR. MEIER:  No, sir, Judge.

13          MR. PERRAS:  No, Your Honor.

14          THE COURT:  Thank you very much.

15      (End of bench conference.)

16          THE COURT:  Next section over.  Yes, sir.

17          A JUROR:  Juror Number 77.  Sir, I work for the

18   Louisville Metro Corrections.

19          THE COURT:  All right.  You do now?

20          A JUROR:  Yes.

21          THE COURT:  Okay.  And are you a sworn officer?

22          A JUROR:  Yes, sir.

23          THE COURT:  All right.  And I take it in that role,

24   you interact a lot with other law enforcement folks from here in

25   Jefferson County.  How about from any of the surrounding

1    counties?

2              A JUROR:  Generally I don't work in the area where

3    they -- the officers drop off inmates, but, I mean, if it's

4    anybody, it's mostly Louisville Metro Police and Sheriff's

5    Department, Jefferson County.

6              THE COURT:  All right.  You've had training in order

7    to be a sworn officer; is that correct?

8              A JUROR:  Yes, sir.

9              THE COURT:  Tell me, where do corrections officers go

10   for their training?

11             A JUROR:  The same academy that the police do.

12             THE COURT:  All right.  And that makes sense.

13      All right.  Is your status as a sworn officer, does that --

14   would that cause you any difficulty in sitting on a jury where

15   the defendant is a sheriff's deputy or former sheriff's deputy?

16   Would that cause you any problems?

17             A JUROR:  No, sir.  I think I could still be

18   impartial.

19             THE COURT:  You think you could weigh the evidence

20   that you hear and be fair to both sides?

21             A JUROR:  Yes, sir.

22             THE COURT:  All right.  Thank you.

23             A JUROR:  Juror Number 90.  I have an uncle that's --

24   he was a detective about 30 years ago.  I have a brother who is

25   retired chief of police.  He retired about a year and a half,

1    two years ago.

2              THE COURT:  Where was he the chief?

3              A JUROR:  Vine Grove.

4              THE COURT:  And that's -- is that in Bullitt County,

5    Vine Grove?

6              A JUROR:  No, I believe it's Hardin County still.

7              THE COURT:  Hardin County.  And did you talk much with

8    him about his work?

9              A JUROR:  Not too much.

10             THE COURT:  And you don't know any of the folks that

11   have been mentioned here, the defendant or any of the witnesses

12   that -- potential witnesses that have been mentioned?

13             A JUROR:  One witness I was concerned about.  I didn't

14   understand the Cottrell's first name.

15             MS. GREGORY:  It's John.

16             A JUROR:  No, I do not know him.

17             THE COURT:  All right.  And the fact that you have

18   these relatives in law enforcement, would that cause --

19             A JUROR:  No.

20             THE COURT:  -- you to have difficulty being fair to

21   both sides here in listening only to the evidence that's

22   presented in the courtroom and rendering a verdict based solely

23   on that, not based on anything that you would hear from police

24   officers outside the courtroom?  Is that right?

25             A JUROR:  I believe I could be fair, yes.

1          THE COURT:  All right.  Do you have any hesitation

2     with that?

3          A JUROR:  No.

4          THE COURT:  All right.  Thank you, ma'am.

5          A JUROR:  Juror Number 48.  I had a brother that died

6     in the line of duty in '85.

7          THE COURT:  Well, I'm sorry to hear that, ma'am.  Did

8     he serve here in Louisville?

9          A JUROR: Radcliff.

10          THE COURT:  And --

11          A JUROR:  It's in Hardin County.

12          THE COURT:  This was -- I'm sorry -- your brother?

13          A JUROR: Yes.

14          THE COURT:  All right.  Ma'am, why don't you approach

15     and we'll ask you a brief follow-up here.

16        (Bench conference on the record outside the hearing of the

17     jury.)

18          THE COURT:  I'm sorry for the loss of your brother

19     even though it's been 30 years.  Is that right?

20          A JUROR:  Yes.

21          THE COURT:  And you said he was lost in the line of

22     duty; is that correct?

23          A JUROR:  Yes.

24          THE COURT:  And which department was he with?

25          A JUROR:  Radcliff.

1          THE COURT:  And do you have any other relatives that

2     are involved in law enforcement?

3          A JUROR:  I had an ex-husband.  I know a lot of police

4     officers.  Of course, they always keep in touch with me but --

5          THE COURT:  Right.

6          A JUROR:  That's about it.

7          THE COURT:  And what was the nature -- was your

8     brother making an arrest?  Was -- what was the -- what were the

9     circumstances, if you can?

10          A JUROR:  It was in a lift station and he got -- he

11     tried to go in and save the people that worked for the water

12     district.

13          THE COURT:  I see.

14          A JUROR:  He didn't understand why they weren't coming

15     up.  So he got called out there and they all got overcome by

16     odorless gas.

17          THE COURT:  I see.

18          A JUROR:  That's how they died in that lift station.

19          THE COURT:  I see.  All right.  You've heard me ask

20     the same question of everyone, and so I'll ask you the same

21     question.  Is your family history and the fact that you have

22     family that have served as police officers, does that -- would

23     that make it difficult for you to serve on a jury where the

24     defendant is a police officer/sheriff's deputy and be fair to

25     both sides?

1          A JUROR:  I would be fair to both sides.

2          THE COURT:  Okay.  Mr. Meier?

3          MR. MEIER:  Nothing, Judge.

4          THE COURT:  Mr. Perras?

5          MR. PERRAS:  Yes, Your Honor.  You indicated on your

6  questionnaire you don't think police should be federally

7  prosecuted, and this is a case involving a federal prosecution

8  of a police officer, so I wanted to ask you to sort of elaborate

9  on that.

10          A JUROR:  I just -- I just didn't think federal --

11  that they should be prosecuted federally.

12          MR. PERRAS:  So would it be difficult for you then to

13  be a juror on a federal prosecution of a police officer?

14          A JUROR:  Probably so.

15          THE REPORTER:  I'm sorry.  I didn't hear the last

16  statement.

17          THE COURT:  If you would, just repeat it.  She's

18  listening through this microphone.

19          A JUROR:  I would have a problem with a police officer

20  being federally prosecuted.

21          THE COURT:  Okay.  And that would make it more

22  difficult for you to be fair?

23          A JUROR:  Yes.

24          THE COURT:  Okay.

25          A JUROR:  For that reason.

1          THE COURT:  I appreciate your candor very much.  Thank

2    you.

3          A JUROR:  Thank you.

4       (End of bench conference.)

5          THE COURT:  Okay.  Next up.

6          A JUROR:  Juror Number 20.  I have a nephew-in-law

7    that is -- he was a retired state police officer and is now

8    currently the sheriff of Grayson County.

9          THE COURT:  All right.  And as you've heard me say,

10   would that relationship cause you any problems to sit on a jury,

11   knowing as I described them earlier the charges that are

12   involved here?

13         A JUROR:  No.

14         THE COURT:  Could you be fair to both sides?  Could

15   you be fair to both sides?

16         A JUROR:  Yes, sir.

17         THE COURT:  All right.  And could you decide the case

18   based solely on the evidence that you hear here and not anything

19   that you've heard from your nephew-in-law or anyone else outside

20   the courtroom?

21         A JUROR:  Yes, sir.

22         THE COURT:  All right.  Thank you.

23         A JUROR:  Thank you.

24         THE COURT:  Next person.

25         A JUROR:  Juror Number 102.  I have a cousin who's

```
 1    currently a detective in Owenton, and he's got a son who's a
 2    dispatcher and another son who's a court bailiff.  I have a
 3    third cousin who retired from the Versailles Police Department,
 4    was chief of police, and his father is retired Supreme Court of
 5    Kentucky.
 6              THE COURT:  Okay.  From any of those relationships or
 7    experiences, same question.  Would having those experiences,
 8    those relationships, would it make it more difficult for you to
 9    sit on a jury and to consider only the evidence that you hear
10    here in this room and make a decision based on that -- or on
11    that evidence and not on what you've heard from your relatives
12    who are police officers?
13              A JUROR:  No, not at all.
14              THE COURT:  You don't have a -- you don't think it
15    would cause you any problem?
16              A JUROR:  No problems at all.
17              THE COURT:  All right.  Thank you.
18              A JUROR:  Juror Number 2.  My brother previously
19    worked for the Kentucky Attorney General's office and my uncle
20    retired from Louisville Metro Government, I believe, four years
21    ago.  And through my own career with Louisville Metro
22    Government, I work closely with our local LMPD, mostly in budget
23    and business operations.  I don't believe that would cause me to
24    be unfair in any way.
25              THE COURT:  All right.  You think you could sit and
```

```
 1    hear the evidence and be fair to both sides, and those
 2    associations that you've had wouldn't keep you from deciding the
 3    case fairly and objectively?
 4              A JUROR:  Yes, sir, I do.  I believe I could be fair.
 5              THE COURT:  All right.  Good.  Thank you.
 6              A JUROR:  Juror Number 64.  My aunt is a state police
 7    dispatcher.
 8              THE COURT:  All right.  And have you had occasion to
 9    talk with your aunt about her work?
10              A JUROR:  All the time.
11              THE COURT:  Do the stories that you've heard from her,
12    do you think that that would color your view on -- if you were
13    to serve on a jury that's hearing about, as I described to you
14    earlier, an arrest that took place?
15              A JUROR:  No.
16              THE COURT:  Do you think you could be fair and
17    impartial and hear the evidence that's submitted here and make
18    your decision based solely on that?
19              A JUROR:  Yes.
20              THE COURT:  All right.  Thank you.
21         Anybody else?
22              A JUROR:  Juror Number 16.  I don't have any family
23    that currently work for the police department, but my son works
24    for a Shepherdsville Police Department officer.  He has some
25    work that he -- my son does for him on the side at a gun range.
```

1   And I am close friends with three Shepherdsville police

2   officers, two that I'm very close friends with.  One's a

3   sergeant and two are just officers.  I work in the education

4   system and we have resource officers that come into the school,

5   two which are daily so...

6            THE COURT:  Okay.  That has earned you a trip up to

7   the bench for a brief discussion.

8       (Bench conference on the record outside the hearing of the

9   jury.)

10           THE COURT:  Just wait on them.

11      All right.  I think, Ms. Gregory, you've identified at least

12  one Shepherdsville Police Department --

13           MS. GREGORY:  Yes.  Billy Allen is one of our

14  witnesses.  Do you know him?

15           A JUROR:  No.  I know John Cottrell.

16           MS. GREGORY:  Yes.

17           A JUROR:  But that's not the one I was talking about.

18           THE COURT:  I think we talked about him.

19           A JUROR:  Yes.

20           THE COURT:  Okay.  Your friendships with

21  Shepherdsville Police Department officers, would those cause you

22  any difficulty in being fair?  Do you think that that would make

23  it more likely that you would believe someone's testimony over

24  someone else's because you have friends that are police

25  department employees?

```
 1          A JUROR:  No, because I have just as many

 2   Shepherdsville police officers that I do not like.

 3          THE COURT:  Okay.

 4          A JUROR:  That I do.

 5          THE COURT:  I see.

 6          A JUROR:  And it's not that I don't think they do

 7   their job.  It's a personality conflict.

 8          THE COURT:  Okay.

 9          A JUROR:  So it's not that I don't think they do their

10   job.  It's a personality thing so...

11          THE COURT:  Okay.  Do you think that you could set all

12   of that aside and just listen to the evidence that comes in here

13   if you were on the jury and make your decision based solely on

14   the evidence here and not based on anything you've heard

15   previously from -- good or bad --

16          A JUROR:  I feel like I can.

17          THE COURT:  -- from a Shepherdsville police officer?

18          A JUROR:  I feel like I can.

19          THE COURT:  All right.  Mr. Meier?

20          MR. MEIER:  If I could, since you're up here.  The

21   person/individual who you know, Mr. Cottrell --

22          A JUROR:  Yes.

23          MR. MEIER:  -- does he fit into one of -- you know,

24   you said you have some -- a personality conflict with some

25   people, not with others.  I know he's not with Shepherdsville.
```

```
 1   He's with Bullitt County.

 2           A JUROR:  He actually isn't one of the ones -- I don't

 3   know him personally, personally.  Like I know him kind of like

 4   in passing and talked with him very shortly when we coached his

 5   son so I can't say that I've developed any type of an image of

 6   him.  It's just kind of a hi/bye.  So I haven't really developed

 7   an image of him.  I've only had one image that I have developed

 8   of him, and that was actually seeing something taking place and

 9   it was a good image.  It was something that happened.  So I

10   would say any image I've developed of him, it was him in action

11   as a police officer.  It wasn't a negative image.

12           MR. MEIER:  Favorable?

13           A JUROR:  Favorable.

14           MS. WYROSDICK:  If he testifies in this case, would

15   you give his testimony more weight or credibility than anybody

16   else because of the past?

17           A JUROR:  I wouldn't -- I mean, I wouldn't give it --

18   I would give all testimony the same.

19           THE COURT:  Anything?

20           MR. PERRAS:  Nothing from the Government, Your Honor.

21           THE COURT:  All right.  Thank you very much.

22       (End of bench conference.)

23           THE COURT:  All right.

24           A JUROR:  Number 43.  I have a cousin who's a retired

25   police officer from Ohio.
```

1          THE COURT:  All right.  And from that relationship,

2     would -- do you have any strong views on -- positive or negative

3     about police officers that would make it difficult for you to be

4     fair?

5          A JUROR:  No, I would not.

6          THE COURT:  All right.  Thank you.

7          A JUROR:  Number 97.  Bullitt County Sheriff has been

8     a good family friend up until adulthood, and I've lost touch

9     with him.  And I don't believe it would influence me in any way.

10         THE COURT:  Are you speaking of the current elected

11    Bullitt County Sheriff?

12         A JUROR:  David Greenwell.

13         THE COURT:  All right.  And you don't know the

14    defendant, do you?

15         A JUROR:  Say again.

16         THE COURT:  You don't know the defendant, Mr. Corder?

17         A JUROR:  I do not.

18         THE COURT:  And the fact that the current sheriff is

19    an old family friend, would you -- would you give him more

20    credibility or less credibility because of that relationship or

21    anyone else that worked for him if they were to testify in this

22    trial?

23         A JUROR:  That is hard for me to say.  I would -- to

24    be perfectly honest, I'd probably believe him before I would

25    somebody else.

1          THE COURT:  All right.  What about somebody that
2     worked for him as a deputy sheriff?
3          A JUROR:  I don't -- you mean -- I wouldn't -- it
4     wouldn't influence me.
5          THE COURT:  Would you weigh their testimony more
6     favorably because they're -- they work for him?
7          A JUROR:  No.
8          THE COURT:  So you could be fair and listen to the
9     evidence and make a decision only -- based only on the evidence
10    that you hear in the courtroom?
11         A JUROR:  I think so.
12         THE COURT:  All right.  Thank you.
13         A JUROR:  Juror Number 40.  My wife is a prosecutor
14    for the Jefferson County Attorney's Office, and we have friends
15    at the commonwealth attorney's, as well as the federal
16    attorney's office.
17         THE COURT:  All right.  And as a result of your wife's
18    work, have you developed strong views about local police
19    departments?  Do you think it would be difficult for you to sit
20    on a jury with the charge that I've given you that's the subject
21    of this trial?
22         A JUROR:  I don't believe so.
23         THE COURT:  The fact that your wife is a prosecutor,
24    would that -- would that tend to make you weigh the credibility
25    of an argument from a prosecutor any differently than you would

1    from a defense lawyer?

2            A JUROR:  I don't believe so.

3            THE COURT:  All right.  And the same question with

4    respect to law enforcement officers.  Would it make it more

5    likely that you would believe a police officer's testimony or

6    less likely?

7            A JUROR:  No, I don't believe so.

8            THE COURT:  All right.  Thank you.

9            A JUROR:  I'm Number 58 and -- again, my friend is

10   chief of police in one of these small cities here in Louisville.

11   I think it's -- it's either Lyndon or Lynnview.  We don't

12   discuss it so he's just -- I just -- you know, you wanted to

13   know if had a friend who was a police officer.

14           THE COURT:  Right.  Would that relationship make it

15   difficult for you to be fair?

16           A JUROR:  Not in this situation.  If it was him, I

17   couldn't be fair.  I would have to believe him.

18           THE COURT:  I don't think we've heard about any

19   potential testimony from Lyndon or Lynnview.

20           A JUROR:  Yes.

21           THE COURT:  So if we excluded that possibility, if it

22   was any other --

23           A JUROR:  Anybody else, I'd -- it wouldn't.

24           THE COURT:  It wouldn't affect you.  All right.  Thank

25   you.

1        A JUROR:  Number 45.  I've got a cousin in Iowa that's

2    a retired police officer, and then I have my wife -- on my

3    wife's side, she's got a relative that's a police officer in

4    Oldham County.  And then I have two friends that are judges in

5    Oldham County.

6        THE COURT:  Would those relationships -- again, you've

7    heard the question asked.  Would those relationships make it

8    difficult for you to be fair?  Could you weigh the testimony of

9    the witnesses that you hear in a fair -- in a manner that's fair

10   to both sides?

11       A JUROR:  Yes.

12       THE COURT:  You wouldn't give undue credibility to

13   someone because of your relationship with police officers?

14       A JUROR:  No.

15       THE COURT:  All right.  Thank you.

16   You'd like to approach?

17       A JUROR:  Yes.

18       THE COURT:  All right.

19       A JUROR:  Thank you.

20   (Bench conference on the record outside the hearing of the

21   jury.)

22       A JUROR:  I am --

23       THE COURT:  Wait for the lawyers to come up.  Okay.

24   Your number?

25       A JUROR:  I'm Number 99.

1          THE COURT:  Okay.

2          MR. MEIER:  99?  I'm sorry.

3          A JUROR:  99.  I've been on EMS for 27 years and I

4   work closely with police/fire/EMS.  Also --

5          THE COURT:  Is that here in Jefferson County?

6          A JUROR:  Here in Jefferson County.  I also work as a

7   VIP, which is a volunteer with the police department helping

8   with different scenarios, and training, and things like that in

9   the school systems and what.  So I have friends that are police

10  officers, sheriffs, just the gamut.

11         THE COURT:  Okay.  And you don't know the defendant?

12         A JUROR:  No, I don't know either one that you --

13         THE COURT:  You don't know any of the police witnesses

14  that the Government has identified?

15         A JUROR:  No.

16         THE COURT:  So would your work as a -- with EMS, your

17  work alongside police officers, would that make it difficult for

18  you to be fair when you weigh the testimony of competing

19  witnesses?

20         A JUROR:  No.  Honestly, it makes me stand back and

21  take a much closer look, because you're working with EMS, you

22  know, can't make snap decisions.  You always have to weigh

23  patient care and things like that but...

24         THE COURT:  Okay.  So you could be fair to both sides?

25         A JUROR:  Oh, absolutely.

```
 1              THE COURT:  Okay.  You don't think you bring any bias
 2    in either for or against the police?
 3              A JUROR:  No, I don't think -- I know I wouldn't.
 4              THE COURT:  Mr. Meier?
 5              MR. MEIER:  No.
 6              MR. PERRAS:  No questions.
 7              THE COURT:  Thank you very much.
 8         (End of bench conference.)
 9              THE COURT:  Okay.  I think we're in the last section
10    over there, yeah.
11              A JUROR:  131.  I have a friend, very close friend
12    I've been friends with since childhood that's recently retired
13    from the FBI.
14              THE COURT:  All right.
15              A JUROR:  And my brother-in-law is a recently retired
16    Jefferson County prosecutor.  And I have a friend that's a
17    retired Tuscaloosa, Alabama, narcotics officer.  I'd like to
18    ask, may I approach and ask you a question?
19              THE COURT:  Sure.
20         (Bench conference on the record outside the hearing of the
21    jury.)
22              A JUROR:  I'm little embarrassed.  I have tinnitus,
23    ringing in the ears.  I'm not sure I heard.  Who's on trial
24    here, the police officer or the young man that the police
25    officer...
```

1    THE COURT:  Well, the police officer --

2    A JUROR:  Okay.

3    THE COURT:  -- is on trial.

4    A JUROR:  All right.

5    THE COURT:  And knowing that and knowing that you have

6    these relationships with folks associated with law enforcement,

7    do you think that would make it more difficult for you to be

8    fair?

9    A JUROR:  I've been wrestling with this since we've

10   been sitting down.  I'm not so sure I wouldn't be sympathetic to

11   the police officer.

12   THE COURT:  And why would that be?

13   A JUROR:  Actually, to be honest, in lieu of recent

14   events and the -- my friends that I mentioned -- not the

15   prosecutor, but some of the stories they've told me, I just...

16   THE COURT:  Yeah.

17   A JUROR:  Particularly the Tuscaloosa narcotics

18   officer.

19   THE COURT:  Yeah.  You think then that you would --

20   you would weigh the credibility of a police officer differently

21   than that of another witness?

22   A JUROR:  I think I could be impartial.

23   THE COURT:  All right.  The Government has indicated

24   that they intend to have witnesses who are police officers also.

25   Could you be equally fair to both sides in weighing the

```
 1    testimony of the various witnesses here?

 2              A JUROR:  Yeah, I think I can be fair.

 3              THE COURT:  Okay.

 4              A JUROR:  Yeah.

 5              THE COURT:  Mr. Meier.

 6              MR. MEIER:  Could I ask who you -- you said you had a

 7    brother-in-law who was --

 8              A JUROR:  Bill Bartley.

 9              MR. MEIER:  Okay.  That's not in Jefferson County?

10              A JUROR:  Yes, he's retired now.  He was, I believe, a

11    prosecutor in family court.

12              MR. MEIER:  Thank you.

13              A JUROR:  I mean, I have a judge that's a close friend

14    you probably know.  Jimmy Nicholson.

15              THE COURT:  Who?

16              A JUROR:  Jimmy Nicholson.

17              THE COURT:  I know the name.

18              A JUROR:  He's a criminal judge that's a golf buddy.

19              THE COURT:  Okay.  Do you-all have any --

20              MR. PERRAS:  Yeah, just a couple.  You mentioned on

21    the questionnaire --

22              THE REPORTER:  Mr. Perras --

23              THE COURT:  You're going to have to speak into the

24    microphone.

25              MR. PERRAS:  You mentioned on your questionnaire that
```

```
 1    in your view police are overinvestigated.  Can you talk a little
 2    bit about that.
 3              A JUROR:  That's just my opinion on various things
 4    I've read in the paper.
 5              MR. PERRAS:  If you're a juror in this case watching
 6    evidence of a trial against a police officer, would those
 7    opinions kind of become part of your -- the way you think about
 8    the case?
 9              A JUROR:  Well, that's what I've been wrestling with
10    in my mind.  I would -- I mean, I'm considering myself an
11    educated man, and I would try to weigh the facts evenly, yes.
12              MR. PERRAS:  You also mentioned -- there's a question
13    on the questionnaire whether it was fair to prosecute police
14    officers and you put "depends."
15              A JUROR:  Yeah, depends on the situation.
16              MR. PERRAS:  So you think in some cases it would be
17    and some cases it wouldn't be?
18              A JUROR:  Yes.
19              MR. PERRAS:  Okay.
20              A JUROR:  Yes.  May I go?
21              MR. PERRAS:  Yes, sir.
22              THE COURT:  Thank you very much.
23         (End of bench conference.)
24              THE COURT:  All right.  Yes, ma'am.
25              A JUROR:  Number 46.  I have a retired brother-in-law
```

```
 1   who was the jailer in Simpson County, another brother-in-law who
 2   was an assistant to the jailer.  He's retired also and he's
 3   Simpson County.  A retired Metro police officer nephew and a
 4   good friend whose husband is retired Metro police officer.  And
 5   may I approach the bench?
 6           THE COURT:  Sure, yeah.
 7      (Bench conference on the record outside the hearing of the
 8   jury.)
 9           A JUROR:  I took the gun conceal carry class in
10   Shepherdsville, and John was an assistant that day teaching that
11   class with Kenny Waters.
12           THE COURT:  John?
13           A JUROR:  The --
14           MR. MEIER:  Cottrell?
15           A JUROR:  Yes, Cottrell.
16           THE COURT:  Okay.
17           A JUROR:  He stepped in when Kenny had to be out.
18   Okay?  I'm afraid I would be biased in my opinion because of the
19   way he acted that day.
20           THE COURT:  Biased how?  You didn't have a good
21   experience?
22           A JUROR:  No.
23           THE COURT:  And so that would cause you to -- you
24   formed an opinion about Mr. Cottrell?
25           A JUROR:  I did, yes, yes.  He was very cocky.  He was
```

1    a jerk, let me put it that way.

2              THE COURT:  All right.

3              A JUROR:  Especially when we got out on the gun range.

4              THE COURT:  Okay.  And so that would -- is it fair to

5    say that that would make it -- that you would weigh the

6    credibility of any testimony he would give more harshly than you

7    would for someone that you haven't had an experience like that

8    with?

9              A JUROR:  It's hard to say.  That day he was just --

10   my opinion that day was that he was going over and beyond his

11   authority.

12             THE COURT:  All right.  So if you heard testimony on

13   that day that you had that experience, you would have had

14   difficulty --

15             A JUROR:  Oh, yes, definitely.

16             THE COURT:  -- being fair?

17             A JUROR:  Yes, definitely.

18             THE COURT:  But there's been a little time now since

19   then.

20             A JUROR:  Uh-huh.

21             THE COURT:  And if he testified in this trial, could

22   you be fair in receiving his testimony the same as you would all

23   other?

24             A JUROR:  Yes.

25             THE COURT:  Okay.  Mr. Meier.

1           MR. MEIER:  So is it fair that your opinion of

2    Mr. Cottrell didn't go to his credibility?  It went more toward

3    his attitude that day?

4           A JUROR:  Yes.

5           MR. MEIER:  Okay.  If he was to be a fact witness and

6    tell you, you know, the light was red or the light was green,

7    you wouldn't -- that wouldn't have any effect on your ability to

8    assess his credibility?

9           A JUROR:  No, no.

10           MR. MEIER:  Okay.  That's all, Judge.

11           THE COURT:  Your prior experience, in other words,

12    wouldn't impact the weight that you give his testimony overall;

13    right?  Is that what you're --

14           A JUROR:  Well, that day it would have been hard to

15    make a decision, let me put it that way.

16           THE COURT:  Right, right.  But now today --

17    Mr. Meier's question was sort of a straightforward example of if

18    he were to come in and testify as to whether the light was red

19    or green, but let's assume he's going to testify about more than

20    that.  Would you be -- would you tend to -- would you tend to

21    believe or not believe him because of your prior experience?

22    Would that affect --

23           A JUROR:  I wouldn't believe him from his prior

24    experience.

25           THE COURT:  All right.  Anything further, Mr. Perras?

```
1              MR. PERRAS:  No.

2              THE COURT:  Anything further, Mr. Meier?

3              MR. MEIER:  No.

4              THE COURT:  All right.  Thank you.

5          (End of bench conference.)

6              A JUROR:  Juror 80.  So I should start this by stating

7     I've lived in a lot of places over time, but I currently have a

8     close friend that's with the LMPD as an officer, a few friends

9     who are in the Indiana State Police, corrections officers, and a

10    lot of military people and several friends and family in the

11    FBI.

12         In all of those situations over the years, we've never

13    discussed any active cases at the time, nor do any of the

14    current conversations ever involve anything of that nature.  I

15    don't believe that any of those conversations or any of those

16    relationships would affect my ability to be completely fair and

17    listen to just the evidence presented.

18             THE COURT:  All right.  Thank you.

19             A JUROR:  You're welcome.

20             A JUROR:  Number 87.  My son is an Elizabethtown

21    police officer.

22             THE COURT:  All right.  And would that relationship

23    make it difficult for you to sit on a jury, and hear testimony

24    from law enforcement officers, and make decisions about the case

25    as I've described it to you?
```

1          A JUROR:  I think I could be very fair.

2          THE COURT:  You think you could be fair to both sides?

3          A JUROR:  Yes, sir.

4          THE COURT:  All right.  Thank you.

5          A JUROR:  Number 126.  I have a nephew that's retired

6     from the Louisville Police Department and now is currently a

7     deputy coroner.

8          THE COURT:  All right.  And does -- would that -- same

9     question.  Would that relationship make it more difficult for

10    you to be fair in this trial?

11         A JUROR:  No, sir.

12         THE COURT:  All right.  Thank you.

13         A JUROR:  Juror Number 110.  I have a nephew who is

14    currently employed with the CIA and a retired brother-in-law

15    from Shively Police.

16         THE COURT:  And also same question.  Would those

17    relationships make it more difficult for you to be fair were you

18    to be a member of the jury in this trial?

19         A JUROR:  I think because of the relationship I'm a

20    skeptic of a lot of things.

21         THE COURT:  You're a sceptic?

22       (Juror nodded head.)

23         THE COURT:  All right.  Well, why don't you come up

24    and let's talk about your skepticism briefly.

25       (Bench conference on the record outside the hearing of the

1    jury.)

2              THE COURT:  Yes, ma'am.  So when you say you're a

3    skeptic, I just thought we might talk up here about what you're

4    a skeptic of.

5              A JUROR:  People's -- what they see and what other

6    people see.  I've just seen -- I have heard both sides of what

7    actually happened, and it makes me skeptical of both things.

8              THE COURT:  All right.  Skepticism in and of itself is

9    not necessarily a bad thing --

10             A JUROR:  No, I agree.

11             THE COURT:  -- as long as it doesn't keep you from

12   being fair.  Can you be unbiased?  Can you be fair in the way

13   that you receive and listen to and consider the testimony that

14   you would hear in a trial?

15             A JUROR:  I believe I could be fair.

16             THE COURT:  All right.  And could you be equally fair

17   to both sides?  Could you hear the evidence and make your

18   decision based solely on the evidence and instruction from the

19   court?

20             A JUROR:  I could definitely try.

21             THE COURT:  Okay.  You seem to hesitate in giving that

22   response.  Do you think it would be difficult for you to do

23   that?

24             A JUROR:  I think my experience, just from my personal

25   experience has made it much more difficult being in a courtroom

```
 1    at this time.  And because I know a lot of things from my --
 2    what my nephew has said and what my brother -- brother-in-law
 3    has said, I see sides of a lot of things that doesn't get out to
 4    the public.
 5              THE COURT:  Okay.  All right.  Any follow-up?
 6              MR. MEIER:  No, sir.
 7              MR. PERRAS:  No.
 8              THE COURT:  Thank you.
 9        (End of bench conference.)
10              THE COURT:  Who's next?
11              A JUROR:  Juror 112.  My mother was a secretary for an
12    enforcement office of the IRS, and a friend of mine was in the
13    FBI and then a lawyer for the City of Louisville Police
14    Department in the 1970s.
15              THE COURT:  All right.  And would any of those
16    relationships make it more difficult for you to be fair?
17              A JUROR:  No.
18              THE COURT:  All right.  Thank you.
19        Excuse me.
20              A JUROR:  Number 107.  Your Honor, I'd like to
21    approach the bench.
22              THE COURT:  Sure.
23        (Bench conference on the record outside the hearing of the
24    jury.)
25              A JUROR:  I'm a retired firefighter and I have a
```

1    friend who is also a retired firefighter for Louisville, and he

2    is now currently a deputy for the Jefferson County Sheriff's

3    Department.  I'm in contact with him daily on social media.

4        And in addition to that, I was active duty fire when Officer

5    Mattingly was involved in his -- there was an incident here in

6    Louisville where he fired on a drug dealer, and I didn't agree

7    with the verdict.  He was found guilty.

8        Prior to that, there was an altercation -- well, more than

9    an altercation.  It was a situation where LMPD responded to --

10   they were trying to serve a warrant on a drug dealer and he took

11   off.  Now, when they chased him out back, he tried to get away

12   in a car.  They shot him.

13       The mayor then was Mayor Armstrong, I think, and he -- they

14   were supposed to be getting awards for service, outstanding

15   service.  He refused to give them the awards, and a lot of us

16   were upset about that.  In fact, we even marched on city hall

17   because of it.  I just wanted you to know that.

18           THE COURT:  All right.  And so from those opinions

19   should -- do you think then that it would be more difficult for

20   you to be fair in a case like this that involves a police

21   officer?

22           A JUROR:  I do because of my history with the police

23   department and the current political state with Black Lives

24   Matter and all the things that are going on now.  I think it

25   would be very difficult for me to be fair.

1          THE COURT:  You heard me say at the outset that race

2    is not an issue in this case.

3          A JUROR:  Right.

4          THE COURT:  But you think that it's -- you think that

5    what's going on in other unrelated cases would change your view

6    or make it difficult for you to be unbiased?

7          A JUROR:  I realize race is not an issue on this, but

8    the police are being -- I don't know how -- what word to use for

9    it.  They're being accused of misconduct at an extraordinary

10   rate.  I find it hard to believe that all that they're saying is

11   going on is going on.

12      I know Black Lives Matter thing is political, but there's

13   other forms of propaganda that have come out over the last 10 to

14   20 years that makes it difficult for me to not be biased in

15   favor of the police officer.

16         THE COURT:  All right.  And that would -- that would

17   be -- well, do you have any follow-up, Mr. Meier?

18         MR. MEIER:  Right.  I mean, in this case you're going

19   to hear testimony from -- I'm sorry -- in this case you're going

20   to hear testimony from police officers on their side, on the

21   Government's side.

22         A JUROR:  Okay.

23         MR. MEIER:  And then you're going to hear testimony

24   possibly from Officer Corder, who is charged in this.  Okay.  So

25   you're going to hear police officer testimony or they're going

```
 1    to have opinions both ways.  So in that context, does it -- do
 2    you feel like you aren't able to be fair just in this situation?
 3              A JUROR:  To be honest with you, I really don't know.
 4    I don't know.
 5              MR. MEIER:  Well, I'm not asking you to make a
 6    judgment.  The fact that you don't know, do you -- because you
 7    haven't heard any proof.
 8              A JUROR:  Right.
 9              MR. MEIER:  But the fact is police officers are going
10    to be testifying on both sides.
11              A JUROR:  Okay.  Let me break it down this way.  Let
12    me make it simpler.  I just wanted to let you guys know where
13    I'm coming.  If you're going to choose me, I just wanted you to
14    know how I feel ahead of time.
15              MR. MEIER:  I appreciate that and I guess what I'm
16    wondering though is do you feel like -- do you feel like you
17    have prejudged this case without hearing any evidence?
18              A JUROR:  No.
19              MR. MEIER:  Could you give the witnesses on their side
20    equal opportunity in your mind and fairly weigh what they say?
21    I mean, what I'm asking you, can you start everybody on a level
22    playing field?  However you come out is how you come out.
23              A JUROR:  It's difficult to say without knowing the
24    circumstances, but I -- I guess I could.  I guess I could.
25              THE COURT:  Do you think you come in knowing the -- a
```

1    police officer is the defendant, do you come in with skepticism

2    simply because the defendant's a policeman?

3              A JUROR:  Yes.

4              THE COURT:  You've got any follow-up, Mr. Perras?

5              MR. PERRAS:  No, Your Honor.  That's clear.

6              THE COURT:  All right.  Anything else, Mr. Meier?

7              MR. MEIER:  No.  Thank you.

8              THE COURT:  Thank you very much.  I appreciate your

9    candor.

10        (End of bench conference.)

11             THE COURT:  All right.  Anybody else on this broad

12   question of member of your family or close friend that's been

13   employed by a law enforcement agency?

14        All right.  Good.  Well, it's only 3:00 and we've gotten

15   through three questions so that's pretty good.  We're doing well

16   though.

17        All right.  The next question is -- and we'll go around the

18   room again -- have you ever been involved in any court in a

19   criminal matter that concerned yourself, any member of your

20   family, or a close friend either as a defendant, a witness, or a

21   victim?

22        All right.  And I'm going to read it again.  Have you ever

23   been involved in any court in a criminal matter that concerned

24   yourself, any member of your family, or a close friend either as

25   a defendant, a witness, or a victim?

1    All right.  We'll start back over here on this side.  Yes,

2    ma'am.  We'll start with you.  You've told us that you're Juror

3    74.  Is that correct?

4              A JUROR:  Yes.

5              THE COURT:  Do you have anything to add from what you

6    told us when you were up here before?

7              A JUROR:  No.

8              THE COURT:  All right.  Thank you.  Yes, sir.

9              A JUROR:  May I approach the bench?

10             THE COURT:  Sure.

11             A JUROR:  Thank you, sir.

12       (Bench conference on the record outside the hearing of the

13    jury.)

14             A JUROR:  I have a very close friend of mine -- I

15    think it was last year -- he was arrested for prescription drug

16    abuse.

17             THE COURT:  All right.

18             A JUROR:  And had to go on trial and he pled guilty.

19             THE COURT:  All right.  And he was a close friend?

20             A JUROR:  Yes.

21             THE COURT:  Were you a witness?

22             A JUROR:  I wasn't a witness to, you know, have to go

23    to court or anything like that.

24             THE COURT:  Okay.  Anything from that experience, any

25    take-away from that experience harden your views on the court

```
 1   system or the trial process?

 2              A JUROR:  I think if this was a drug case, I may have

 3   some issues with it just because of, you know, my experience

 4   with my friend, but since this is not a drug case, I think I

 5   could view all parties fairly.

 6              THE COURT:  Okay.  You could weigh everybody's

 7   testimony evenly and fairly?  You wouldn't have any bias coming

 8   in before you've even heard the testimony or seen the evidence?

 9              A JUROR:  No, sir, Your Honor.

10              THE COURT:  All right.  Thank you.

11              A JUROR:  Thank you.

12         (End of bench conference.)

13              THE COURT:  All right.  Anybody else in that first

14   section there on the right side?  No.

15         How about the second section over?

16              A JUROR:  Would you repeat the question, please.

17              THE COURT:  I would be happy to.

18         Have you ever been involved in any court in a criminal

19   matter that concerned yourself, any member of your family, or a

20   close friend either as a defendant, a witness, or a victim?

21              A JUROR:  Juror 61.  I'd like to approach, please.

22              THE COURT:  Okay.

23         (Bench conference on the record outside the hearing of the

24   jury.)

25              A JUROR:  I'm still -- it wasn't actually court.  This
```

1    was a case that never made it to court.

2              THE COURT:  Okay.

3              A JUROR:  It involved my grandson, 22 years old, who

4    was charged with a felony involving sex with a 15-year-old girl

5    that he met on the internet who supposedly was 18.  My issue is

6    at the same time -- this has been going on for three years.

7    He's awaiting sentencing -- is at the very same time in the

8    outlying counties there were two police officers, middle-aged

9    men with families who was accused of the very same charges,

10   having sex with a 15-year-old girl that they just knew from

11   their county, the same girl.  My grandson was released on a

12   $20,000 bond, home incarcerated.  The police officers were

13   released on $1,000 bond, no home incarceration.

14      My grandson is ending up spending almost four years home

15   incarcerated.  He will be labeled a sex offender for the rest of

16   his life.  The police officers are not labeled sex offenders and

17   they were put on probation, no time served.

18             THE COURT:  All right.  Where was this?

19             A JUROR:  My grandson's here in this -- in

20   Jeffersonville.  The officers were in one of the outlying

21   counties.  I don't remember exactly.  And this information I

22   received from the media and the newspaper.

23             THE COURT:  Okay.  Your grandson is in Jeffersonville,

24   Indiana?

25             A JUROR:  No, Jeffersonville.

```
1              THE COURT:  J-Town?

2              A JUROR:  Yeah, J-Town.

3              THE COURT:  So here in Jefferson County.

4              A JUROR:  Right, right.

5              THE COURT:  He was prosecuted in Jefferson Circuit

6    Court?

7              A JUROR:  Yes.

8              THE COURT:  Okay.  And so from that experience

9    you've -- I take it you've developed some skepticism.

10             A JUROR:  I'm just bitter about it all, and I don't

11   think I could be fair.

12             THE COURT:  All right.

13             A JUROR:  I really don't.

14             THE COURT:  You don't think you could be fair to...

15             A JUROR:  The police officer.

16             THE COURT:  Okay.

17             A JUROR:  The whole judicial system at this point in

18   time.  I mean, I'm just -- just really disillusioned by it all.

19             THE COURT:  Okay.  And you think that experience with

20   your grandson would make it too difficult for you to simply

21   decide the case based on the evidence that's presented here?

22             A JUROR:  I do, I do.  I just don't think I would be

23   fair to anyone.

24             THE COURT:  All right.  Mr. Meier, you have any

25   follow-up?
```

```
 1              MR. MEIER:  No.  Thank you.

 2              THE COURT:  Mr. Perras?

 3              MR. PERRAS:  No.

 4              THE COURT:  Thank you, ma'am.

 5              A JUROR:  Thank you.

 6         (End of bench conference.)

 7              A JUROR:  May I approach?

 8              THE COURT:  Yes.  I'm going to get you-all stools, put

 9    stools up here, yeah.

10         (Bench conference on the record outside the hearing of the

11    jury.)

12              A JUROR:  I really don't know how much --

13              THE COURT:  You're Juror 90; is that right?

14              A JUROR:  I'm sorry.  I'm Juror 90, yes.

15              THE COURT:  That's all right.

16              A JUROR:  I have a 29-year-old son that has been what

17    we call a handful, and he's kind of been in and out.  He's been

18    in Buck Snort or -- Buckhorn and he has been in the Wilderness

19    Challenge.  And we have been in court a time or two with him.

20    So I just didn't know what all I needed to bring up about that.

21              THE COURT:  Okay.  And as a result of your son's

22    involvement in the criminal justice system, has that caused you

23    to develop strong feelings --

24              A JUROR:  No, I can be fair, yes.

25              THE COURT:  You think that you can listen to law
```

```
 1    enforcement officers whether they be for one side or the

 2    other --

 3              A JUROR:  Yes.

 4              THE COURT:  -- and weigh their credibility --

 5              A JUROR:  Yes.

 6              THE COURT:  -- fairly?  All right.  Thank you.  Any --

 7              MR. MEIER:  Your son was in juvenile court?

 8              A JUROR:  Yes, most of it was -- yes, it was all

 9    juvenile, yes.

10              MR. MEIER:  Okay.  Thank you.

11              MR. PERRAS:  I just have a quick thing.  You mentioned

12    on your questionnaire that your son was arrested for disorderly

13    conduct.

14              A JUROR:  He got drunk, ran from the police officers.

15    He was 16.

16              MR. PERRAS:  So one of the allegations in this case is

17    that the police officer who's the defendant, Matthew Corder,

18    falsely arrested a person and then claimed that he was -- he

19    committed disorderly conduct and fled from police, and the

20    allegation is that that never happened.  Would your experience

21    with your son being arrested for disorderly conduct and your

22    knowledge of the disorderly conduct statute have any impact on

23    your ability to evaluate whether that happened in this case?

24              A JUROR:  No.  I know my son was guilty and I don't

25    think that -- with the evidence, no, I don't think that I would
```

```
 1    have a big weight either way.

 2              MR. PERRAS:  Okay.

 3              THE COURT:  Thank you.

 4       You guys can just stay up here.

 5       (Juror exiting bench.)

 6       (Juror approaching bench.)

 7              THE COURT:  Assembly line voir dire, how's that?

 8              A JUROR:  Yes.  Juror Number 25.  I was charged with

 9    burglary -- I don't remember what degree -- which was later

10    dismissed and expunged off my record.

11              THE COURT:  Okay.  And this has been some time ago?

12              A JUROR:  It's been within the last 10 years.

13              THE COURT:  Okay.  All right.  And from that

14    experience, did that cause you to develop any strong feelings

15    about police officers, about the criminal justice system?

16              A JUROR:  The ones that arrested me, yes, but other

17    ones, no.

18              THE COURT:  So the strong feelings you have about the

19    one who arrested you, you wouldn't -- you would not necessarily

20    extend that -- those strong feelings to others?

21              A JUROR:  No.

22              THE COURT:  All right.  So would you be able to weigh

23    the evidence as it's presented and be fair to both sides?

24              A JUROR:  I believe so, yes.

25              THE COURT:  All right.  Thank you.
```

```
1          (Juror exiting bench.)

2          (Juror approaching bench.)

3              THE COURT:  You're Number 102; right?

4              A JUROR:  102.

5              THE COURT:  102.

6              A JUROR:  I was a defendant in a couple criminal cases

7    when I was 19 years old.  It's cold checks.  I paid restitution

8    on that, and I had a cold check at 19 in Fayette County, but

9    it's a felony but it's -- back then it was like $100 was a

10   felony.  It was like 101.  I forgot about it.  I thought my

11   ex-wife would pay it, and I went to jail on that for one day.

12   It was dropped to a misdemeanor and one year probation.

13             THE COURT:  All right.

14             A JUROR:  And an alcohol intoxication when I was 26.

15   The designated driver decided he wanted to drink and I didn't

16   know it.

17             THE COURT:  Okay.  And from those experiences, have

18   you developed strong feelings one way or the other about the

19   police department, about law enforcement, the criminal justice

20   system?

21             A JUROR:  No, no, Your Honor.

22             THE COURT:  Would you be able to make a decision on --

23   in this case based on -- solely on the evidence and not based on

24   your own scrapes with the system itself?

25             A JUROR:  The own evidence and the evidence against
```

1    the police department or anybody, straight up fairness, Your

2    Honor.

3              THE COURT:  All right.  Mr. Meier?

4              MR. MEIER:  Nothing.  Thank you.

5              THE COURT:  Mr. Perras?

6              MR. PERRAS:  No.

7              THE COURT:  All right.  Thank you very much.

8              A JUROR:  Thank you.

9         (End of bench conference.)

10             A JUROR:  Juror 64.  You want to know why I went to

11   court?  Eighteen years ago my husband and I got pulled over, and

12   he got a DUI and I got a PI.

13             THE COURT:  Okay.

14             A JUROR:  I tried to tell the officer I wasn't

15   intoxicated.  He gave me a test, said I was.  We went to court,

16   took the urine test.  When they did the urine test and

17   everything, I was fine.

18             THE COURT:  All right.  And from that experience did

19   you develop strong feelings about law enforcement officers or

20   the criminal justice system?

21             A JUROR:  I did with the officer lying.  He lied in

22   court.

23             THE COURT:  With the officer that arrested you or --

24             A JUROR:  Uh-huh.

25             THE COURT:  -- or cited you?  Do you extend those

1    strong feelings to other law enforcement officers?  Why don't

2    you approach also.  I haven't seen the lawyers up here in the

3    last 30 seconds, so you might as well come on up.

4        (Bench conference on the record outside the hearing of the

5    jury.)

6            THE COURT:  The reason I prefer to hear your answer up

7    here is I don't want the rest of the jury pool to hear you say

8    that every police officer --

9            A JUROR:  No, not every.  I've had good and bad

10   experiences.

11           THE COURT:  What I want to make -- what I want to ask

12   you about is this same question you've heard now repeatedly.  Is

13   your prior experience, does that mean that you couldn't be fair

14   and hear the testimony that comes into the case?

15           A JUROR:  It doesn't mean I couldn't be fair, but I

16   would have to see the facts.

17           THE COURT:  Okay.

18           A JUROR:  It would not be -- I couldn't go -- if it

19   wasn't facts, I wouldn't judge.  You know what I'm saying?

20           THE COURT:  I think I do.

21           A JUROR:  It's just because this officer just flat out

22   lied in court, just flat out lied in court.

23           THE COURT:  Okay.  Do you know whether there was any

24   consequences to him for doing that?

25           A JUROR:  No, there was none.

```
 1                THE COURT:  Okay.  And --

 2                A JUROR:  But he was a trooper going into a detective.

 3                THE COURT:  Okay.

 4                A JUROR:  And it was -- it was just a bad situation.

 5                THE COURT:  Okay.  Mr. Meier.

 6                MR. MEIER:  Yes, ma'am.  One of the -- of course, in

 7      this case the officer is on trial.  He's the defendant.

 8                A JUROR:  Uh-huh.

 9                MR. MEIER:  And one of the allegations is going to be

10      that he lied or at least misled the facts when he wrote down the

11      citation.  That's what they're claiming.  He's denying that.  Do

12      you believe that your experience, which is kind of similar in

13      terms of the allegation, would have some kind of effect on you,

14      the playing field wouldn't maybe be level given the fact of your

15      personal experience?

16                A JUROR:  What I would have to tell you is I would

17      have to hear both sides, and I would have to try to judge their

18      character on --

19                THE REPORTER:  I'm sorry?  I didn't hear the last

20      part.

21                THE COURT:  This is the microphone that the court

22      reporter listens through so you can just talk into that one.

23                A JUROR:  You want me to repeat it?

24                MR. MEIER:  I think she does.

25                A JUROR:  I would say I would have to listen to both
```

1    sides and go by that because everybody lies.  Some people do.

2             THE COURT:  In listening to both sides, can you be

3    fair to be both sides?

4             A JUROR:  Oh, yes, I would absolutely be fair.

5             THE COURT:  And would your prior experiences cause you

6    to weigh the credibility of a law enforcement officer

7    differently than any other witness?

8             A JUROR:  No.

9             THE COURT:  All right.

10            A JUROR:  No, because I've had good experiences too.

11            THE COURT:  Okay.  Anything further?

12            MR. MEIER:  Nothing.

13            THE COURT:  Anything further?

14            MR. PERRAS:  Nothing.

15            THE COURT:  Thank you.

16            A JUROR:  Thank you.

17       (Juror exiting bench.)

18       (Juror approaching bench.)

19            A JUROR:  97.  In 1985, my dad was involved in the

20   foster child scandal in Bullitt County.  He pled the *Alford*

21   plea.  The thing it has done to me is that I'm very, very firmly

22   a believer in innocent until proven guilty.

23            THE COURT:  Okay.  And can -- does that mean that you

24   would have any difficulty in being fair to both sides and

25   listening to all the evidence?

1          A JUROR:  I don't think I would have any difficulty

2    being fair.  If they said something, if I felt like it was --

3    you know, if you had proven to me.

4          THE COURT:  Right.  Okay.

5          A JUROR:  I mean, if you tell me you saw it yourself,

6    no.

7          THE COURT:  What we want is we want jurors who cannot

8    release their past but jurors who can listen and apply --

9          A JUROR:  Common sense.

10         THE COURT:  -- only what they -- listen to the

11   testimony and receive the evidence that they get in the

12   courtroom and make their decision based on that alone and not

13   base their decision on something that happened to them --

14         A JUROR:  I know.

15         THE COURT:  -- in a prior situation.

16         A JUROR:  I understand.

17         THE COURT:  So could you -- in this case, if you were

18   on this jury, could you be fair to both sides and could you make

19   your decision based on the evidence that you hear in the

20   courtroom and the instruction that you get from me and not based

21   on any other --

22         A JUROR:  Oh, I think so.

23         THE COURT:  -- outside influence?

24         A JUROR:  I think so.

25         THE COURT:  Okay.

1           A JUROR:  Yes.

2           THE COURT:  All right.  Mr. Meier, anything?

3           MR. MEIER:  No.  Thank you.

4           MR. PERRAS:  Just briefly.  So if you were a juror on

5    this case -- obviously, the defendant is a police officer.  If

6    you heard all the evidence and you determined that the police

7    officer committed intentional misconduct, and you felt that that

8    was proved beyond a reasonable doubt, that all the charges were

9    proved, could you give a verdict of guilty?

10          A JUROR:  Yeah.  I mean, just because he's a police

11   officer doesn't affect anything.

12          MR. PERRAS:  Okay.

13          A JUROR:  You know.

14          THE COURT:  Thank you.

15      (Juror exiting bench.)

16          THE COURT:  All right.  Juror Number 24.

17      (Juror approaching bench.)

18          THE COURT:  Yes, sir.

19          A JUROR:  How you doing, Your Honor?

20          THE COURT:  Good.

21          A JUROR:  Forty-one years ago I was shot by Louisville

22   Metro Police Department in a robbery.  It was like a set-up.  I

23   was set up in a robbery 41 years ago.  I was 23.  And what

24   happened out of it, it was -- they amended it down to robbery by

25   violence, but I was set up by a person that set me up on it.  I

```
 1    didn't do any time.  I did two years probation.  I healed.
 2    That's it and I don't think I would be a good deal in this.
 3              THE COURT:  You don't think what?  I'm sorry?
 4              A JUROR:  I don't think I would be a good juror in
 5    this case.
 6              THE COURT:  You don't think you would?
 7              A JUROR:  No.
 8              THE COURT:  Because of that prior experience?
 9              A JUROR:  Because of what happened, yeah.  It wasn't
10    right.  It wasn't right.  What went down wasn't right because
11    the guy who set me up was friends with the cops.
12              THE COURT:  Okay.
13              A JUROR:  And they gave him some stuff going on.  I
14    worked for this guy and they -- it shouldn't have happened like
15    that.
16              THE COURT:  And did you -- did you have a trial or did
17    you plead guilty or --
18              A JUROR:  I had a trial.
19              THE COURT:  You had a trial?
20              A JUROR:  Uh-huh, yeah.
21              THE COURT:  And were you found guilty as a result of
22    the trial?
23              A JUROR:  They amended it down to robbery by violence.
24    I didn't have a gun or nothing like that.
25              THE COURT:  Okay.
```

1          A JUROR:  I was supposed to go in and got money and

2     shared it with the guy who set me up, but he set me up to be

3     killed and he keep the money.

4          THE COURT:  I see.  So were you convicted of a crime

5     at the end of the trial?

6          A JUROR:  Yeah, they convicted me --

7          THE COURT:  Oh, they did.

8          A JUROR:  -- of robbery by violence.

9          THE COURT:  Okay.  By violence.

10         A JUROR:  By violence, that's what they amended to.

11         THE COURT:  You spent two years locked up?

12         A JUROR:  Probation.

13         THE COURT:  Probation.

14         A JUROR:  Probation two years.

15         THE COURT:  All right.  And that was 41 years ago?

16         A JUROR:  Forty-one years ago, yeah.

17         THE COURT:  Is it fair to say that would make it --

18         A JUROR:  Say what?

19         THE COURT:  Is it fair to say that experience would

20     make it difficult for you?

21         A JUROR:  Yeah, it would make it difficult because I

22     don't think the cops should have been in on that.

23         THE COURT:  Okay.  Now, I --

24         A JUROR:  Not to shoot me up like that.

25         THE COURT:  Right.  In this case there is the

```
 1    potential for testimony to come from police or law enforcement
 2    officers on both sides of the case.
 3              A JUROR:  Uh-huh.
 4              THE COURT:  Would that matter to you?  Could you weigh
 5    the testimony evenly?
 6              A JUROR:  I don't think I'd be a good juror on this
 7    one.
 8              THE COURT:  Okay.
 9              A JUROR:  I really don't.
10              THE COURT:  All right.
11              A JUROR:  I don't --
12              THE COURT:  Mr. Meier, do you have questions?
13              MR. MEIER:  Nothing.
14              THE COURT:  Mr. Perras?
15              MR. PERRAS:  No.
16              THE COURT:  I appreciate your candor.  Thank you.
17         (Juror exiting bench.)
18         (Juror approaching bench.)
19              A JUROR:  I just don't know how much it applies, but
20    on my wife's side of the family, they had a family member
21    murdered in 1989 here in Louisville.  So I just -- I don't know
22    if -- I wasn't a witness.  I wasn't --
23              THE COURT:  Right.
24              A JUROR:  -- involved in that.
25              THE COURT:  As a result of that, that family
```

1    experience, has it changed or does it shape how you view police

2    officers, law enforcement officers, the criminal justice system?

3              A JUROR:  No, no.  I mean, it's more turned the family

4    upside down, of course, as you can imagine.  But, no, no,

5    everything was handled -- except for the person, you know, that

6    was found guilty and the resentment and the sentence and all

7    that stuff was going to, you know, haunt them forever.

8              THE COURT:  What was the result?

9              A JUROR:  He was a juvenile and he was -- he was

10   convicted but, of course, under the juvenile courts, he was let

11   out very, very early.

12             THE COURT:  All right.

13             A JUROR:  So he didn't serve a lot of time.  That,

14   obviously, is --

15             THE COURT:  Creates --

16             A JUROR:  -- creates issues.

17             THE COURT:  -- strong feelings.

18             A JUROR:  Uh-huh.

19             THE COURT:  Would this experience make it more

20   difficult for you to sit on a jury and be fair when the law

21   enforcement process is an issue in the trial?

22             A JUROR:  No, I think I would be okay there.

23             THE COURT:  All right.  Mr. Meier.

24             MR. MEIER:  Could I just clarify.  I may have missed

25   the beginning.  Someone on your wife's side of the family was a

1    victim?

2          A JUROR:  Yes.

3          MR. MEIER:  Not charged, was a victim.

4          A JUROR:  Someone in my wife's family was murdered,

5    yes, was the victim.

6          MR. MEIER:  I understand.  The killer was a juvenile?

7          A JUROR:  Yes.

8          THE COURT:  Anything in follow-up?

9          MR. PERRAS:  Yes, Your Honor, just briefly.  So you

10   put in your questionnaire that you don't know whether it's right

11   to prosecute police officers.  This is, obviously, a prosecution

12   of a police officer.

13         A JUROR:  That's a different question.  Is that the

14   one you're getting to later?

15         THE COURT:  Uh-huh.  That's okay.

16         A JUROR:  Let's answer it now, yeah.  When I read that

17   question, I had never posed that question to myself --

18         THE REPORTER:  I'm sorry, sir.  Can you move closer to

19   the microphone.

20         THE COURT:  Yes, she's listening through there.

21         A JUROR:  The instruction said, if you're not sure,

22   then say you're not sure.  I never ever thought about that

23   before as far as if I had strong feelings about prosecuting one

24   way or the other.

25         MR. PERRAS:  Have you had a chance to think about it

1    since then?

2              A JUROR:  A little bit.  I don't know that I still

3    have come to a conclusion one way or the other, but I have

4    thought about it a little bit --

5              MR. PERRAS:  Okay.

6              A JUROR:  -- since that question.  It made me think.

7              MR. PERRAS:  In this case you would potentially be a

8    juror in deciding the guilt or innocence of a police officer.

9    And so before everybody's seated in the jury, the court needs to

10   make sure that everybody would be able to be fair and impartial.

11   And so I guess if you still haven't come to a decision, you

12   should hopefully by the end of the day have a decision on

13   whether you think you would be a proper juror for this case

14   or -- because if you don't think it's right to prosecute police

15   officers, it sounds like it would be tough for you to be fair in

16   a case where the prosecution is against a police officer.

17             A JUROR:  Yeah, yeah.

18             MR. PERRAS:  That's all I have.

19             A JUROR:  I understand the question for sure.

20             THE COURT:  Do you think you could be fair?

21             A JUROR:  I sure -- I believe I could.  In my heart, I

22   want to believe I could do that, yeah, and I think -- yeah,

23   that's why I'm here.

24             THE COURT:  All right.  Thank you.

25             A JUROR:  Appreciate it.

```
 1        (Juror exiting bench.)
 2        (Juror approaching bench.)
 3             THE COURT:  Yes, ma'am.
 4             A JUROR:  I try not to hang out up here, but you
 5   asked.
 6             THE COURT:  That's okay.
 7             A JUROR:  In 1990, I was a witness to a young lady
 8   that was -- actually, two people that were abducted and
 9   assaulted on my street in a car and it resulted in a kidnapping.
10   I had to witness -- I was a witness for that.  They found him
11   guilty and sent him away in --
12             THE COURT:  Was there a trial?
13             A JUROR:  It was a trial.
14             THE COURT:  And you were --
15             A JUROR:  I was a witness.
16             THE COURT:  -- a witness in the trial?
17             A JUROR:  Because she -- one of them got away and ran
18   up to the house, and I was the only one that would open the
19   door.
20        And then in '97 -- and y'all get one minute to laugh at
21   this -- I was working on a farm and got attacked by a reindeer.
22   Yes, go ahead, get it out of your system.
23             MR. MEIER:  I'm sorry.
24             A JUROR:  Yes, a reindeer as in Santa Claus, ho, ho.
25   It gored me several times, stomped me.
```

1          THE COURT:  Goodness gracious.

2          MR. MEIER:  Not so fun.

3          A JUROR:  At first people are like, "Really?"  So that

4    resulted in a lawsuit to get medical bills paid, that kind of

5    stuff paid.

6        And then up until three years ago, I chased my ex-husband

7    around for child support and had him locked up about five times

8    before they finally got all that taken care of.

9        And then I have been pending now -- I was working a concert,

10   EMS on duty, had a patient get out of control, injured me and my

11   partner.  And because we were on duty working, he's got two

12   charges, felony charges against him for assaulting a government

13   worker.

14         THE COURT:  That's ongoing?

15         A JUROR:  That's ongoing.  We go to trial in December.

16         THE COURT:  Okay.  I appreciate you passing all of

17   that along.  And as a result of any of those -- any or all of

18   those experiences, is your ability to be fair in a trial like

19   this compromised?

20         A JUROR:  Not really.

21         THE COURT:  All right.

22         A JUROR:  No.

23         THE COURT:  You think you can weigh the evidence and

24   follow the court's instructions and decide the case fairly to

25   both sides based solely on the evidence that you hear --

1          A JUROR:  I'll do my best to --

2          THE COURT:  -- in the trial?

3          A JUROR:  -- but until I'm put in the situation, I

4    don't know.  I've never been on jury duty.  You know, I'm honest

5    and I'm one of these people that don't ask me if you don't want

6    to know.

7          THE COURT:  Well, I'm asking you.

8          A JUROR:  But I'm one of those terrified of reindeer.

9          THE COURT:  I'm glad you're okay.  To your point about

10   if you don't want to know don't ask, I'm asking you.  Can you

11   follow my instructions?

12         A JUROR:  Oh, absolutely.

13         THE COURT:  And you can anticipate one of my

14   instructions will be that you're to decide the case based on the

15   evidence that you hear in this courtroom and not based on

16   anything that you pick up or learn outside the courtroom.

17         A JUROR:  Oh, yeah.  If I'm chosen or whatever and

18   there are questions, do we come to you?  How is that -- if at

19   any time I start feeling something like I --

20         THE COURT:  Well, there's a process for that, but it's

21   actually fairly limited.  You have to simply listen to the

22   instruction of the court.

23         A JUROR:  Abide by you and nobody else, yeah.

24         THE COURT:  Yes.

25         A JUROR:  I'm good.

1          THE COURT:  Any follow-up?

2          MR. PERRAS:  No.

3          MR. MEIER:  No.

4          THE COURT:  All right.  Thank you.

5      (End of bench conference.)

6          THE COURT:  Everybody still remember what question

7    we're on?

8        All right.  Have you ever been involved in any court in a

9    criminal matter that concerned yourself, any member of your

10   family, or a close friend either as a defendant, a witness, or a

11   victim?  Anybody else like to talk about that question?

12       All right.  Great.  Thank you-all.

13       I think that the next few questions should not yield quite

14   as many responses.  This next question is, as I mentioned

15   earlier -- you've heard me say or ask this question in some form

16   or fashion now dozens of times.  So I need to ask it in summary

17   fashion, and I'm going to read it so that I get it exactly

18   correct, but you only need to respond if you haven't already

19   responded to this question.  All right?

20       If you are -- here's the question:  If you are selected to

21   sit on this case, will you be able to render a verdict solely on

22   the evidence presented at the trial and in the context of the

23   law as I will give it to you in my instructions, disregarding

24   any other ideas, notions, or beliefs about the law that you may

25   have encountered in reaching your verdict?

1    All right.  If you've already discussed with us either

2  openly or up here at the bench a response to another question

3  where we've talked about that issue, about your ability to

4  render a verdict solely on the evidence presented at the trial,

5  then you don't need to repeat what you've already said.  But if

6  you've not had an opportunity and now listening to this question

7  you need to discuss an answer, now would be your opportunity.

8    And I'll read it again:  If you are selected to sit on this

9  case, will you be able to render a verdict solely on the

10  evidence presented at the trial and in the context of the law as

11  I will give it to you in my instructions, disregarding any other

12  ideas, notions, or beliefs about the law that you may have

13  encountered in reaching your verdict?

14    All right.  So anybody who hasn't had a chance to talk about

15  that broad category before, if you need to talk about it now,

16  please raise your hand.  No?  All right.

17    Next question:  Is there any member of the panel who has any

18  special disability or problem that would make serving as a

19  member of this jury difficult or impossible?

20    Now, a couple of you have raised, when you've been up here,

21  some issues that you have.  If you've already raised the issue,

22  you don't -- you don't need to raise it again.  But if you

23  haven't had an opportunity and if you do have a special

24  disability or problem that would make serving on this jury

25  difficult or impossible, I'd like for you to let us know.

1          Okay.  The next question:  Have any of you ever had any

2     claim, or lawsuit, or any other type of litigation against or

3     with the United States or one of its agencies?  This might be a

4     lawsuit or some type of administrative proceeding.  The agency,

5     for example, could be the U.S. Postal Service, the IRS, the

6     Social Security Administration, the FBI, the Veteran's

7     Administration, or any other federal agency.  This is any type

8     of litigation, lawsuit, administrative proceeding involving any

9     of those agencies.

10          All right.  No response to that.  Thank you.

11          The next question:  The parties would like to know if any

12     member of the jury pool has frequent interaction with police or

13     law enforcement officers?  Now, again, this is the type of

14     question where if you've already had an opportunity to come up

15     in response to another question and answer and tell us about

16     either your work, or relative, or something along those lines or

17     your prior issues, you don't need to repeat what you've already

18     told us.  But if you have an answer to this question and you've

19     not had a chance previously to discuss it with us, now would be

20     the time.

21          And I'll read it again:  The parties would like to know if

22     any member of the jury pool has frequent interaction with police

23     or law enforcement, again, if it's -- if you've not had an

24     occasion to tell us about that previously.  Yes, sir.

25               A JUROR:  Juror 112.  I used to work for a newspaper

1    and I would call the police almost every day.

2            THE COURT:  So your interaction with them was work

3    related; is that right?

4            A JUROR:  Yes.

5            THE COURT:  Anything from that experience that -- or

6    was there anything in your experience working for the newspaper

7    and interacting with the police that would make it difficult for

8    you to be fair and impartial in this trial?

9            A JUROR:  No.  It was usually cordial and

10   businesslike.

11           THE COURT:  Good.  Thank you.

12        Anybody else?  Yes, sir, up here.

13           A JUROR:  Juror 18.  My boss is a Vine Grove part-time

14   police officer so that's it.

15           THE COURT:  He's your boss in a different context,

16   different type of work?

17           A JUROR:  No, he's my project manager and I guess on

18   the side he does work for Vine Grove.

19           THE COURT:  But you're not a law enforcement officer?

20           A JUROR:  No, no, no.

21           THE COURT:  Okay.  And is there anything from your

22   experience in interacting with him that would make it difficult

23   for you to be fair and impartial?

24           A JUROR:  No, sir.

25           THE COURT:  All right.  Thank you.  Anybody else?

1     All right.  Having heard the various questions that I've

2     asked you, does any other reason suggest itself to you as to why

3     you could not sit on this jury and render a fair verdict based

4     on the evidence presented to you and in the context of the

5     court's instructions to you on the law?

6     And, again, if -- this is asking for you to respond with

7     something different than anything you might have already told

8     us.  The lawyers here are good note takers so -- and our court

9     reporter has recorded what you've told us previously so -- but

10    if there is something that you've not had occasion to tell us

11    already, is there anything -- now having heard the questions put

12    to you by the court, does any other reason suggest itself to you

13    as to why you could not sit on this jury and render a fair

14    verdict?  No?

15    All right.  If you would, give the lawyers and me just a

16    minute or two here at the bench.  We're working our way through

17    the end of this process.  Thank you.

18    (Bench conference on the record outside the hearing of the

19    jury.)

20    THE COURT:  Okay.  What I'd like to do is hear from

21    you on any lingering issues of import that you think need to

22    be -- you think need to be the subject of some follow-up

23    questions.  So I'll start with the Government first.  How

24    many --

25    MR. PERRAS:  I'll just go through them.  ▮▮▮▮▮

1   ███████, Juror Number 111, she didn't raise her hand or

2   anything, but from the questionnaire, she said her sister was

3   sexually assaulted.  She had a bad experience with the police

4   and prosecutor.  She had a bad experience as a juror in that

5   case.

6        This one man, ███████████ --

7            THE COURT:  Okay.  Let's talk about that one first.

8   Let's just take them in order, 111.  What do you think remains

9   to be asked of that juror?

10           MR. PERRAS:  Just whether that would impact her --

11           MS. WYROSDICK:  Which one?

12           MR. PERRAS:  I mean, we don't have to go through that,

13   but I just wanted to raise that issue with the court, given that

14   she wrote it in her questionnaire.

15           THE COURT:  We didn't talk with her; is that right?

16           MS. WYROSDICK:  She said she had jury duty.

17           MR. MEIER:  That's the only thing I have on her.  You

18   talking about something she said in her questionnaire?

19           MR. PERRAS:  Questionnaire.

20           MS. GREGORY:  We didn't talk to her at the bench.

21           THE COURT:  Okay.  We did not talk with her here; is

22   that right?  What's your position on that?  Do you think we need

23   to follow up with her?

24           MR. MEIER:  That's fine.

25           THE COURT:  Okay.

1        (End of bench conference.)

2              THE COURT:  This is the -- you-all can stay up here.

3    This is the point where we might have some follow-up questions.

4    These will appear to be random, but I assure you that these

5    highly experienced and well organized lawyers, their approach is

6    anything but random.  It's designed to be as efficient as

7    possible, I assure you.  So we're going to try and ask as few

8    follow-up questions as is necessary, but the first person is --

9    who was it?

10             MR. PERRAS:  Juror Number 111.

11             THE COURT:  Juror Number 111, if you could come up to

12   the bench for a brief follow-up question.

13       (Bench conference on the record outside the hearing of the

14   jury.)

15             THE COURT:  Thank you.  So you had a question -- or a

16   response on the questionnaire that was mailed out.

17             A JUROR:  Uh-huh.

18             THE COURT:  And, Mr. Perras, tell me about that real

19   briefly.

20             MR. PERRAS:  You indicated in your questionnaire that

21   your sister was sexually assaulted.

22             A JUROR:  Yes, she was.

23             MR. PERRAS:  You had a bad experience with both the

24   police and the prosecutors in that case.

25             A JUROR:  Uh-huh.

```
 1              MR. PERRAS:  We were just wondering if that would
 2   impact your --
 3              A JUROR:  No, no, it has no effect on what I'm doing
 4   here today.
 5              MR. PERRAS:  Okay.
 6              THE COURT:  You would be able to weigh the evidence
 7   as --
 8              A JUROR:  Yeah.
 9              THE COURT:  -- it comes in and be fair to both sides?
10              A JUROR:  Yeah, I feel I could.
11              THE COURT:  Okay.  Any follow-up?
12              MR. MEIER:  Just briefly.  The bad experience with
13   that, did you --
14              A JUROR:  I felt like the prosecutors had misled us in
15   what --
16              THE REPORTER:  I'm sorry, ma'am.  I can't hear you.
17              A JUROR:  I'm sorry.
18              THE COURT:  That's okay.
19              A JUROR:  The prosecution sort of misled our family
20   sort of in terms of the plea deal and that whole process.  It
21   just felt a little -- I mean, that was the bad experience.  That
22   was sort of what happened, but it did settle out of court.  We
23   didn't end up going to court or anything.  He pled guilty.
24              THE COURT:  And that bad experience, that -- which
25   county was this in?
```

1          A JUROR:  In Grayson.

2          THE COURT:  Grayson County.  Over in Eastern Kentucky?

3          A JUROR:  No, no, it's in Leitchfield.

4          THE COURT:  Oh, Leitchfield, Grayson County.  I'm

5     sorry.  I'm thinking Grayson over in Eastern.

6        Okay.  So down in Grayson County.  And did that experience

7     change the way that you think about the lawyers generally

8     or prosecutors generally or --

9          A JUROR:  No, no.  It just -- my parents probably are

10    more skewed than I was by it.  They were dealing with it more

11    than I was.  I mean, I was like 18 at the time, 17 or 18 at the

12    time so -- but it was some real turmoil in our household.

13         THE COURT:  Yeah.

14         A JUROR:  But, yeah.

15         THE COURT:  Okay.  So you think -- despite that

16    experience, you think you could be fair to both sides and you

17    could --

18         A JUROR:  I think I could, yeah.

19         THE COURT:  -- listen to just the testimony and

20    receive the evidence --

21         A JUROR:  Yeah.

22         THE COURT:  -- that's presented in the trial.

23         A JUROR:  I don't feel like that sort of had anything

24    to do with what this is, you know.

25         THE COURT:  Okay.  All right.  Thank you.

1          A JUROR:  Okay.  Thank you.

2      (Juror exiting bench.)

3          THE COURT:  Okay.

4          MR. PERRAS:  Your Honor, Juror Number 30 indicated on

5  his questionnaire that his step cousin was raped by an LMPD

6  officer.

7          THE COURT:  Okay.  We should probably follow-up with

8  her.

9      (End of bench conference.)

10          THE COURT:  Juror Number 30.  I'm sorry.  Juror Number

11  30.

12      (Bench conference on the record outside the hearing of the

13  jury.)

14          THE COURT:  Hi.  Thank you for coming up.  You

15  indicated in your questionnaire that you had a relative who was

16  assaulted, sexually assaulted.

17          A JUROR:  Yes.  I think I -- excuse me.  I think I

18  misread the question on the questionnaire, because when you

19  re-asked it, you said "you."  I wasn't involved in the court

20  case at all.

21          THE COURT:  Okay.

22          A JUROR:  Yes, she was assaulted by a Louisville

23  police officer.

24          THE COURT:  How long ago was that?

25          A JUROR:  It was probably -- I want to say probably 30

1    years ago, close to it.

2                THE COURT:  All right.

3                A JUROR:  And she was -- she was a lesbian or she is a

4    lesbian.  I mean, it kind of was a big thing in our family that

5    this happened to her so...

6                THE COURT:  All right.  And what, if anything,

7    happened to the person who assaulted her?

8                A JUROR:  I don't remember the details of what

9    happened.  There was just a lawsuit and he was convicted.  I

10   can't remember that far back.

11               THE COURT:  So you don't know if he was convicted, or

12   went to jail, or anything like that?

13               A JUROR:  No, sir, I don't.

14               THE COURT:  You didn't have to be a witness in the

15   trial?

16               A JUROR:  No, sir.  I just heard about it through the

17   family.

18               THE COURT:  And were you young at the time?

19               A JUROR:  Yes, sir.

20               THE COURT:  Yeah, yes, 30 years ago.  And would that

21   affect your ability to be fair and impartial --

22               A JUROR:  No, sir.

23               THE COURT:  -- in this trial --

24               A JUROR:  No, sir.

25               THE COURT:  -- in any way?  You would be able to weigh

1    the evidence fairly to both sides?

2              A JUROR:  Yes, sir.

3              THE COURT:  All right.  Anything further?

4              MR. MEIER:  Just -- if you don't mind -- the facts of

5    that case, I know you said you didn't hear -- you don't remember

6    what happened to the officer, but was this a situation where --

7    like a date situation where he just happened to be an officer or

8    was --

9              A JUROR:  No.

10             MR. MEIER:  -- or was she arrested by this officer and

11   was in custody, in his custody when this occurred?

12             A JUROR:  I can't remember if he pulled her over, but

13   he was -- it was in the back of his police car so he

14   arrested/handcuffed supposedly --

15             MR. MEIER:  So she was under his control --

16             A JUROR:  Yes.

17             MR. MEIER:  -- for being a police officer?

18             A JUROR:  Yes.

19             MR. MEIER:  I see.  Okay.  And as horrible as that is,

20   was there any residual?

21             A JUROR:  Just a bad person that did something.

22             MR. PERRAS:  You also put down, "It's hard to be a

23   police officer because police officers have to make split-second

24   decisions."  If you were a juror in this case and you hear the

25   evidence and you believe that the evidence finds or the evidence

```
 1   shows beyond a reasonable doubt that this police officer

 2   intentionally violated the law, would it be difficult for you to

 3   find him guilty, given that it's difficult to be a police

 4   officer?

 5           A JUROR:  No.  I mean, it was -- I don't think so, no.

 6           MR. PERRAS:  Okay.

 7           THE COURT:  Thank you.

 8       (Juror exiting bench.)

 9           THE COURT:  Okay.  Who's next on your list?

10           MR. PERRAS:  Juror Number 87 indicated that his son is

11   a police officer.  And with respect to the question about

12   whether investigated too much, he said, "My son needs to come

13   home no matter what," which means to me he's okay with police

14   officers doing what they need to do to come home, which is

15   problematic.

16           THE COURT:  Okay.  Mr. Meier, do you agree?

17           MR. MEIER:  I'll talk to anybody.

18           THE COURT:  Especially at 3:45.  What's the number?

19           MR. PERRAS:  87.

20       (End of bench conference.)

21           THE COURT:  Juror Number 87.

22       (Bench conference on the record outside the hearing of the

23   jury.)

24           THE COURT:  Hi.  Thank you for coming up.  We just had

25   a follow-up question.  With respect to the written questionnaire
```

```
 1    that you answered, there's an answer or response in the
 2    questionnaire that you gave about your son, I believe, who is a
 3    police officer.  Is that correct?
 4              A JUROR:  Uh-huh.
 5              THE COURT:  And a reference to he needs to come home.
 6              A JUROR:  Yeah.  He was in -- two years ago he was
 7    involved in a shooting in E-town.
 8              THE COURT:  All right.
 9              A JUROR:  And, you know, state police did the
10    investigation and everything.  He was fortunate that it happened
11    at Kroger at the gas stations.  There was plenty of video
12    footage of everything.  And that was the first thing the state
13    trooper told him when he walked in was, you know, we're not here
14    to point blame.  We just want to make sure that he comes home
15    safe.
16              THE COURT:  All right.  So that's what you meant by
17    that?
18              A JUROR:  Yes, yes.
19              THE COURT:  Okay.  Would the fact that your son is a
20    police officer and has been in an incident in which another
21    outside agency had to investigate to determine what happened,
22    would that experience make it more difficult for you to be fair
23    in this trial?
24              A JUROR:  No, sir.
25              THE COURT:  All right.
```

1        A JUROR:  Not at all.

2        THE COURT:  You think you could be fair to both sides?

3        A JUROR:  Yes.

4        THE COURT:  Weigh the evidence evenly?  All right.

5   Thank you very much.

6      (Juror exiting bench.)

7        THE COURT:  Okay.  Mr. Meier's willing to talk to

8   anybody so let's -- on that basis, who do we have next?

9        MR. PERRAS:  Juror Number 13 indicated on her

10  questionnaire, "Cops wouldn't be investigated if people followed

11  the law," which would indicate a bias.

12     (End of bench conference.)

13       THE COURT:  Juror Number 13, you're the next lucky

14  winner.  Come on down.

15       A JUROR:  Do I get a Big Mac or something?  I'm

16  starving.

17       THE COURT:  If I had -- let's see -- if I had about 60

18  of them, I would pass them out.  Right?

19     (Bench conference on the record outside the hearing of the

20  jury.)

21       THE COURT:  We have a follow-up question for you about

22  the questionnaire.

23       A JUROR:  Okay.

24       THE COURT:  And we sent those out and asked everybody

25  to provide responses, which you did.

1          A JUROR:  Yes.

2          THE COURT:  And we appreciate that.  One of the

3    questions that you responded to -- Mr. Perras, why don't you

4    characterize the response so I make sure we get it right.

5          MR. PERRAS:  Yes.  With respect to the question about

6    whether police officers are sufficiently investigated, do you

7    remember that question?

8          A JUROR:  Yeah, I remember it, but it's been --

9          MR. PERRAS:  It might have been a while ago.

10         A JUROR:  Yeah.

11         THE COURT:  A few weeks.

12         MR. PERRAS:  You wrote down that police wouldn't be

13   investigated if criminals followed the law or if people followed

14   the law.

15         A JUROR:  Well, I think -- I thought what I wrote,

16   something similar to that, was that they should be investigated,

17   but if people followed the law, there wouldn't be so much of all

18   this stuff going on.

19         THE COURT:  Okay.

20         A JUROR:  Because I know on another question I

21   answered I put that same thing, that if people would follow the

22   law, there wouldn't be so much of all this --

23         THE COURT:  By "people," do you mean just --

24         A JUROR:  Anybody.  I mean, you know, we have laws.

25         THE COURT:  Would you include police officers in that?

```
 1              A JUROR:  Well, yeah.

 2              THE COURT:  Okay.

 3              A JUROR:  Yeah, because we all make mistakes.

 4              THE COURT:  Right.  And so we shouldn't -- you tell

 5    us.  Should we take from that that you think everybody is

 6    required to follow the law and so you --

 7              A JUROR:  Yeah.

 8              THE COURT:  -- could be fair to both sides?

 9              A JUROR:  Yeah, I do believe that.  I do believe that.

10              THE COURT:  Mr. Meier, any follow-up?

11              MR. MEIER:  No.  Thank you.

12              THE COURT:  Thank you very much.

13         (Juror exiting bench.)

14              MR. PERRAS:  Juror ▮▮▮▮▮▮▮, Juror Number 102, he's

15    come up here before.  He indicated for all of the questions

16    about feelings about the police, he said, "Not my job to judge."

17    I would just want some follow-up to indicate whether he would be

18    comfortable judging in a situation like this.

19              THE COURT:  All right.  He's 22?

20              MR. PERRAS:  102.

21              THE COURT:  102.

22         (End of bench conference.)

23              THE COURT:  Juror Number 102.

24         (Bench conference on the record outside the hearing of the

25    jury.)
```

```
 1            THE COURT:  Hi.  Good to see you again.  We just had a
 2   quick follow-up on the written questionnaire.  One of the
 3   responses that you filled out or, I think, maybe in a couple of
 4   places you used the response not your place to judge or
 5   something along those lines.  Do you recall saying that in
 6   response to some of the questions that you were asked to review?
 7            A JUROR:  About the judge?
 8            THE COURT:  That it's -- you were saying it's not your
 9   place to judge.  Do you recall saying that?
10            A JUROR:  Oh, yeah, which, I mean, fairness right down
11   the middle, I mean, judge would be on race or religion.
12            THE COURT:  But you would be comfortable with your
13   role as a juror in following the court's instructions and making
14   a decision based on the evidence that you receive in the course
15   of the trial?
16            A JUROR:  Yes.
17            THE COURT:  You could do that?
18            A JUROR:  Yes.
19            THE COURT:  Okay.  And so when you say it's not your
20   place to judge, that doesn't mean you wouldn't -- you have a
21   problem being a juror?
22            A JUROR:  No.
23            THE COURT:  Okay.
24            A JUROR:  Not a problem being a juror.  It's just --
25            THE COURT:  Thank you very much.
```

1          (Juror exiting bench.)

2              MR. PERRAS:  Just a couple more, Judge.  Juror Number

3     58 indicated on the question whether it's fair to prosecute

4     police officers federally, she wrote, "Police should be

5     prosecuted federally but only if the violation is severe."  I

6     just want to follow up what she means by that.

7              THE COURT:  All right.

8          (End of bench conference.)

9              THE COURT:  Juror Number 58.

10         (Bench conference on the record outside the hearing of the

11    jury.)

12             THE COURT:  Hi.  Thank you.

13             A JUROR:  What happened?

14             THE COURT:  We just have a follow-up question for you.

15    With respect to the written questionnaire that was mailed out to

16    you-all in advance, there was a question that you responded to

17    about whether police should be investigated or prosecuted.  And

18    I believe your response was something to the effect of only if

19    it's severe.  Do you recall that response?

20             A JUROR:  I don't remember what I answered.

21             THE COURT:  I think, Mr. Perras, you might have a more

22    verbatim account of her response.

23             MR. PERRAS:  I could get her verbatim account, if you

24    want to look at it right now.

25             THE COURT:  That's okay.

1          MR. PERRAS:  So the question was whether you think

2    it's fair to federally prosecute a police officer who violates

3    the law.  And so what we were just wondering was what your

4    answering to that is, because this is a federal prosecution of a

5    police officer.

6          A JUROR:  Yeah.  Well, what I meant was, like anybody

7    else, you know, whatever it is, I would -- I don't know how to

8    answer you.  I didn't mean that if it was like a severity --

9    like if it was a stronger thing.  I just meant that I was trying

10   to be like it's fair for anybody.

11         THE COURT:  Okay.  Let me ask you this question:  If

12   the case was presented to you as a juror, at the end of the case

13   could you decide the case based solely on the evidence that you

14   hear and not on any standard that you have heard somebody else

15   give you about when a case is severe or not severe, less

16   important or more important?

17         A JUROR:  I can't believe I just wrote severe.

18         THE COURT:  That's okay.  Do you understand what I'm

19   getting at?

20         A JUROR:  Yeah.

21         THE COURT:  In other words, if I instruct you on what

22   the law is and you hear the evidence, can you apply my

23   instructions without regard to what you may have heard from

24   someone else about what makes a case severe or important or less

25   important?

1           A JUROR:  Yeah.

2           THE COURT:  Okay.  All right.  Mr. Meier, any follow-

3   up?

4           MR. MEIER:  I mean, I guess the bottom line is does it

5   matter, when you answered, "only if something is severe" --

6   excuse me, cold -- the fact is a police officer is no different

7   than any other citizen.

8           A JUROR:  Right.

9           MR. MEIER:  If they said firefighter or electrician,

10  your answer would have been the same.

11          A JUROR:  Yeah.

12          THE COURT:  All right.  Thank you very much.

13      (Juror exiting bench.)

14          THE COURT:  By my count this will be your last one; is

15  that right?

16          MR. PERRAS:  Sure, Your Honor.  Juror Number 55 wrote,

17  "The media wants to micromanage police and point out all the

18  procedures that weren't followed while ignoring the criminals

19  put them in that situation.  Police are under a microscope."  Do

20  you want to follow up?

21          THE COURT:  Okay.  Did we have him up here?  We did

22  not?  Okay.  All right.

23      (End of bench conference.)

24          THE COURT:  Juror Number 55.

25      (Bench conference on the record outside the hearing of the

1    jury.)

2          THE COURT:  Hi.  If you'll step up.  The court

3    reporter listens through that microphone right there.  We just

4    had a follow-up question for you from the written questionnaire

5    that you filled out.  That's what most of these are is just

6    follow-up questions on those.

7        And in response to one of the questions, you wrote that you

8    thought that the media micromanaged or perhaps was unfair in the

9    coverage of police issues and sort of suggest in your response

10   that perhaps they're unfair to law enforcement officers.  Is

11   that a fair --

12         A JUROR:  Yes.

13         THE COURT:  -- account of what you wrote?

14         A JUROR:  Yes.

15         THE COURT:  Okay.  Let me just ask you, does that

16   position or does that opinion that you have, does that make it

17   more difficult for you to sit as a juror in a case where the

18   defendant is a police officer and some of the witnesses are

19   anticipated to be police officers?

20         A JUROR:  I would probably be biased in their favor,

21   yes.

22         THE COURT:  In whose favor?

23         A JUROR:  The police.

24         THE COURT:  Well, how would you handle if they're on

25   both sides of the case?

```
 1              A JUROR:  I don't know.

 2              THE COURT:  Let me ask you that.  Knowing that, that

 3    you might hear testimony or evidence from the police point of

 4    view on both sides of the case, would you be able to be fair to

 5    both sides of the case?

 6              A JUROR:  Yes.

 7              THE COURT:  Would you be able to follow my

 8    instructions and base your decision only on the evidence that

 9    you receive here in this courtroom and not on anything else that

10    you read in the paper or any other views that you've developed

11    as a result of time spent outside this courtroom?

12              A JUROR:  Yes.

13              THE COURT:  Okay.  Mr. Meier?

14              MR. MEIER:  Nothing.

15              THE COURT:  Mr. Perras?

16              MR. PERRAS:  Just a quick follow-up question.  You

17    mentioned that you would probably be biased toward police.  If

18    you were a juror sitting and evaluating whether to find a

19    defendant who is a police officer guilty or not guilty, would it

20    be difficult for you to find him guilty?

21              A JUROR:  No.

22              MR. PERRAS:  Okay.

23              THE COURT:  Thank you.

24         (Juror exiting bench.)

25              THE COURT:  Mr. Meier, do you have any on your list?
```

1          MR. MEIER:  Actually, I only have one that --

2          THE COURT:  Hallelujah.

3          MR. MEIER:  -- Number 14.  She talks about her

4    brothers, who have shared stories about coming home and being

5    arrested without just cause.  And then in a later question, she

6    elaborates that an older brother was arrested for disorderly

7    conduct, which I'm assuming from the context of the answers is

8    without just cause.

9          THE COURT:  All right.

10       (End of bench conference.)

11          THE COURT:  Juror Number 14.

12       (Bench conference on the record outside the hearing of the

13    jury.)

14          THE COURT:  Hi.  If you'll just step up here.  The

15    court reporter listens through that microphone.

16       We just have a follow-up question for you from the written

17    questionnaire, and that's what most of these questions are

18    about.  In response to one of the questions, you wrote about --

19    and, Mr. Meier, help me out here, make sure I get this

20    correct -- was it your brother who was arrested for disorderly

21    conduct?  Is that right?

22          MR. MEIER:  I believe you wrote about a couple of your

23    brothers being what you characterized as unfairly arrested, and

24    then later you talk about one being arrested for disorderly

25    conduct.

1          THE DEFENDANT:  These are the same incidents, riding

2     their bikes home from work.  One of my -- well, my young

3     brother's friends and they were, what they said, unfairly

4     arrested.  They said they were like given charges of like

5     menacing, and disorderly conduct, and something else, yeah.

6          MR. MEIER:  Okay.  I mean, did you think there was

7     some kind of racial profiling or something in that situation or

8     do you know?

9          A JUROR:  I don't know why exactly they stopped them

10    or why they pulled them over but, I mean, it's a possibility

11    definitely.

12         MR. MEIER:  Right.  Do you -- because of that do you

13    harbor any kind of ill will or distrust of the police?

14         A JUROR:  Well, it depends.  Particular police, if I

15    would -- I mean, it's definitely a relational thing, if you get

16    to know someone or if you -- everyone has feelings and are kind

17    of pre -- pre-assumed notions about people or about even -- even

18    professions.

19      So I think -- I think police are getting a bad wrap

20    nowadays, but I think -- I mean, it's still an individual.  And

21    if an individual has -- I mean, individuals have individual

22    qualities so I guess it -- it does come down to the individual,

23    but it's definitely -- could be -- it definitely is a case that

24    right now police officers are getting a lot of crap in the U.S.

25         MR. MEIER:  So in your particular case though, do you

1   feel like they were in the wrong or do you not have an opinion?

2           A JUROR:  I mean, I doubt they were.  They were just

3   riding their bikes, because they let me know, but maybe there

4   was something that they left out because they were like shy

5   about it or just felt a certain way about it.

6           MR. MEIER:  Okay.  So is there anything about that

7   experience or are you just -- your relationship with police in

8   general that would cause you to have a distrust or to make you

9   feel like they're more likely to be dishonest?

10          A JUROR:  Maybe not more likely to be dishonest, but

11  just like people could be dishonest as well.

12          MR. MEIER:  Sure.

13          THE COURT:  Let me just ask you generally, would that

14  experience make it more difficult for you to be fair as a juror

15  on this case, which obviously has nothing to do with the

16  incident your brothers were involved in?

17          A JUROR:  Not that particular case.  This is

18  completely different.  This person probably wasn't even there.

19  So, no, but I think -- I think maybe in a subconscious way that

20  happens with people, but on a conscious level, no.

21          THE COURT:  All right.  Do you think that you would be

22  able to follow my instructions and listen to the evidence that

23  is presented during the course of the trial and make your

24  decision at the end of the trial based solely on the evidence

25  that you've heard and the instructions that you've been given?

1          A JUROR:  Yeah.

2          THE COURT:  Good.  All right.  Anything further?

3          MR. PERRAS:  No.

4          THE COURT:  Thank you very much.

5          MR. MEIER:  Thank you, ma'am.

6          A JUROR:  Thank you.

7          THE COURT:  All right.

8          A JUROR:  Maybe you guys have a feel on this, but I'm

9    really hungry.  Like you guys have a time amount?

10         THE COURT:  We are getting very close.

11         A JUROR:  Okay.  All right.

12         THE COURT:  All right.  Thank you.

13      (Juror exiting bench.)

14         THE COURT:  All right.  Here's what we're going to do:

15   I'm going to let them go for 30 minutes, and I'm going to let

16   you-all prepare.  I'm going to let you take about -- what -- 10

17   minutes to do your for cause arguments.  Will that suffice?

18         MR. MEIER:  For the for cause, yeah.  I'd ask for a --

19   that would only leave 20 minutes for peremptories though.  I was

20   hoping for a little more time than that.

21         THE COURT:  I'll give you more time for that, but I

22   was thinking we might come back in 10 minutes, do the for cause,

23   and then you can tell me how much time you think you need.  But

24   I'm going to let them know that they're going to be able to

25   leave for at least 30 minutes, so if they want to run down to

1   the -- well, it's closed but they can get to the machines.  And

2   I think we can process that, as I said earlier, outside.  I

3   don't think they need to be in here for all of that.  All right?

4          MR. PERRAS:  Your Honor, given the time, may I release

5   the police officers who are waiting?

6          THE COURT:  Yes.  You're not going to have any

7   witnesses today.

8          MR. PERRAS:  All right.  Thank you.

9      (End of bench conference.)

10         THE COURT:  Ladies and gentlemen, we are very, very

11  close, and what we're going to do now is we're going to let you

12  go for about 30 minutes, give or take, and during that time we

13  will be hard at work here working through -- as I said at the

14  beginning, I said there were two categories.  One is a cause

15  challenge and the other is a peremptory challenge.  And then

16  there is a third category, which is sort of random.  So we will

17  work through all of that and then the -- we'll have -- once

18  we've gotten through all of that, we will have you back in and

19  we will apply those -- those challenges.  And then we will have

20  a random draw for the 14 people who will be seated on the jury.

21     So you're going to have about, as I said, give or take 30

22  minutes.  I would very much like to have the jury seated and

23  have the preliminary instructions done by the 5:00, 5:15 time

24  frame so that I don't keep you-all much beyond that.

25     If you're not used to traveling downtown frequently, I can

```
1    tell you that you're better off leaving downtown at 5:30, 5:45
2    than you are 5:00 to 5:15.  I tell my staff all the time.  They
3    still want to leave at 5:00, but that is the unfortunate
4    circumstance of the traffic here.
5        So we're -- that's going to be our goal is to try and get
6    the jury seated, the preliminary instructions done, and get
7    you-all out the door by -- the 14 of you on the jury out the
8    door by 5:15, 5:30, and the rest of you who are not going to be
9    serving on the jury out a little bit earlier than that.  So you
10   have the next 30 minutes.
11       The CSOs, the court security officers that are taking care
12   of you will point you in the direction of the snack bar.  I know
13   there are machines.  They're going to be limited, but you can
14   get some caffeine and you can get crackers and that sort of
15   thing to get you through the afternoon, and we'll see you back
16   here in about 30 minutes.  Thank you.
17       (Jury out 4:08 p.m.)
18           THE COURT:  All right.  You-all want to return your
19   seats to their locked and upright positions.
20       As I said a minute ago at the bench, we'll take a few
21   minutes to let you-all first develop your arguments for motions
22   to strike.  Do you think 10 minutes is adequate, Mr. Meier?
23           MR. MEIER:  For cause, yes, Judge.
24           THE COURT:  On your for cause strikes?
25           MR. MEIER:  Yes.
```

1          THE COURT:  All right.  I think what I'd like to do is

2    do those first.  And then once we've settled those, then I'll

3    let you develop -- I believe it's 10 and six.  Is that right --

4    your peremptories.  We'll take that list.

5       We need to get a pool of 30, 32 remaining out of our

6    remaining 59.  I think we've got enough here that we'll be able

7    to accommodate that, but clearly over the course of the prior

8    two hours we did hear a fairly significant amount of information

9    from these folks that I know will form the basis for some

10   motions to strike for cause so I'll let you do that.  And then

11   we'll take up, as I said, the peremptories.

12       Anything with respect to the jury selection process to this

13   point that we need to talk about?  Any corrections?  Any

14   objections that need to be made?

15          MR. MEIER:  Nothing I'm aware of, Judge.

16          MR. PERRAS:  Not from the Government, Your Honor.

17          THE COURT:  All right.  I'll be back in about 10

18   minutes.  And if you decide you need more than 10, you can send

19   word back and we'll give you that.

20       (Recess at 4:12 p.m. until 4:29 p.m.  Jury out.)

21          THE COURT:  We're back on the record.  The jury pool

22   is still out.  Let's talk a bit about strikes for cause.

23   Mr. Perras, you want to go first?

24          MR. PERRAS:  Yes, Your Honor.  The Government would

25   start with Juror Number 48, ███████████.  She's one of the

1    jurors that both sides agreed beforehand should be struck for

2    cause.

3        She also admitted at the bench that she doesn't think that

4    police officers should be prosecuted federally.  I think that's

5    a pretty clear one.  I don't know if you want more on that.

6                THE COURT:  Your position hadn't changed?

7                MR. MEIER:  We agree, Judge.

8                THE COURT:  Yeah, I agree, having heard her at the

9    bench.  So Juror Number 48 will be struck for cause.

10       All right.

11               MR. PERRAS:  Next one, Juror Number 74, ▇▇▇▇▇▇▇▇.

12   She is another juror whom we both agreed beforehand should be

13   struck for cause.  She claims that her sons were railroaded,

14   that all courtrooms are crooked and you can't trust judges,

15   prosecutors, or police.

16               THE COURT:  And, again, your position hasn't changed?

17               MR. MEIER:  I originally agreed with that position,

18   Judge, yes.  I agreed with her, yes, with that being cause

19   strike.

20               THE COURT:  I realize it's getting late in the day.

21       Okay.  We'll -- given the parties' agreement and what we

22   observed, I think it's appropriate to strike Juror Number 74 for

23   cause.  So 48 and 74.

24               MR. MEIER:  And the fourth one did not make it.  Is

25   that what I'm to understand?  We had agreed to four people but

1    one of them --

2         MR. PERRAS:  He was not here, yes.  That covers the

3    four that we had already agreed upon.

4         THE COURT:  Who was the other one, 48, 74 -- oh, and

5    the lady we excused earlier.  Let's go ahead and put -- make

6    sure the record's got that.  She was number what?

7         DEPUTY CLERK:  82.

8         THE COURT:  82.  All right.  We had agreed that she

9    could be excused earlier due to her apparent health problem,

10   which was obvious at the time she approached the bench.

11     Okay.  So 48, 74, and 82 are now excused.  That reduces our

12   pool down to 57.  Now we need to take up -- have you-all agreed

13   on any others or do we need to just take them up one by one?

14        MR. PERRAS:  We haven't discussed them with each

15   other.  We didn't know we were supposed to discuss for cause.

16   We can do that now if it would be helpful.

17        THE COURT:  No, that's -- I mean, you don't need to

18   discuss it any further if you haven't had a chance to.  If you

19   want to tell me who's -- who you would like to argue to strike

20   for cause next.

21        MR. PERRAS:  Yes, Your Honor.  Juror Number 107, ████

22   ████.  He stated at the podium that he's biassed in favor of

23   police.  He's actually recently protested for police and he

24   believes police are unfairly accused of misconduct.  He's anti-

25   Black Lives Matter.

```
 1            THE COURT:  Mr. Meier.

 2            MR. MEIER:  Judge, I would object to that one.  I

 3   mean, he did say what Mr. Perras said he said.  He talked about

 4   the Black Lives Matter.  He was upset with the jury verdict in

 5   the Mattingly case and --

 6            THE COURT:  This is the fellow who is the former -- or

 7   recent --

 8            MR. MEIER:  Firefighter.

 9            THE COURT:  -- recently retired fireman?

10            MR. MEIER:  Yes.  I mean, really, the closest he said

11   was that he comes in with -- what I had wrote down in terms of,

12   well, you know, would you be fair to both sides?  I can't

13   remember the exact question.  But he basically -- he said --

14   agreed that, yes, I come in with skepticism, which I think, as

15   the court pointed out with an earlier person, that's not

16   necessarily a bad thing.  You are supposed to presume the

17   defendant is innocent.  So coming in with skepticism, I think --

18   I don't think disqualifies him.  I think certainly could be

19   struck peremptorily, but I don't think he rises to the level of

20   cause challenge.

21            MR. PERRAS:  Your Honor, he also stated that it would

22   be difficult for him to be fair in this case.

23            THE COURT:  That's the -- that's the part of his

24   answer at the bench that I recall is that he did admit that it

25   would be difficult for him to be fair.  And I think he was -- he
```

1   was not hesitant in his answers.  He didn't pause.  He didn't

2   suggest that his views were still in flux.  They seemed to be

3   rather strongly held views so I'm going to grant that motion and

4   strike Juror Number 107 for cause.

5             MR. PERRAS:  Yes, Your Honor.  Juror Number 46,

6   Patricia Smith.  She stated that she would not believe John

7   Cottrell, who is one of our witnesses.

8             THE COURT:  Is she the one who indicated she had taken

9   a shooting lesson, something along those lines?

10            MR. PERRAS:  Yes, Your Honor.

11            THE COURT:  All right.  Mr. Meier.

12            MR. MEIER:  Judge, she did say that.  She went back

13  and forth and her last answer was, yeah, based on that day, but

14  she went back and forth in her answers that, yes, based on what

15  he did then, I was upset with him, but that was a long time ago.

16  The court pointed that out.  And now in terms of, you know,

17  police officers -- or in terms of her judging his credibility,

18  she could do that.  And when pressed, like based on that day

19  what was you thinking, my impression was she went back to that

20  day and, "Well, no, not that day."  So I don't think it was

21  quite as cut and dry.

22            THE COURT:  I'm not sure it's cut and dried either.  I

23  do think that she did -- she expressed some rather strong views

24  on Mr. Cottrell, and at one point during our discussion seemed

25  to indicate she would have trouble being fair, but you're right,

1    she did -- she did also seem to come back around.

2        Now, there were other issues with respect to her.  Did she

3    not indicate she had doctor's appointments and some other issues

4    like that?

5            MR. PERRAS:  She has an 89-year-old mother --

6            THE COURT:  Right.

7            MR. PERRAS:  -- she has to take care of and --

8            MS. GREGORY:  Her daughter has mental disorder.

9            MR. PERRAS:  -- her daughter has schizophrenia and she

10   cares for her daughter as well.

11           THE COURT:  I'm going to be inclined to excuse her on

12   that basis.  Had this been a smaller jury pool and had we

13   proceeded where we could have let people go on the spot -- I

14   don't think we had that luxury given the numbers here today --

15   but I would have been inclined to excuse her on that basis.  So

16   I'm going to go ahead and grant that motion as well, just given

17   the totality there.

18       All right.  Who's next?

19           MR. PERRAS:  Juror Number 45, ███████████.  He was

20   the juror who indicated on his questionnaire that he didn't know

21   whether it would be right to prosecute police officers.  I asked

22   him whether he'd reflected upon that and come to some decision.

23   He said he still doesn't know whether it's fair to prosecute

24   police officers.  This is a case involving prosecution of a

25   police officer.  There's a juror who says that he doesn't know

1    whether it's fair to do that.  I think putting him on the jury

2    would be a mistake.

3              THE COURT:  Mr. Meier.

4              MR. MEIER:  Judge, unlike some of the other people, he

5    unequivocally indicated he believed he could be fair.  And in

6    saying I don't know if it's fair, a lot of people -- it's been

7    my experience and probably everyone here's experience, a lot of

8    jurors answer those questions in the context of I don't know

9    until I hear it.  I don't know whether this is fair.  I haven't

10   heard the evidence, and you get that response all the time.

11       And, you know, certainly our position is it's not fair that

12   he's prosecuted.  Their position is that it's more than fair.

13   So I think that answer was in that context and he did

14   unequivocally state that he could be fair.

15             THE COURT:  Well, I think he did come back around and

16   indicate that he would be fair.  I'm going to hold off on him

17   for now.

18       Who's next on your list?

19             MR. PERRAS:  Juror Number 97, Your Honor, ██████

20   ██████.  She's the one who indicated that she was close

21   friends with Sheriff Greenwell and would tend to believe him as

22   a witness over somebody else.  Sheriff Greenwell is not on our

23   witness list but is a potential rebuttal witness in this case,

24   given that he was the person who fired Defendant Corder from the

25   Bullitt County Sheriff's Office.

 1           To the extent that there's some evidence that comes in about

 2    the fairness of the process, which I would anticipate would come

 3    from the defense, he would be a rebuttal witness.

 4                MR. MEIER:  Did she come up twice?  I'm sorry?

 5                MS. WYROSDICK:  Several times.

 6                MR. MEIER:  Did 97 say that she knew Greenwell?

 7    That's not my recollection.  Oh, wait.  I take it back.

 8                THE COURT:  She's the one who was in the middle

 9    section, middle left section.

10                MR. MEIER:  Yes.  My notes are just scrambled here.

11           I have no objection to that.

12                THE COURT:  Well, based on what you've just said,

13    Mr. Perras, about the possibility of Sheriff Greenwell being a

14    rebuttal witness, I think the prudent thing would be to go ahead

15    and strike her for cause, given that she did admit that she

16    would be biased in favor of him as a witness.  So I'll grant

17    that motion and we'll strike Juror 97 for cause.

18                MR. PERRAS:  Your Honor, the last one the Government

19    has is Juror Number 55, ███████████.  She was towards the end.

20    She readily admitted that she was biased towards police.  She

21    said that media wants to micromanage police, point out all the

22    procedures that aren't followed while ignoring the criminals put

23    them there in that situation, that police are under a

24    microscope.

25           When questioned by Your Honor, she did say she could be fair

1   in this case, but having those views and admitting that she's

2   biased towards police and I think she thinks that they're under

3   a microscope, I think, would make her difficult to be fair in

4   this case.  Unlike in a typical 242 excessive force case where

5   there's fact witness police officers on both sides, this is a

6   case where all the fact witnesses are civilians and then the

7   only other one that's a fact witness is the defendant.

8       So while there are law enforcement witnesses on the

9   Government's side, they're really only there to show the

10  procedures, the training.  And so if someone would tend to

11  believe a police officer over someone else, that would really

12  inure to the benefit of the defense in this case.

13          MR. MEIER:  Judge, we would object to that one.  And

14  as Mr. Perras said, she did indicate she could be fair and --

15  but I have in my notes and my recollection, since she was one of

16  the last people, was that it was a very emphatic yes, that she

17  could be fair.

18      And I wouldn't -- I would also disagree with the

19  characterization that there's no fact witnesses on both sides.

20  I believe the Government's going to call the other police --

21  there were two police officers here and they were both arresting

22  Mr. Baize.  And so -- and I fully expect Mr. Allen, Deputy Allen

23  to be a witness here in this case.

24      So while she did say the media micromanages things, I mean,

25  I don't see that that opinion necessarily disqualifies you

1    because of your opinion of the media coverage of these type

2    issues.  It is a hot button issue here, but I don't think

3    there's anything to suggest that she wouldn't be fair to both

4    sides.

5              THE COURT:  I think it's a close call.  I think that

6    she was one of the last ones we had at the bench, and I remember

7    her being emphatic in her opinion but, also, she was quick to

8    indicate that she could be fair, particularly -- I think it was

9    fairly clear that she had not considered the possibility that

10   there might be police testimony on both sides of this issue so

11   I'm going to deny that particular motion.

12      Do you have any others?

13             MR. PERRAS:  That's it, Your Honor.

14             THE COURT:  All right.  Mr. Meier, for the defendant,

15   do you have any?

16             MR. MEIER:  We do, Judge.  Number 24, that's the

17   gentleman who was shot some years ago, and no matter how the

18   question was posed, made it clear that he didn't believe he

19   would be an appropriate juror in this case.

20             MR. PERRAS:  The Government does not object.

21             THE COURT:  I think that he was candid and forthright

22   in his answer to the question, but I think it's clear he doesn't

23   think he could be fair and I understand why.  So we'll grant

24   that and we will -- we will strike Juror Number 24 for cause.

25             MR. MEIER:  Judge, the next one I would ask for cause

```
 1    would be Number 61.  This person's grandson was -- she was quite
 2    bitter about the fact that her grandson was charged with some
 3    form of statutory rape, I believe.  And she cited a case where
 4    police officers were apparently having relations with that same
 5    15-year-old child and they didn't get any punishment, in her
 6    view.  She, I think, characterized herself as bitter over that
 7    whole series of events and specifically indicated that she
 8    didn't think she could be fair as a result of that.
 9              MR. PERRAS:  Government doesn't object.
10              THE COURT:  All right.  I think that's a reasonable
11    basis to strike her for cause.  I agree with the
12    characterization of her answers so we'll strike 61.
13              MR. MEIER:  Judge, we'd move to strike Number 64.
14    This woman, I think, ended up by saying she would have to see
15    all the facts, which is a typical response, I think.  But it was
16    quite clear that she had some bitter feelings about the officer
17    who had arrested her at some point in time for some kind of
18    alcohol offense, I believe -- I don't know if it was disorderly
19    conduct.  I think it was public intoxication perhaps -- and that
20    she was quite bitter about the fact that this officer lied in
21    court.  She did say she would have to see all the facts, but it
22    seemed to me that she was significantly affected by that.
23              MR. PERRAS:  Your Honor, the Government would object.
24    She said that she's had good and bad experiences with police.
25    When she was asked if she could be fair, she said she could be
```

1    fair.  I object.

2         THE COURT:  I think this is a close call.  Juror

3    Number 64 is the one I -- with the aunt who's the KSP

4    dispatcher -- is that correct -- and reported that her husband

5    got a DUI.  She got a PI.  She was quick to talk about how she

6    could be impartial.  I think I'm going to overrule that one.

7         MR. MEIER:  The last one we have, Judge, is Number

8    116.  This juror also said he could be fair.  However, he was

9    quite vociferous, I believe, in the prior murder case that he

10   was on with money laundering, prostitution.  He was sequestered.

11   There were two jurors in the case that he believed were

12   unreasonable, and they turned it into a racial issue in his

13   opinion.  And he mentioned that this whole thing took a toll on

14   him, I think, is the way he put it.

15     I'd also add that he also is one of the people who answered

16   at the beginning in terms of time at the beginning -- I don't

17   know.  I don't expect that we'll go to Monday, but he had some

18   kind of surgery --

19        THE COURT:  Right.

20        MR. MEIER:  -- scheduled for next week.

21        THE COURT:  Yeah, and I would put him in that same

22   category I mentioned earlier.  If we were able to excuse people

23   on the spot as we went -- as we were going through, he's

24   probably one that would have been in that category.  So I'm

25   going to grant that motion.  We'll strike Number 116.

1       All right.  Let's talk then -- I guess we're through all of

2   the motions for cause.

3           MR. MEIER:  Yes, Judge.

4           THE COURT:  Let's talk about the folks who had some

5   sort of personal issue but did not make it on the strike list,

6   the hardship list, if you will.  Juror Number 128 mentioned that

7   his mother's got Alzheimer's.  He's the primary caregiver.  He

8   mentioned having to consider putting her into a facility this

9   week.  Any objection to excusing Number 128?

10          MS. WYROSDICK:  Just one second, sir, please.

11          MR. PERRAS:  Your Honor, the Government would defer to

12  your judgment on strike for that.

13          MR. MEIER:  We would also defer.

14          THE COURT:  All right.  I'm going to excuse Juror

15  Number 128.

16      I'm going to for now skip the Zumba fitness person and the

17  person I assume is going to play Jack Nicklaus's golf course in

18  Columbus.

19      Let's talk about Number 68, who is the person that's got job

20  training in Kansas.  He did say next week and I think there's a

21  good chance we'll -- a very good chance we'll get done here,

22  but any thoughts?

23          MR. PERRAS:  Your Honor, the Government doesn't take a

24  position on it.

25          THE COURT:  All right.

```
1            MR. MEIER:  Nor does the defense, Judge.
2            THE COURT:  All right.  I'm going to excuse Juror
3    Number 68 for cause.
4        And I think we should do the same -- well, no, we already
5    did 116.  Let's see.  We did 46.
6        Did we talk about Juror Number 110?
7            MR. MEIER:  No, we have not.  Actually, I meant to.
8    She's the woman that had the civil lawsuit that was kind of -- I
9    forgot.
10           MS. WYROSDICK:  She was all worked up about the
11   process of being in court.  Isn't that her?
12           MR. MEIER:  Yes.  She, I mean, to me...
13           MR. PERRAS:  Your Honor, she seemed to be on the verge
14   of crying during several times that she came up.  She did
15   indicate that she -- on her questionnaire that serving would be
16   a financial burden for her.
17           THE COURT:  Yeah.  I think she's the one that was a
18   plaintiff in a recent case.
19           MR. MEIER:  She was the first person that approached
20   the bench and, yes, it distressed her just being in the
21   courtroom because her case was decided in her favor, but
22   apparently it's being appealed.
23           THE COURT:  She was on our list of most likely to be
24   the subject a motion to strike and neither of you raised her
25   so --
```

```
1              MR. MEIER:  To be honest, from a strategic, she's a
2   total loose cannon, to be quite candid.  I have no idea.  So I
3   don't have a problem with her being struck.
4              MR. PERRAS:  I wouldn't oppose it either, Your Honor.
5              THE COURT:  I think given the totality of the
6   circumstances with her self-evaluation that she's got a colored
7   view and her indication of -- that it was causing her stress to
8   be back in a courtroom after a recent experience, I think
9   excusing 110 for cause is also reasonable or we would -- or
10  strike her for cause as well.
11     All right.  Any other on the hardship list?
12             MR. MEIER:  Somebody had surgery -- Juror Number 1's
13  son had surgery --
14             THE COURT:  Sister having surgery this week.  She's
15  the ride to the hospital, apparently.  That's a tough one.
16     I think that the fellow, Number 131, who has the graduation
17  concert in Indianapolis is also a tough one.
18     The person who had the pre-prepared statement regarding
19  their Zumba fitness program, while sincere and I appreciate that
20  she was prepared, we all -- I think every juror faces some
21  inconvenience to their work schedule so I'm just not inclined to
22  do that.  And I think if we don't excuse her, I think the fellow
23  who would like to go to Columbus on Friday probably will still
24  get to do that.
25     So what is the -- what are parties' positions with respect
```

1    to Juror Number 1, the person who has the surgery, the driver?

2           MR. PERRAS:  The Government has no position on Juror

3    Number 1.

4           MR. MEIER:  We're talking about the one with the

5    sister with surgery?  I mean, I don't know.  Maybe we should

6    have asked her more questions.  If that was the only ride her

7    sister had, I guess that would be a pretty legitimate excuse.

8    Whatever the Court thinks.

9           THE COURT:  I'm going to excuse her for cause.  I just

10   think that -- I think we can afford one or two more here.

11      So that has -- let's see, we've got four, five, six, seven,

12   eight, nine, 10, 11, 12, 13; is that right?  We've now excused

13   13.  So we're down to 47 or 46?  Are we counting back from 59 or

14   from 60?

15          DEPUTY CLERK:  From 60.

16          THE COURT:  Okay.  All right.  How much time do

17   you-all need at this point?  We're a little behind, surprise,

18   surprise.  But how much time do you-all think you need at this

19   point to work on your strikes?

20          MR. PERRAS:  The Government's prepared to do that now.

21          THE COURT:  Okay.

22          MR. MEIER:  We need -- we need at least 20 minutes,

23   Judge.

24          THE COURT:  Twenty minutes.

25          MR. MEIER:  At least and by that I mean 25.

1          THE COURT:  Well, I would say how about 20 minutes and

2     by that I mean 15?  Could you do it in --

3          MR. MEIER:  All right.

4          THE COURT:  We've cut your list down so you're in

5     pretty good shape.

6          MR. MEIER:  Okay.  Could we retire to the room back

7     there?

8          THE COURT:  Absolutely.  We'll take -- we'll go back

9     off the record for the next 15 minutes.  In 15 minutes, if you

10    tell me that you're not close to being done, then we'll give you

11    a few more.

12         MR. MEIER:  We'll go as quick as we can.

13         THE COURT:  All right.  You need to wait, actually.

14    We need to -- they need to pull the list after we've employed

15    the --

16         MR. MEIER:  Yeah, we're going to have an official

17    thing --

18         THE COURT:  Yes.

19         MR. MEIER:  -- list.

20         DEPUTY CLERK:  Do you want 30 drawn out or 32?

21         THE COURT:  Do you-all have a thought on that?  We can

22    put the wheel in and we can draw 30 numbers or we could draw 32

23    numbers.  I don't think it really matters because you have

24    between you 16 peremptories.  If they're all different, then --

25    and applied to a list of 30, that would leave us the 14.  If it

1    were 32, that would leave us 16.  And then what we would

2    typically do, because those are randomly generated, is we would

3    not generate yet again another list.  Having been randomly

4    generated, we would just read the first 14 off and those would

5    be our jurors.

6         MR. MEIER:  It seems easiest to me to just go to 30

7    and then we make our strikes and...

8         MR. PERRAS:  That's fine with the Government, Your

9    Honor.

10        THE COURT:  That's how would I prefer to do it.

11     Let's just generate a list of 30 random from the resulting

12   -- from the list that's left over the application of the --

13        DEPUTY CLERK:  Are we going to do it without the

14   jurors in here?

15        THE COURT:  I'm sorry?

16        DEPUTY CLERK:  I was asking Mike if he's ever been

17   where they've drawn out the numbers without the jurors being in

18   here.

19        COURT SECURITY OFFICER:  Usually the jurors are in and

20   what they do, they clear the first two rows.

21        THE COURT:  Actually, I don't think it matters but --

22   honestly, because we're behind, I think it probably would be

23   better for the 20 of them that are going to get to go so let's

24   go ahead and bring them in.

25     Mike, you want to just bring them in.  We'll wait here.

1          DEPUTY CLERK:  I didn't know if it mattered.

2          THE COURT:  I don't think that it does.

3      If it were 2:00, I would probably just let them stay out

4   rather than bring them back and then let them go back out, but

5   given the late hour, we'll at least get to move some of them.

6          MR. PERRAS:  Does Your Honor have a schedule for

7   tomorrow set?

8          THE COURT:  I think what we'll do is we'll do very

9   brief -- I think I need to instruct them preliminarily because

10   that instruction includes admonition about not talking about the

11   case and so forth.  So I think we're going to be forced to do

12   that.  Then we'll start with opening argument in the morning.

13          MR. PERRAS:  At what time?

14          THE COURT:  Let's plan on starting at 9:00.

15          MR. PERRAS:  9:00.  Thank you.

16      (Jury in 5:00 p.m.)

17          THE COURT:  Good afternoon, ladies and gentlemen.

18   I've got good news and bad news.  The bad news first.  We're

19   running a little bit behind what we had hoped, not too badly.

20   The good news is that a significant number of you are going to

21   be able to leave here in just a few minutes.

22      As I said at the outset, the parties -- folks can be excused

23   for cause and they -- each side has what are called peremptory

24   challenges.  So having applied -- and, also, there is the random

25   selection.  So what we're going to do now is, having applied the

1   numbers of those jurors who are being struck for cause or

2   excused, the remaining list, from that list will be a random --

3   randomly generated list of 30 numbers.  So in other words, we're

4   going to cut you in half.  And so Mike will take these 30

5   numbers and will reseat you; right?

6           COURT SECURITY OFFICER:  Yes, sir.

7           THE COURT:  And the rest of you will then be free to

8   leave.  And then the 30 of you, we'll take a few more minutes,

9   hopefully not more than another half hour, to get you down to

10  the 14.  This is a bigger than normal jury pool given the nature

11  of this case, and that's why it's a little more unwieldy for us.

12  And I appreciate your patience.

13      You now understand why I laid it on thick at the beginning

14  about how important this civic duty is.  And we really do

15  appreciate your patience and your candor, your participation in

16  this process.  It's very important and don't let my weak attempt

17  at humor mislead you on that respect.  All of us here -- I speak

18  for all of the lawyers, all of the folks participating here in

19  the courtroom -- we take this very seriously.  This is a very

20  important process and your participation is very much

21  appreciated.

22      All right.  So let's now, Madam Clerk or Clerks, if you

23  would, let's begin with the list of 30, please.

24          DEPUTY CLERK:  Number 43.

25          THE COURT:  If your number is called, that means

1   you're on the list of 30 who will be remaining.

2          DEPUTY CLERK:  Number 64.

3          COURT SECURITY OFFICER:  64.

4          DEPUTY CLERK:  Number 2, Number 106, Number 17, 131,

5   16, 65, 130, 18, 13, 20, 121, 25, 84, 36, 90, 30, 55, 109, 99,

6   89, 19, 83, 113, 79, 40, 80, 34, 11.

7       That's 30, Judge.

8          THE COURT:  Let me ask all of you whose number was not

9   called to please stand.  Let me again thank you for your

10  service.  This has been a long afternoon for you.  I realize

11  that.  We asked you lots of questions that most people would

12  have -- would like to avoid talking about, certainly with

13  strangers, but you-all did an outstanding job.  Your

14  participation was excellent.  And I'll again repeat what I said

15  at the outset.  You're to be commended for participating in the

16  process.  It is useful.  It is helpful and it's absolutely

17  necessary to our system so I thank you.

18      You-all are now excused.

19      (Jury members exiting the courtroom.)

20          THE COURT:  Congratulations to the rest of you for

21  making it to the final round.  The parties now have peremptory

22  challenges that we will be applying, and that will take us from

23  30 down to the final jury of 14.

24      If I could, let me see the lawyers at the bench, please.

25      (Bench conference on the record outside the hearing of the

1    jury.)

2              THE COURT:  So you think you need how much time now at

3    this point?

4              MR. MEIER:  Well --

5              THE COURT:  Fifteen or 20 still?

6              MR. MEIER:  Yes.

7              THE COURT:  Okay.

8              MR. MEIER:  I mean, I'll try to get out of here at

9    5:30.

10             THE COURT:  Why don't we -- can you just do it in here

11   or do you need to go in the room?

12             MR. MEIER:  I mean, I can do it in here or -- or we

13   could --

14             THE COURT:  That would be my preference.  That way we

15   don't have to take them out, bring them back in.  We can just

16   sit here -- well, 15 or 20 minutes.  I'll let Mike take them

17   back and then we'll bring them back in 15 minutes.  When I

18   reverse myself I'm getting tired, Mr. Meier.  We'll just do

19   that.  I'll give you -- I'll tell Mike to bring them back at

20   5:30.

21        (End of bench conference.)

22             THE COURT:  All right.  Ladies and gentlemen, you get

23   another break.  I will see you at 5:30.  During this 17-,

24   18-minute time period, the lawyers will be working out their

25   final peremptory challenges under the rules.  And then when you

```
 1    come back in at 5:30, we will select the 14 of you who will sit
 2    on the jury.  Those 14 -- the remaining 16 of you will, like the
 3    others just a few minutes ago, you will be excused.
 4        The 14 of you, you'll have to sit here for a little while
 5    longer.  I'll give you some very brief preliminary instructions,
 6    and then we're going to end for the day.  There will be no
 7    argument.  There will be no testimony today, but I ask you to
 8    just hang in with us for just a little while longer.  And I will
 9    tell you that we will start at 9:00 in the morning.  And once
10    the 14 of you are in the box, I'll talk with you a little bit
11    about what everybody's schedule is and so -- whether we can --
12    whether we need to end every day by 4:30, 5:00, or whether we
13    can maybe go a little later on some days.  All right?  But for
14    now I'm going to let Mike take you back for 15 minutes or so.
15        (Jury out 5:16 p.m.)
16            THE COURT:  All right.  I'm going to step out for
17    about 15 minutes while you-all do this.  Any questions?  Any
18    objections?  Anything we need to talk about at this stage?
19            MR. MEIER:  Nothing, Judge.
20            MR. PERRAS:  No, Your Honor.
21            THE COURT:  All right.  If you -- anything comes up,
22    send word.
23            MR. MEIER:  Is it okay to go in the other room?
24            THE COURT:  Yes.
25        (Recess at 5:17 p.m. until 5:42 p.m.  Jury out.)
```

1          THE COURT:  All right.  We've applied our

2   peremptories.

3          DEPUTY CLERK:  Yes.

4          THE COURT:  All right.  Any points of discussion or

5   objections to be made at this point?

6          MR. MEIER:  No, Judge.

7          THE COURT:  All right.  Then I think we need to call

8   the 30 in and seat the first 14.

9          MR. PERRAS:  Your Honor, if we may view the 14 before

10  the jurors are called back in, we may have objections based on

11  the people who were struck.

12         THE COURT:  Hold on, Mike.

13     Grab Mike.

14         MR. MEIER:  Did you need to see our strike list?  Is

15  that --

16         THE COURT:  Would that be easier?

17         MR. PERRAS:  Yes, Your Honor.

18         THE COURT:  All right.

19         MR. MEIER:  I can --

20         THE COURT:  Why don't you just trade.  Can you-all

21  each just review -- if that's how you prefer to do it, that's

22  fine.

23         MR. MEIER:  I'll look at it.

24         THE COURT:  You can each review the other's strike

25  list.

1          MR. PERRAS:  We're good.

2          THE COURT:  Okay.  Go ahead, Mike.  You can bring them

3    now.

4       So each side quickly reviewed the other's strike sheet, is

5    that it?

6          MR. PERRAS:  The Government did.  The Government has

7    no objections.

8          THE COURT:  I'm just glad you didn't need 15 minutes

9    to do that.

10      I don't think I can avoid -- just by way of housekeeping, I

11   don't think I can avoid going ahead and giving them the

12   preliminary instructions.  I would love to just seat them and

13   send them home, but I think we're going to have to.

14         MR. MEIER:  You could just tell them not to talk about

15   the case, but I don't care.  It doesn't matter to me.

16      (Jury in 5:45 p.m.)

17         THE COURT:  Thank you, ladies and gentlemen.

18      The clerk is now going to read 14 numbers.  Those numbers

19   will be members of the jury.

20         DEPUTY CLERK:  43, 2, 17, 130, 18, 25, 84, 36, 90, 19,

21   83, 79, 40, 80.

22         THE COURT:  For those of you who were not selected,

23   let me repeat what I said earlier.  Again, we are very grateful

24   for your time, for your perseverance this long afternoon, for

25   your patience.  Thank you very much.  You did contribute to a

1    very important process and all of the participants here today

2    join me in thanking you for participating.  You're now excused.

3        (Jury exiting the courtroom.)

4            THE COURT:  While the nonselected -- unselected folks

5    are leaving, if I could see the lawyers just briefly.

6        (Bench conference on the record outside the hearing of the

7    jury.)

8            THE COURT:  Any objections to the jury as constituted?

9            MR. MEIER:  Nothing other than -- no.

10           MR. PERRAS:  None from the Government.

11           THE COURT:  All right.  Thank you.

12       (End of bench conference.)

13           THE COURT:  Congratulations, ladies and gentlemen.

14   You will comprise our jury for the duration of this trial.  I am

15   grateful for your service.  We will do everything within our

16   power to go as quickly and efficiently as we can.

17       Your service begins with a second oath, and so let me ask

18   the clerk to administer that oath now.

19           DEPUTY CLERK:  If you-all can raise your right hand.

20       (Oath administered to the jury.)

21           THE COURT:  Thank you.

22       I'm going to now give you some preliminary instructions and

23   then we will proceed in earnest tomorrow.

24       Now that you've been sworn, these preliminary instructions

25   will guide you in your participation in the trial.  It will be

your duty to find from the evidence what the facts are.  You and

you alone will be the judges of the facts.  You will then have

to apply those facts to the law as the court will give it to

you.  You must follow that law whether you agree with it or not.

Nothing the court may say or do during the course of the

trial is intended to indicate nor should be taken by you as

indicating what your verdict should be.

The evidence from which you will find the facts will consist

of the testimony of witnesses, documents and other things

received into the record as exhibits and any facts that the

lawyers agree to or stipulate to or that the court may instruct

you to find.

Certain things are not evidence and must not be considered

by you.  I'm going to list those for you.  First, statements,

arguments, and questions by the lawyers are not evidence.

Second, objections to questions are not evidence.  Lawyers

have an obligation to their clients to make objections when they

believe evidence being offered is improper under the rules of

evidence.  You should not be influenced by the objection or by

the court's ruling on it.  If the objection is sustained, ignore

the question.  If it is overruled, treat the answer like any

other.

If you are instructed that some item of evidence is received

for a limited purpose only, you must follow that instruction.

Testimony that the court has excluded or told you to

1    disregard is not evidence and must not be considered.

2         Anything you may have seen or heard outside the courtroom is

3    not evidence and must be disregarded.  You are to decide the

4    case solely on the evidence presented here in the courtroom.

5         There are two kinds of evidence, direct and circumstantial.

6    Direct evidence is direct proof of a fact, such as testimony of

7    an eyewitness.  Circumstantial evidence is proof of facts from

8    which you may infer or conclude that other facts exist.  I will

9    give you further instructions on these, as well as other matters

10   at the end of the case, but keep in mind that you may consider

11   both kinds of evidence.

12        It will be up to you to decide which witnesses to believe,

13   which witnesses not to believe, and how much of any witness's

14   testimony to accept or reject.

15        I will give you some guidelines for determining the

16   credibility of witnesses at the end of the case.

17        As you know, this is a criminal case.  There are three basic

18   rules about a criminal case that I want you to keep in mind.

19   First, the defendant is presumed innocent until proven guilty.

20   The indictment brought by the Government against the defendant

21   is only an accusation, nothing more.  It is not proof of guilt

22   or anything else.  The defendant, therefore, starts out with a

23   clean slate.

24        Second, the burden of proof is on the Government until the

25   very end of the case.  The defendant has no burden to prove his

1     innocence or to present any evidence or to testify.

2         Since the defendant has the right to remain silent, the law

3     prohibits you from arriving at your verdict by considering that

4     the defendant may not have testified.

5         Third, the Government must prove the defendant's guilt

6     beyond a reasonable doubt.  I will give you further instructions

7     on this point later, but bear in mind that in this respect a

8     criminal case is different from a civil case.

9         In this case the defendant, as I told you at the outset, is

10    charged in a two-count indictment with deprivation of rights.

11        I will give you detailed instructions on the law at the end

12    of the case, and those instructions will control your

13    deliberations and decision.  But in order to help you follow the

14    evidence, I'm going to now give you a very brief summary of the

15    elements of the offense that the Government must prove to make

16    its case.

17        The defendant has been charged with two counts and each

18    count represents a separate violation of Title 18, United States

19    Code, Section 242.  The crimes alleged in Counts 1 and 2 each

20    have three primary elements.

21        First, that the defendant acted under color of law; two,

22    that the defendant deprived Deric Baize of a right secured or

23    protected by the constitution or the laws of the United States;

24    three, that the defendant acted willfully.  And for the first

25    offense, there is also a fourth element, that the offense

1    resulted in bodily injury or involved the use, attempted use, or

2    threatened use of a dangerous weapon.

3        Now, a few words about your conduct as jurors.  You as

4    jurors must decide this case based solely on the evidence

5    presented here within the four walls of this courtroom.  You've

6    heard that already numerous times.

7        This means that during the trial you must not conduct any

8    independent research about this case, the matters in this case,

9    the individuals or other businesses or organizations that may be

10   involved in this case.

11       In other words, you should not consult dictionaries or

12   reference materials, search the internet, websites, blogs, or

13   use any other electronic tools to obtain information about this

14   case or to help you decide the case.

15       Please do not try to find out information from any source

16   outside the confines of this courtroom.

17       Until you retire to deliberate, you may not discuss this

18   case with anyone, even with your fellow jurors.

19       After you retire to deliberate, you may begin discussing the

20   case with your fellow jurors, but you still cannot discuss the

21   case with anyone else until you have returned a verdict and the

22   case is concluded.

23       I know that many of you, perhaps all of you, have

24   smartphones.  You have access to the internet.  You have other

25   tools of technology.  You must also not talk to anyone at any

1   time about this case or use these tools to communicate

2   electronically with anyone about the case.

3       This includes your family and friends.  You may not

4   communicate with anyone about the case on your smartphone, your

5   cell phone, through email, iPhone, instant messaging, text

6   messaging, or on Twitter or through any blog or website, through

7   Facebook, Google Plus, LinkedIn, You Tube, Instagram or any

8   other social media platform that I am unaware of but my

9   teenagers could tell me about.  Those are off limits for

10  discussing this case, even if I haven't specifically mentioned

11  it here.

12      I also expect you will inform me as soon as you become aware

13  of another juror's violation of these instructions.  A juror who

14  violates these restrictions jeopardizes the fairness of these

15  proceedings and a mistrial could result, which would require the

16  entire trial process to start over.

17      Finally, do not form any opinion until all the evidence is

18  in.  Keep an open mind until you start your deliberations at the

19  end of the case.

20      I hope for all of you that this case is interesting and

21  noteworthy.  If you want to take notes during the course of the

22  trial, you may do so.  I will tell you, however, it is difficult

23  to take detailed notes and pay attention to what the witnesses

24  are saying at the same time.  But if you're a note taker, be

25  sure that your note taking does not interfere with your

1    listening to and considering of all of the evidence.

2         If you do take notes, do not discuss them with anyone else

3    before you begin your deliberations.  You won't take your notes

4    with you at the end of the day.  You'll need to be sure to leave

5    them in the jury room.

6         If you choose not to take notes, remember that that is your

7    own individual -- that it is your own individual responsibility

8    to listen carefully to the evidence, and you can't give away

9    that responsibility to your neighbor who happens to be taking

10   notes.  We depend on the judgment of all members of the jury.

11   You all must remember the evidence in the case.

12        The trial will begin tomorrow morning.  First, the

13   Government will make an opening statement, which is really just

14   an outline to help you understand the evidence as it comes in.

15   And then the defendant's attorney may but does not have to make

16   an opening statement.  Opening statements are neither evidence,

17   nor arguments.

18        The Government will then begin presenting its witnesses and

19   counsel for the defendant may cross-examine them.

20        Following the conclusion of the Government's case, the

21   defendant may, if he wishes, present witnesses whom the

22   Government may cross-examine.  After all the evidence is in and

23   after the court has instructed you on the law, the attorneys

24   will present their closing arguments to you to summarize and

25   interpret the evidence for you.  And then at that point, you

1    will retire to deliberate on your verdict.

2        Those are your preliminary instructions.  As I said, we will

3    start tomorrow morning at 9:00.  At that point, just prior to

4    the Government beginning with opening statements, we'll talk a

5    little bit more about housekeeping, about what your schedules

6    are, about -- hopefully we'll have a little sharper view on how

7    long the trial may take.  And so it will be fine for you to come

8    in and let me know if you have child care issues, if you have

9    other issues that require you to be gone.  We would really like

10   to be able to go to 5:00 every day.  We will try our best to

11   avoid going this late, but I'll want to hear that from you.  We

12   can do that tomorrow.  I want to let you go at this point.

13   Thank you.  But, remember, you cannot talk about the case.  Keep

14   that to yourself for now and we'll see you in the morning.

15       (Jury out 6:00 p.m.)

16           THE COURT:  All right.  Anything we need to talk about

17   at this stage, Mr. Meier?

18           MR. MEIER:  Not that I'm aware, Judge.

19           THE COURT:  Mr. Perras?

20           MR. PERRAS:  No, Your Honor.

21           THE COURT:  All right.  I'll see you-all -- if you-all

22   could be in here at 8:45, that would be great.

23           MR. MEIER:  Yes, Your Honor.

24       (Proceedings concluded at 6:01 p.m.)

25

1              C E R T I F I C A T E

2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5

          s/Dena Legg                    December 9, 2016
6    Certified Court Reporter No. 20042A157      Date
     Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25