1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                        LOUISVILLE DIVISION

3

UNITED STATES OF AMERICA,      )      Case No. 3:15-CR-00141-DJH
4                              )
           Plaintiff,          )
5                              )
      VS.                      )
6                              )
MATTHEW B. CORDER,             )
7                              )      October 17, 2016
           Defendant.          )      Louisville, Kentucky
8

9                              *  *  *  *  *

10                    TRANSCRIPT OF SENTENCING
                  BEFORE HONORABLE DAVID J. HALE
11                  UNITED STATES DISTRICT JUDGE

12                             *  *  *  *  *

13   APPEARANCES:

14   For United States:       Amanda E. Gregory
                              U.S. Attorney's Office
15                            717 West Broadway
                              Louisville, KY 40202
16
                              Christopher J. Perras
17                            U. S. Department of Justice
                              601 D Street, NW
18                            Washington, DC 20004

19

20   [Defendant present.]

21                       Dena Legg, RDR, CRR, CCR-KY
                          Official Court Reporter
22                        232 U.S. Courthouse
                          Louisville, KY 40202
23                          (502) 625-3778

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant:          Donald J. Meier
                              Western Kentucky Federal
 3                               Community Defender, Inc.
                              629 S. 4th Avenue, Suite 200
 4                            Louisville, KY 40202

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Begin proceedings in open court at 1:37 p.m.)

2               DEPUTY CLERK:  3:15-CR-141, *United States of America*

3     *v. Matthew Corder*.

4               MR. PERRAS:  Chris Perras and Amanda Gregory for the

5     United States.

6               MR. MEIER:  Don Meier for Mr. Corder, who is present.

7               THE COURT:  Well, good afternoon.  We're here for a

8     sentencing hearing.  I understand as an initial matter we have

9     just -- am I correct -- just one guideline disagreement?  Is

10    that right?

11              MR. PERRAS:  I believe so, Your Honor.

12              THE COURT:  All right.  You want to speak to that

13    first, Mr. Perras?

14              MR. PERRAS:  Yes, Your Honor.  The Government believes

15    that the Section 3A1.3, restraint of victim enhancement, is

16    appropriate here.  Just by the plain language of the

17    enhancement, if the victim was physically restrained in the

18    course of the offense, then the adjustment should be applied.

19        The exception is written into the rule, and the exceptions

20    are two, that the offense guideline specifically incorporates

21    the factor or that unlawful restraint is an element of the

22    offense.  In this case, neither is present.

23        And the Sixth Circuit has said in exactly the same case, a

24    242 conviction based on a false arrest, that neither of those

25    two exceptions apply.  And that's because unlawful restraint is

```
 1    not an element of the 242 offense, although it is commonly
 2    associated with false arrest.  In this case, there's not only
 3    that initial unlawful restraint -- or the initial restraint
 4    during the arrest, it's also the subsequent two weeks of being
 5    jailed in which Mr. Baize was restrained against his will in
 6    jail that would support the restraint enhancement here.
 7         And I don't -- I just don't believe that the defense has
 8    called anything -- has pointed out anything in Epley which would
 9    suggest otherwise.
10              THE COURT:  Mr. Meier.
11              MR. MEIER:  Judge, we're not ready to concede that
12    restraint.  I recognize the 3A1.3 restraint of victim.  We do
13    object to it.  I recognize the Government's argument.  I point
14    out a number of things.
15         And as the Government conceded in the case, they -- or in
16    their sentencing memorandum, restraint of the victim may be
17    not -- may not have to occur 100 percent of the time, because
18    there are offenses that would fall in this category that don't
19    involve that, but generally speaking, it does.  And it certainly
20    does in this particular case because the violation is his -- Mr.
21    Baize's right to be free from unreasonable seizure in that he
22    was arrested without probable cause and the -- his home was
23    breached, the entryway of his home was breached.
24         So in this particular case, it was part and parcel to the
25    offense, and in general, it is part and parcel to the offense,
```

and the offense occurred, both having him come out and making an

arrest, without probable cause.

I also point out that there was a third offense, resisting

arrest.  And no one at any time suggested that that was improper

because even if an arrest is unlawful, the commentary and the

case law is clear in state court that an unlawful -- the

unlawfulness of arrest does not preclude or is not a defense to

resisting arrest in that a citizen, when some who is -- an

officer is arresting them under color of law, they're required

to submit to that authority and then let the chips fall where

they may, should there be a problem thereafter.

In this case, as Mr. Corder clearly testified, he was going

out to the door.  He was requesting that Mr. Baize come out.  In

fact, I guess you could say ordered him to come out.  He

refused.  He had not restrained him.  He had not arrested him,

and as he testified, had not even made a decision, likely would

have talked with him, admonished him, given him a warning or

whatever.

The failure to submit to that authority led to the offense

of resisting arrest, which lead to both the handcuffing and the

tasing, which I point out was after several warnings that that

would occur.  So we believe that for those reasons, the

restraint of victim should not apply to this underlying offense.

And even if it does, because of the fact that most of these

offenses certainly occur like this, I think it would be grounds

1   for a variance or departure given the facts of this particular

2   case.

3          MR. PERRAS:  I would just point out that the Sixth

4   Circuit has said in analogous circumstances that the lawfulness

5   of the arrest involved does not preclude application of the

6   restraint enhancement, just responding to the last point about

7   the resisting arrest charge.

8          THE COURT:  Well, I have considered carefully the

9   Government's objection to the guideline calculations proposed in

10  the PSR.

11      And I've considered carefully, Mr. Meier, your argument,

12  which I think is reasonable, but I'm going to sustain the

13  Government's objection and apply the enhancement under 3A1.3,

14  which requires a two-level enhancement if a victim was

15  physically restrained in the course of the offense.

16      The U.S. relies on the *Epley* case, which is also a false

17  arrest case, to establish that physical restraint is not an

18  element of the deprivation of rights offense under 18 U.S.C.

19  242.

20      And as I said, I think that your arguments, Mr. Meier, are

21  reasonable, arguing that there is a simultaneous lawful arrest

22  on a resisting arrest charge and the physical restraint occurred

23  in the context of that arrest, but in the *U.S. v. Carson* case, a

24  Sixth Circuit case, the court there found that the lawfulness of

25  a restraint is irrelevant for purposes of the 3A1.3 enhancement.

1    And so I think that that is the -- I think that case is

2    dispositive here.  As long as the victim was physically

3    restrained at the time of the offense, the enhancement applies,

4    regardless of whether the restraint was otherwise lawful.

5        And here there's no question from the facts proven at trial

6    that Deric Baize was physically restrained.  He was handcuffed

7    and ultimately incarcerated for approximately two weeks.  So

8    because the victim of the offense here was physically restrained

9    in the course of those offenses for which the defendant was

10   convicted, the two-level enhancement under 3A1.3 applies.

11       That results in an adjusted offense level of 18 and a

12   Criminal History Category of I, resulting in a range of 27 to 33

13   months.

14       What other motions or issues do we need to discuss?

15           MR. PERRAS:  No issues from the Government, Your

16   Honor, other than just being heard on sentencing, the final

17   sentence.

18           MR. MEIER:  Judge, as it relates to the PSR, the court

19   is obviously well familiar with the facts of this case.

20   Mr. Corder testified during the course of the trial.  Certainly

21   we had and continue to have disagreements as to the result or

22   the characterization of his conduct.

23       We respect the jury's verdict.  They found him guilty and

24   it's against the law, but -- I don't know what you need to do

25   for appeal.  I believe that his testimony as to the facts was

1    relatively consistent with the Government's rendition, and so I

2    don't want to go over every little difference.  I don't know

3    that I would be able to.

4        But to the extent that what -- if it did -- and I don't know

5    that it did -- that Mr. Corder's testimony differs as to the

6    factual account of what would happen, we would rely on

7    Mr. Corder's testimony.  I would acknowledge that the facts as

8    listed in the PSR are accurate in terms of the rendition of

9    facts that were produced by the Government at trial.

10            THE COURT:  Any response, Mr. Perras?

11            MR. PERRAS:  No response from the Government, Your

12   Honor.

13            THE COURT:  What does the United States have to say

14   with respect to restitution at this point?  And, also, does

15   Mr. Baize wish to speak?

16            MR. PERRAS:  Mr. Baize has submitted a victim impact

17   statement, which we have submitted to the court.  Does Your

18   Honor have a copy of that?

19            THE COURT:  I have seen it.  On the basis of the

20   submission, I'm -- I would not be prepared to order a specific

21   number.  I think here that -- and I'm certainly willing to hear

22   more from either side on this issue, but I think that -- I think

23   restitution is mandatory here, as I look at 3663 and 3663(a),

24   and particularly subpart (B)(2)(c).  I think the victim is

25   entitled to mandatory order of restitution, but I'm not sure

 1   that what he has submitted thus far is sufficient for me to make

 2   a specific restitution order.  Do you have anything further

 3   other than what has been submitted?

 4        MR. PERRAS:  We spoke with Mr. Baize about getting

 5   kind of documented proof of certain of these things.  He said

 6   he's going to look into that and try to get it.

 7        As far as the amount of restitution, the Government believes

 8   that sort of the first thing would be lost wages from the time

 9   -- the two weeks that Mr. Baize was in jail, as well as the

10   three weeks before which he was able to get another job.

11   That's, of course, an amount which we don't have documentation

12   for quite yet.

13        So that's something that we could hold off on a restitution

14   award today, and we could get further documentation, submit that

15   to the probation office.  We just haven't been able to get it to

16   this point.  So that's sort of the first thing, the lost wages.

17        Mr. Baize is also requesting, as you can see in the victim

18   impact statement, the money for the trailer upgrades which he

19   lost.  Apparently the trailer was used as collateral for rent

20   payments.  He wasn't able to make the rent payments.  They took

21   the trailer.  So that's the theory on that.

22        And then around $300 in cash.  Mr. Baize has informed the

23   Government that when he was taken into the jail, he had

24   approximately $300 in cash in his wallet.  And he said that the

25   jailers took it and they said they put it towards fines.  So I

1  can't personally speak to that, Your Honor, but that's what's

2  included in the victim impact statement form.

3          THE COURT:  Do you have anything to add to that,

4  Mr. Meier?

5          MR. MEIER:  Judge, I did see the victim impact

6  statement, was provided a copy of that not too long ago.  And

7  just at first blush, it appeared in terms of -- assuming it

8  could be proven or assuming there was some documentation, the

9  $300, that seemed like -- reasonable.

10     The trailer, yeah, I didn't know if he had owed money on the

11  trailer.  I didn't know how that worked out.

12     I do know from the trial that it was my understanding

13  certainly there would be lost wages while he was in jail.  My

14  recollection was that he was offered a position back with that

15  company and quit the position.  So I think a little bit more

16  needs to be fleshed out in terms of the cause and effect as it

17  relates to the trailer.

18

19          THE COURT:  I think that's fair.  I think, as I said,

20  the statute, particularly that subpart (B)(2)(c), seems to

21  contemplate the lost wages issue that you've talked about,

22  Mr. Perras.  We probably would need to connect the other claims

23  more specifically to a statutory provision, but I think -- is it

24  90 days?  I think you-all have 90 days to supplement.  So we'll

25  wait on the restitution portion.

1         MR. PERRAS:  Yes, Your Honor.

2         THE COURT:  And Mr. Baize does not wish to address the

3    court?

4         MR. PERRAS:  He does not.  He wishes that the court

5    will agree to his victim impact statement, but he would not like

6    to speak in court today.

7         THE COURT:  Just for the record, I have reviewed his

8    victim witness impact statement, as well as all of the

9    materials, Mr. Meier, that you submitted in behalf of the

10   defendant.  What motions does either side have next to consider?

11        MR. PERRAS:  None from the Government, Your Honor.

12        MR. MEIER:  No other motions other than argument at

13   sentencing, Judge, and Mr. Corder may wish to address the court

14   as well.

15        THE COURT:  All right.  Why don't you go ahead then

16   with the argument then.  I presume the argument is, essentially,

17   going to support an argument or a motion for a --

18        MR. MEIER:  Right.

19        THE COURT:  -- a variance; is that right?

20        MR. MEIER:  It is, Judge.  I'm sorry.  Yes.

21        THE COURT:  That's all right.

22        MR. MEIER:  Our argument -- we're asking -- we believe

23   -- under 18:3553, we acknowledge that the sentencing guidelines

24   are a factor that the court has to consider, but they're one of

25   many factors, as the court's aware from the *Booker* case.  So

1    that while we recognize that the court has ruled that the

2    guideline range is 27 to, I believe, 33 months, we believe that

3    when you factor in the other items that need to be considered

4    under 18:3553, we believe that a sentence of probation is

5    appropriate under this case with conditions that the court would

6    deem necessary and appropriate.

7        And just to go through briefly -- I will try not to take a

8    very long time, but --

9            THE COURT:  Take as much time as you need, Mr. Meier.

10           MR. MEIER:  We'll start with the nature of the

11   offense.  And the first part of the statute indicates that the

12   court is to consider the nature and circumstances of the

13   offense, as well as the history and characteristics of the

14   defendant.

15       I recognize that police officers are held to a higher

16   standard than the average citizen, and I believe in this case

17   Officer Corder was held to a higher standard and as a result is

18   suffering serious repercussions and serious punishments that

19   will occur and have already occurred without even considering

20   incarceration.

21       This particular offense clearly was not a planned offense.

22   You look, for example, at the *Epley* case that was cited by the

23   Government in their brief.  That was a planned police conspiracy

24   where these officers got together and made a bogus arrest of

25   this individual, planted drugs on him, planted guns on him in a

1    particularly heinous set of facts.  Two of the conspirators in

2    that case, by the way, got a sentence of probation.

3        This was -- this was not a planned offense.  Even under the

4    Government's rendition, they have repeatedly characterized this

5    as contempt of cop, and I'm -- I am assuming that's what the

6    jury believed.  And what that means to me is that Officer Corder

7    was baited.

8        So regardless of whether you believe that Deric Baize acted

9    criminally, which the jury did not, he still acted

10   inappropriately.  He still may have uttered what two ordinary

11   citizens might consider fighting words and an ordinary citizen,

12   you know, after being confronted by somebody yelling at them in

13   a parking lot, might end up in a fistfight as a result of,

14   quote, unquote, fighting words.

15       Well, a police officer is not allowed to be baited --

16   okay -- but that doesn't mean that a police officer is not a

17   human being.  And that doesn't mean that a police officer

18   doesn't, even if they've been trained otherwise, succumb to

19   pressures and succumb to external events that normal human

20   beings respond to.

21       And I think it's important that the court recognize that

22   this was spontaneous.  I mean, we know it was spontaneous

23   because he taped it.  They know exactly what happened because of

24   the tape that was provided by his body camera that he turned on

25   beforehand.

1    And regardless of what you believe his motivations were at
2    the time that it happened, that has to tell anyone looking at
3    this that when he first walked up there, he did not have any bad
4    intentions or he wouldn't have taped it.

5        It was not a use of excessive force.  Most of the cases
6    cited, when you look through these type of cases and the cases
7    cited by the Government in their sentencing memorandum, almost
8    exclusively were cases that were police brutality, basically.
9    There was no excessive force here.  And I mentioned that in the
10   resisting arrest.

11       The police officers that testified -- this Billy Allen was
12   not charged with anything.  He was not to my knowledge even
13   reprimanded for his conduct that day and that -- and that's
14   because, as he testified, he believed that there was -- there
15   was a disorderly conduct or there was some type of offense that
16   led to the conduct at the doorway.  And so all the force that
17   was applied at the doorway, had there been sufficient probable
18   cause, was within the law.

19       So we're not talking about one of these egregious situations
20   where someone is handcuffed and they're in custody and the
21   police officers are beating them with broomsticks or batons or
22   kicking them in the face or whatever, as is in the case of many
23   of these cases that have been cited, or shot and killed.

24       This was a situation where Mr. Baize baited Officer Corder.
25   Officer Corder, unfortunately, fell for the bait.  He still went

1    there.  He warned him several times, even -- you know, the jury

2    has found this is an illegal arrest and I accept that.  But he

3    even then warned him several times that he'll be tased.  And

4    then when he was tased, it didn't take, you know, and continued

5    to warn him.  And then tased him one time, which is all that was

6    required to achieve the purpose of the detention.  So this was

7    not a police brutality case.  It was an unlawful arrest and I

8    recognize that.

9        That brings us to the other character -- or to the

10   considerations that we have to take in number one under that

11   subsection, and that's the history and the character of the

12   defendant.  Now, as the court's aware from the 404 hearing and

13   through the course of the trial, the Government and the

14   Government indicated in its memorandum the incident where the

15   tow truck driver in state court -- I believe in the courtroom

16   today is an individual that was -- is a relative of someone that

17   he arrested at one point.

18       Mr. Corder has no criminal record, zero criminal record.

19   And, again, we're talking about -- job conduct and criminal

20   record are two separate things.  And if the court -- you know, I

21   think it is inappropriate and I don't think it's fair to

22   testify -- to sentence somebody in a criminal court based on

23   their past history of job failures or job problems that did not

24   rise to the level of criminal conduct or even close in most

25   cases.

1    In this particular case, even if you did that, what you
2    would find -- I added just a handful of things that were
3    provided in discovery, but his file is replete with
4    commendations, letters, awards, meritorious service, awards of
5    valor.  I highlighted a view of them.
6    He confronted an individual in a White Castle restaurant who
7    had already stabbed a customer.  This is probably somebody who
8    was mentally ill and obviously very violent.  Then Officer
9    Corder diffused the situation, talked him down from it, received
10   a medal of valor.  And as I included in my memo, his commanding
11   officer indicated that that very likely saved a life if not
12   lives.
13   He also intervened in a suicide situation where an
14   individual was threatening suicide.  They had the hostage
15   negotiating team respond.  Because of the rapport that Officer
16   Corder established with that guy, he would not speak with the
17   psychologist and the people on that team, would only speak with
18   Officer Corder, who, again, was able to talk him down from the
19   ledge, metaphorically speaking, and avoid this.
20   The court may be aware that one of the news stations did a,
21   quote, unquote -- I use the term loosely -- news article
22   regarding Mr. Corder.  I believe it aired last night and maybe
23   this morning.  I don't know.  One of the incidents that they
24   used in, I guess, documenting a poor history was, I believe, an
25   individual, Adrian Reynolds, who later died in jail as a result

1  of getting into a fight with guards.

2      In this particular case, he was engaging in acts of --

3  allegedly acts of domestic violence against his partner,

4  girlfriend, wife.  I'm not sure which.  That woman also came on

5  TV.  She was also clearly injured facially and credited Officer

6  Corder in that instance of saving her life.  And, yes, he did

7  apply force which resulted in injury to Mr. Reynolds, which did

8  not by the way have anything to do with his death.

9      So when you look at this characteristic, you have an

10  individual that has absolutely no prior record.  He's 51 years

11  old.  We're not talking about a kid that's 18 or 19 years old

12  and I'm standing here saying he doesn't have any prior record,

13  Judge.  Well, that's because he's not old enough to have

14  developed one.  Mr. Corder is 51 years old.  He has no prior

15  record.  He has not been a perfect cop.  He will never be a cop

16  again, but he also has had a mostly meritorious service during

17  his time as a police officer.

18      When you go farther in the statute in terms of

19  considerations, sub (2) is the need for the sentence imposed.

20  And there are, as the court's aware, four different

21  considerations that are enumerated under that.

22      First of all, if you look at the seriousness of this offense

23  -- and, again, we talked about that in the nature -- in the

24  nature of the offense.  I would reiterate many of the same

25  comments I made there.

1        I would also point out in that -- under that category, I've

2    been doing this a lot of years and I've seen a lot of cases in

3    district court.  And if there's probably one thing I would agree

4    with in terms of the testimony provided by the trainers was

5    that, yes, this contempt of cop, if that's what you want to call

6    it -- I don't know that I've necessarily heard it called that,

7    but I understand what the principle is -- it was a problem that

8    is common enough that it required training.

9        These people said, yes, we believe -- you know, it was our

10    belief that disorderly conduct or some of these offenses was on

11    a regular basis or at least a common basis being used to somehow

12    extract revenge on someone who had -- who had insulted or yelled

13    at or done something to provoke a police officer.

14        If you look at deterrence, is there any need to protect the

15    public from further crimes of the defense?  I mean, that's --

16    that almost -- that's a no-brainer.  Officer Corder, as I said,

17    has no record.  He absolutely, even if you believe the

18    Government's rendition, would only pose even the chance of a

19    danger to the community as a police officer.  He will never be a

20    police officer again.  He was fired from this job, and as a

21    convicted felon, that's one of the consequences, that it's going

22    to cost him not only a job.  It's going to cost him a career,

23    and it's going to cost him the opportunity to get into other

24    careers as a convicted felon.

25        He's an individual that has the motivation, the wherewithal

to find other jobs, to get meaningful careers.  He may still be able to do that, but he will suffer serious financial ramifications throughout the rest of his working career as a result of this felony conviction.

A felony conviction means the same thing to every citizen in terms of the rights you lose collaterally, but its importance to some citizens is significantly more than others.  Mr. Corder loves to hunt.  He's not going to be able to do that.  Like I say, he had good job prospects.  That's going to be significantly curtailed.  He takes his right to vote seriously. These are things that he will no longer have and will be taken away as a result of this conviction.

But back to the issue of deterrence.  There is absolutely -- that's just not an issue in this case.  He's not a danger to society, and I believe the consequences that he could face short of incarceration would certainly be enough to deter other officers from thinking, well, I can do this without any repercussions.

The next category is the kinds of sentences available.  I recognize that Deric Baize spent two weeks in jail for which the jury believes he was -- wrongfully and we acknowledge that.  A police officer going to jail and an ordinary citizen, I think that's two different things.  I think the -- not only the stigma, but the potential danger involved in that type of situation and the steps that would have to be taken to remedy it

1   make for a more severe sentence, I believe, for a police officer

2   than an ordinary citizen.

3       I point out that the court could punish Mr. Corder, could

4   take away his liberty without sending him to prison.  Home

5   incarceration is clearly an option in this case.  And, again,

6   that is a significant punishment.  Yes, it's not behind razor

7   wire, but Officer Corder is not an individual that requires

8   razor -- the only reason razor wire is there is not because it

9   looks so good.  It's because people you put there are very

10  likely to run, and that's not going to be the case with Officer

11  Corder.  He can -- he can be confined.  He can be punished and

12  can be punished for a much longer time than Mr. Baize through

13  the use of home incarceration.

14      The court could -- can modify that any way it wants in terms

15  of not allowing any releases or allowing a release only for

16  work, which would facilitate payment of restitution, which

17  apparently is going to be an issue and is one of the factors

18  that needs to be considered as well in 3553.

19      So I believe there are sentences available in conjunction

20  with the things that he's already lost that can add to the

21  punishment, because this is not a question of protection of

22  society.  It's not a question of him running.  The issue here is

23  punishment for what he has done.  I mean, I don't think anybody

24  disagrees with that.  Maybe I'm wrong.

25      The last thing that I think I haven't talked about -- I

1    jumped ahead to the restitution issue briefly -- is the need to

2    avoid sentencing disparities.  And, you know, I'm not -- this is

3    the first case of this type that I've ever done so I don't have

4    any personal knowledge of cases.  A lot of cases, I can look

5    back and say I've done hundreds of these, Judge, and this is

6    what normally happens.  I can't say that.

7        But I did look through the cases that were cited by the

8    Government in its sentencing memorandum, either for the

9    proposition of the two-level increase that we disputed or the

10   need for a guideline sentence, and nothing was mischaracterized.

11   The quotes that the Government put in their report or their

12   memorandum were accurate in so much as they were stated.  But if

13   you actually look at these cases, you see that the *McQueen* case,

14   for example, that was cited, this was an egregious situation

15   where the corrections officers were staging fights between

16   inmates.  And then it went over a long period of time.  It

17   wasn't just one incident.  They staged, basically, cage battles,

18   for lack of a better word, when they -- they would beat them

19   with broomsticks, just egregious.

20       And, yes, the court made the quotes that, yeah, you know,

21   these abuses may go undetected and, you know, we need to have,

22   you know, serious consequences, those type of quotes.  In that

23   particular case, what was -- what was being protested was the

24   fact that the one corrections officer was facing 151 to 188

25   months and he was given a sentence of 12 months, down from a

 1    guideline of, you know, 15 years, in that area, plus or minus.

 2        So you look at the *Boone* case, which was the -- a case in

 3    Iowa, the same thing.  That involved kicking an individual in

 4    the face pretty much straight on.  They lost their teeth, a

 5    bunch of facial injuries after the person was already subdued.

 6    None of that happened.

 7        The *Ronda* case that was cited was multiple police shootings

 8    where one case involved the death of two people where an

 9    individual shot in the back.  And I think most of these people

10    were in a guideline range similar, if not less than, what's the

11    case here.

12        The *Epley* case, which was the first case they indicated,

13    that as I said was a planned planting of drugs and guns on an

14    individual.  Two of the individuals in that case got probation.

15    Other individuals got some time to serve, but it was in

16    conjunction with other fraud cases and other weapons charges.

17        So, you know, when you look at this case, it is illegal.  It

18    is a felony.  It is a serious offense.  Nobody is -- nobody is

19    saying that it is not a serious offense.  But virtually every

20    sentencing characteristic here weighs in favor of a sentence of

21    probation, and like I say, possibly if the court wants to add

22    some additional punishment, home incarceration is probably

23    certainly appropriate.  I believe that is clearly fair,

24    notwithstanding the environment today with result to police --

25    alleged police misconduct.

1       But, again, I think anything more than probation is to set

2   up Mr. Corder unfairly and to make an example of him that I

3   think is more than necessary to -- for the example that's being

4   made.  That's a pretty inartful way of putting it, but the

5   bottom line is, yes, this conduct cannot and should not occur.

6   Yes, there should be repercussions for it.  I believe the court

7   can do that without a prison sentence.

8               THE COURT:  Mr. Perras.

9               MR. PERRAS:  Yes, Your Honor.

10              MR. MEIER:  I don't know when court wants -- I'm

11  sorry.  I don't know what the court wants to hear -- I think

12  Mr. Corder would like to address the court at some point.

13              THE COURT:  Well, we'll take that up at the conclusion

14  of these arguments.

15              MR. PERRAS:  Yes, Your Honor.  Mr. Meier raised

16  several factors, mitigating factors which he said would militate

17  against a guideline sentence in this case, and the Government

18  agrees that there are mitigating factors here.  I mean, this was

19  not a planned offense.  If there was excessive forced used, it

20  wasn't egregious.  There were lasting physical injuries and

21  there is no need for specific deterrence in this case, but those

22  are the mitigating factors that get the Government to a sentence

23  at the low end of the guidelines, which is a sentence of 27

24  months.

25      The Government believes for a variety of reasons that a

downward departure or downward variance would be inappropriate in this case, and I think the first thing you look at is the harm to the victim.  So Mr. Meier said that police officers are held to a higher standard, but they're held to a higher standard because they have more power than ordinary citizens.

If the defendant was just an ordinary citizen that night and he got into a verbal argument with somebody and they got in a fight, he might be charged with assault but that's it.  There would be no color of -- federal color of law case against him. It's his abuse of power, his arresting Deric Baize, his charging him with crimes and sending him to jail, doing something that an ordinary citizen couldn't do, which is what makes police misconduct cases especially serious.

And if you look at what happened to Deric Baize in this case, he became an accused criminal.  He spent weeks in jail. He lost his job and he lost his home, all for being rude.  And so defense counsel is asking for a probationary sentence when his client admittedly sent someone to jail for weeks for a crime he didn't commit.

So I think you start with the harm to the victim.  You also have to look to the harm to the public that these sort of offenses occasion.  Mr. Meier mentioned the news coverage of this offense, and there's been all sorts of news coverage nationwide with similar incidents, some with video and some with not.  I think when your average member of the public sees that,

1    it might cause several people to lose their trust in law

2    enforcement, which is a real harm to the public and a real shame

3    for the well meaning and good officers out there who are now

4    looked at differently and treated differently because of rogue

5    officers like the defendant who abuse their power.

6        I think you also have to look at the defendant's history.

7    You have to look at it not because it shows prior criminal

8    conduct, but you have to look at it, is this just a bad day that

9    the defendant had and he just went off?  Maybe he's having

10   problems in other areas of his life, but that's just not what

11   is -- what we can see here.

12       I mean, he's been fired from three separate law enforcement

13   agencies for abusing his power.  He's been sued successfully in

14   federal court and other court for excessive force.  He's been

15   criminally prosecuted for abusing his power, and he continues to

16   do these sorts of things.  And I think that goes to his

17   character.  It probably doesn't go to his likelihood of

18   recidivism, because he will -- as Mr. Meier points out, he'll

19   never be a law enforcement officer again, but it does go to the

20   blame worthiness of the conduct here.  He continued to be

21   re-trained on the same things.  He just didn't seem to care.

22       Mr. Meier pointed out specific deterrence, there's no need

23   for specific deterrence.  And I'd agree with him here, but I do

24   believe that there is a need for general deterrence.  And as

25   several courts have pointed out, law enforcement misconduct

1    cases are very, very difficult to first identify and then

2    investigate and successfully prosecute, and I can attest to that

3    as that is my docket of cases.

4        So when there's a rare case where one is actually ferreted

5    out, where there is a video, where there's no cover-up, where

6    the partner of the officer does the right thing and tells the

7    truth, the court needs to send a message that this is not the

8    sort of thing that is just going to go by with a slap on the

9    wrist.  So I think there's a large interest for general

10   deterrence here.

11       Mr. Meier talked about unwarranted sentencing disparities.

12   I think the easiest way to avoid that is to give guideline

13   sentences to take account for all the factors that the

14   Sentencing Commission has put together and decided that these

15   things warrant these sentences and stick with that.

16       I just don't see the type of things that are in -- listed as

17   factors in the guidelines that would warrant a departure here.

18   The types of things that might warrant a departure in a color of

19   law case would be sort of a heat of battle situation where

20   there's a high speed chase or something.  That's not the case

21   here.  It was two guys talking and neither -- Mr. Baize was not

22   even suspected of being a criminal.

23       The lasting harm for victim.  The victim lost his job.  He

24   lost his house.  I mean, there's a real harm here.  I think he

25   would have traded a black eye for that any day of the week.

1       This isn't just a single incident, as I said before.  He has

2   a long history of misconduct and he knew better.  As we heard

3   from the Kentucky law enforcement trainers, they get -- they

4   receive -- officers receive great training in Kentucky and we

5   saw that.  And he was trained and re-trained and re-trained

6   again and specifically told, "Hey, somebody swears at you, you

7   can't arrest them for it."  He was told that because that

8   happened before and he still disregarded that.  And it shows

9   that he just didn't really much care what the consequences of

10  his actions were.

11      So for all those reasons, the Government believes that a

12  downward departure or variance would not be appropriate and

13  requests a guideline sentence of 27 months' imprisonment.

14          THE COURT:  Anything further, Mr. Meier, on that

15  discrete issue?

16          MR. MEIER:  Well, Judge, no, I don't want to beat a

17  dead horse, although I tend to.  Just a couple of very brief

18  points.  First of all, in terms of being sued successfully,

19  there was a settlement I know on that tough man case and another

20  case.  To me, that's similar to the Government's talk of when we

21  mentioned that there was probable cause stipulated.  A lot of

22  times you can settle a case for five, 10, 15,000, whatever,

23  which did occur in this case of some amount of money, a nominal

24  amount of money that would have been less than it would have

25  cost to try it.  So those decisions are made a lot of times for

1    reasons completely different.

2        The other thing -- and, again, I say this because I'm -- I

3    don't mean to minimize the conduct.  Deric Baize certainly

4    suffered consequences as a result of that.  I don't mean to

5    minimize two weeks in jail and loss of wages.  I recognize that.

6    I just don't think he lost his job because of this.

7        I specifically remember the testimony -- and I could be

8    wrong -- that he was given the job back at this same company.

9    He was put in a position where he didn't interact with the

10   public.  And then he later quit the new job that he was given.

11   And I don't know -- I can't speak for another employer, but it's

12   certainly realistic to believe that if that's the conduct you

13   display towards police officers, illegal or not, maybe this

14   isn't somebody we want in a position that deals with the public.

15   And maybe we will still employ him but put him in another

16   position where he doesn't deal with our customers.  And that --

17   that could be something that is done regardless of whether

18   Mr. Baize's conduct was legal, illegal, you know, against the

19   law or not against the law.

20       So we would dispute the characterization that he eventually

21   lost his job, while recognizing that he certainly lost wages and

22   he certainly was as a result of this put into jail for a couple

23   of weeks wrongfully.  So I don't mean to belittle that, but I

24   also think I need to point out what we -- what we believe is a

25   discrepancy.

```
 1              THE COURT:  All right.  Anything further on that

 2    issue?

 3              MR. MEIER:  No, Your Honor.

 4              THE COURT:  And you mentioned that your client would

 5    like to address the court.

 6              MR. MEIER:  Yes.

 7              THE COURT:  Why don't you come around to the podium.

 8              THE DEFENDANT:  Just a few words, Your Honor.  I

 9    didn't prepare anything and I'm not going to get into a long,

10    drawn out, you know, deliberation of facts or figures or what

11    was stated in this court case.  Number one, I guess most of all

12    is my sincere apology to Mr. Baize.  I know what it's like to be

13    incarcerated.  I've been incarcerated.  I know what it's like to

14    lose a job.  I've lost a job.  I know what it's like to lose a

15    house, because I've lost my house before due to a job loss.

16       I think the biggest thing is -- I want Deric to understand

17    is my intention that night was never -- regardless of what the

18    Government has presented, regardless of what the jury has found

19    -- and I have to respect that and I do respect that.  You know,

20    I've been a police officer for X amount of years, and I've had

21    to be on both sides of this fence now.

22       Number one, I've saw people have to deal with the sentence

23    of the court, and I respected that and I have to respect it on

24    this side also.  I have no choice.

25       So, you know, I don't mean to say this in any way, but -- in
```

disrespect in any way.  I didn't want anybody to take this as disrespectful, but I want you to understand that I did not ever come to your door to disrespect you, or to embarrass you, or to violate your rights, and that is the honest truth.

And I hope, I guess, another thing too is I read in your impact letter that, basically, you said that you have issues now when you're around police.  You kind of feel on edge and so forth, and I guess I need to reiterate that regardless of what you feel like happened between me and you, I want you to respect the police.  And I want you to feel that if you call them or if you need them, that that's the people you need to call and don't hesitate because of whatever happened between me and you.  All right?

Next, I guess, is just apology to the court.  All this took place because, you know, of what happened that night, but it could have been avoided, I guess, because I could have took the offer given or originally given by the Government in regards to probation.  I guess I want the court to understand that like Mr. Baize -- excuse me -- Mr. Meier had already said something about probation for me, even though I guess I'm requesting that now -- and I know, I guess, I'm talking out of both sides of my mouth here -- was not really an option.  Based on the lifestyle that I had created and the support and the financial responsibilities I have to my family, taking a felony probation hit was -- you know, it was hard.  It was going to cause issues.

1    Before the Government had indicted me in regards to things,

2    I was already enrolled in Jefferson County Community College to

3    start with aviation technology certification.  I had already

4    planned to do other things with my life.

5    And when this happened, I knew that, you know, if I took a

6    felony hit in regards to whether it was probation or otherwise,

7    that the FAA or nobody else was ever going to think about me

8    allowing me to work on a plane or anywhere, you know, with any

9    kind of substantial income.

10   So I guess I'm saying I was kind of forced in the situation

11   of having to defend myself.  I know it could have all been

12   avoided and the Government wouldn't had to spend the money they

13   had to spend to fly people back and forth to do this trial and

14   so forth, but I want the court to understand that it wasn't

15   because I'm just thumbing my nose at the court.  It wasn't that,

16   hey, you know, try your best shot.  You know, see what you get.

17   It wasn't anything like that.

18   I had some financial obligations and I had some things that

19   I wanted to do with the rest of my life, obviously wasn't going

20   to be in policing, and that's what I was looking for and what I

21   was trying to do.

22   You know, I guess -- you know, Mr. Meier had talked about

23   the different things supposedly that are written down in letters

24   from people saying that I've did, you know, in my career, the

25   good and the bad.  And I guess it's hard for an individual like

1    me to kind of sit here and go, you know, after all this time,

2    it's hard to feel or hard to wrap your head around the fact that

3    a career is coming down to a criminal sentence.  It really is.

4    I hope that the people that I served and the people that I

5    helped or try to help feel like I did that.  And I know

6    Mr. Baize has a different opinion of that and I get that.

7         But I just want the court to understand that this wasn't

8    about violating Mr. Baize's rights and that's what the jury came

9    up with.  And like I said, I have to, you know, respect --

10   excuse me -- respect that but -- and whatever the court decides,

11   I will take and do.  I just don't want, I guess, the court -- I

12   want the court to understand that it was not my intention to go

13   disrespect Mr. Baize and violate his rights that night.  It was

14   never that intention.  One of the simple reasons for that is I

15   turned the camera on.  I turned the camera on to document

16   everything that happened that night.

17        If I'm going to disrespect him or if I'm going to violate

18   his rights, I'm sure not going to turn on a recording device and

19   show everything that's going on if I'm trying to get away with

20   something.  It just isn't feasible.  It doesn't make sense and

21   that's not what I was going to do.

22        And the best piece of evidence that the Government's got is

23   that video.  And per the policy of the department that I work

24   for and because that was what I was supposed to do, I did that.

25   And that's the reason why we're pretty much sitting here is

1    because of that video.  And without that video, I obviously

2    don't know if the case ever would have been brought up.  I don't

3    know.

4        But I'm trying to make you-all understand that this was not

5    an intention of mine, to abuse my authority, nor was I trying to

6    intentionally disrespect Mr. Baize.  And I hope he understands

7    that and I hope he accepts my apology in regards to that.  I

8    wish things would have come out different.

9             THE COURT:  Thank you, Mr. Corder.

10       Mr. Meier, anything further?

11            MR. MEIER:  Nothing further, Judge.

12            THE COURT:  Anything further from the United States?

13            MR. PERRAS:  Nothing further.

14            THE COURT:  I think at this point, having heard the

15   argument and considered the briefs, I'm going to take just about

16   a 10-minute break before I announce the sentence.

17       (Recess at 2:29 p.m. until 2:57 p.m.)

18            THE COURT:  All right.  Thank you all.

19       I have carefully considered the arguments that I have read

20   as submitted by the parties and that I have heard here this

21   afternoon.  Of course, I presided over the trial of this matter

22   and am well aware of the facts that were proven at trial.  And

23   so that the record is clear, I have carefully considered the

24   factors as enumerated in 18 U.S.C. 3553(a) and (b).

25       With respect to the defense motions, I find that there is no

1    basis here for a variance or departure.  I find no mitigating

2    circumstance that is not adequately taken into consideration by

3    the guidelines.  So I will deny the defense motion for either a

4    variance or a departure.

5        Deprivation of rights under color of law is a significant

6    crime and one which our federal law and sentencing guidelines

7    take seriously.

8        Here what occurred was not a misunderstanding or a mere

9    mistake.  The facts proven at trial show otherwise.  And

10   accordingly, a sentence consistent with the sentencing

11   guidelines is appropriate.

12       Mr. Meier, I will now announce the sentence.

13       The court, having considered the advisory sentencing

14   guidelines and 18 U.S.C. 3553(a), I now impose the following

15   sentence:

16       It's the judgment of the court that the defendant is

17   committed to the custody of the Bureau of Prisons for a term of

18   27 months as to Count 1 and 12 months as to Count 2 in the

19   indictment, which shall be served concurrently for a total term

20   of 27 months' imprisonment.

21       Upon release from imprisonment, the defendant shall be

22   placed on supervised release for a term of one year as to each

23   of Counts 1 and 2, which shall also run concurrently, for a term

24   of -- a total term of one year.

25       The defendant shall abide by standard conditions of

supervision adopted by the court, all of which will be explained to the defendant by the U.S. probation officer.

It is further ordered, pursuant to 18 U.S.C. 3663(a), including subpart (B)(2)(c) that the defendant will be responsible for restitution in an amount to be determined. Earlier in the hearing I suggested that the United States may have up to the permitted 90-day time period to submit additional documentation. Any interest requirement on the imposed restitution will be waived.

The defendant shall pay a special penalty assessment fee of $100 as to Count 1 and $25 as to Count 2, for a total special penalty assessment of $125.

Any financial sanctions imposed here shall be paid in accordance with the schedule of payments page, which will be contained in the judgment.

A fine and the cost of incarceration and supervision are waived due to defendant's inability to pay.

I have determined that the defendant has a low risk of substance abuse and mandatory drug testing will be suspended until further order of the court.

Having considered 18 U.S.C. 3553(a) and (b) and the advisory sentencing guidelines, which produce a total offense level of 18 at a Criminal History Category of I, the resulting advisory guideline range is 27 to 33 months' custody, a fine of 6,000 to 60,000, and a supervised release term of one to three years.

1      I have found that a sentence of 27 months' custody, followed

2  by one year of supervised release, as well as payment of

3  restitution, falls within the advisory guideline range and is

4  sufficient but not greater than necessary to comply with the

5  purposes set forth in 3553(a)(2).  It also satisfies the

6  statutory provisions.

7      Mr. Meier, any objections to the sentence that I've just

8  announced other than what you've already covered?

9          MR. MEIER:  Nothing other than -- nothing in addition,

10  Judge, no.  Thank you.

11          THE COURT:  Mr. Perras, on behalf of the United

12  States, anything further?

13          MR. PERRAS:  Nothing further, Your Honor.

14          THE COURT:  Mr. Corder, you have the right to appeal

15  your conviction and the right to appeal the sentence that I just

16  announced if you believe it was illegally or incorrectly

17  imposed.

18      Any notice of appeal that you file must be filed within 14

19  days of the entry of judgment or within 14 days of the filing of

20  a notice of appeal by the United States.

21      If you need the assistance of the clerk of court, the

22  clerk's office will assist you in the preparation of your notice

23  of appeal.  If you need -- if you cannot afford the fee, you can

24  apply to have that fee waived.  If you cannot afford a lawyer to

25  prosecute your appeal for you, you can also apply to have a

 1   lawyer appointed in your behalf.

 2       Anything further with respect to your client's appeal

 3   rights, Mr. Meier, that we need to cover?

 4               MR. MEIER:  No, Your Honor.

 5               THE COURT:  Anything further there, Mr. Perras?

 6               MR. PERRAS:  No, Your Honor.

 7               THE COURT:  Anything further from the United States?

 8               MR. PERRAS:  Nothing further, Your Honor.

 9               THE COURT:  Any position with respect to the

10   defendant's pretrial detention status?

11               MR. PERRAS:  The Government wouldn't oppose a motion

12   to self-report.

13               MR. MEIER:  Judge, that would be my motion at this

14   point, to allow Mr. Corder to self-report.  Additionally -- and

15   I don't know if the -- this argument is ripe at this time, but

16   in reading the statute regarding the release of someone pending

17   appeal, I believe Mr. Corder does intend to appeal.  The statute

18   as written basically says someone sentenced to a term of

19   imprisonment and who has filed an appeal.  So if the court wants

20   us to wait until we've filed notice of appeal -- we can't do

21   that until judgment is entered.  So I don't know if that

22   argument is ripe, but for the time being anyway, we would ask

23   the court to allow him to self-report.

24               THE COURT:  I will allow him to self-report.  I think

25   once the notice of appeal is filed, I think that triggers your

 1   time period for the motion.

 2            MR. MEIER:  That's fine, Judge.

 3            THE COURT:  I would want to review that motion in

 4   writing in any event.

 5            MR. MEIER:  That's fine, Judge.  Could I have one

 6   second?

 7            THE COURT:  Yes.

 8      (Mr. Meier conferring with defendant off the record.)

 9            MR. MEIER:  Judge, two things.  Number one, we would

10   ask the court to recommend a facility as close to this area as

11   possible.  And, secondly, you know, I don't know what the timing

12   would be -- my guess is this is probably not much different than

13   what --

14            THE COURT:  Mr. Corder, why don't you join Mr. Meier

15   at the podium there.  I'm going to address his request.  I want

16   you to hear me clearly on that point.

17      Go ahead, Mr. Meier.

18            MR. MEIER:  And the second thing is the timing.  I

19   don't know that this would really change anything, given we're

20   at October 17th.  I would ask that the court allow Mr. Corder,

21   as you've indicated that you would, to self-report and to make

22   that, you know, no sooner than the first of the year or the

23   second of January, to allow him to remain out during the

24   holidays, which my guess of the timing is it might be past that

25   anyway.  But just for -- to give him an opportunity to be with

1    his family during the holidays, we'd ask the court to make that
2    reporting date no sooner than say January the 2nd or something
3    of that nature.
4            THE COURT:  All right.  Mr. Perras, do you have
5    anything to add to that request?
6            MR. PERRAS:  The Government will defer to the court on
7    that.
8            THE COURT:  Why don't we do this, Mr. Meier:  I'm not
9    aware what the current time frame is.
10    I'm sure, Mr. Corder, that Mr. Meier has informed you that
11    you would, in circumstances like these where you're permitted to
12    self-report, you will get a notice.  And the U.S. Bureau of
13    Prisons, as well as the marshal's service, will communicate with
14    you on your responsibilities with respect to self-report.
15    I don't think I need to tell you this, but I will tell you
16    that you need to be responsive to all of those notices.  I know
17    that I'm simply adding my voice to Mr. Meier's advice to you in
18    that respect, but I want you to know that you need to be very
19    sensitive to and responsive to any of those communications.
20    I don't know what the current time frame is so why don't I
21    ask you to simply put that in writing in the form of a motion
22    within, say, seven days of today and we'll look into it and
23    consider it.  I suspect that you're correct, that in any event
24    it would go past the first of the year and so it would -- it
25    would be -- it would sort of take care of itself in that

1    respect.  So let me ask you to just file a brief motion on that.

2        And, Mr. Perras, if your position stays the same, as I

3    anticipate that it would, if you'll just indicate that in a very

4    brief response thereafter.

5            MR. PERRAS:  Yes, Your Honor.

6            THE COURT:  I would appreciate that.

7        With respect to your request for placement near -- in a

8    facility as close to Louisville as possible, I will grant that

9    request.  I will put that in the judgment.

10        Mr. Corder, I want you to understand that I do not have the

11    authority under the law to order the Bureau of Prisons to put

12    you in any specific facility.  All the law allows us to do is

13    recommend.  The Bureau of Prisons makes that determination.  And

14    as I understand it -- I'm not an expert on their process -- but

15    as I understand it, they take into account a number of different

16    factors in determining where a convicted defendant is sent.  And

17    I think that their current rules allow for a 500-mile radius if

18    a judge requests close to home.  Close to home includes a 500-

19    mile radius.

20            THE DEFENDANT:  I understand.

21            THE COURT:  So I want you to understand I will make

22    that recommendation but the ultimate decision is left to the

23    Bureau of Prisons.

24        All right.  Anything further, Mr. Meier?

25            MR. MEIER:  Nothing further, Your Honor.  Thank you.

1          THE COURT:  Mr. Perras, anything further?

2          MR. PERRAS:  Nothing further, Your Honor.

3          THE COURT:  All right.  Thank you.

4    (Proceedings concluded at 3:09 p.m.)

5                C E R T I F I C A T E

6      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

7    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9
     _____              _____
         s/Dena Legg                        December 9, 2016
10   Certified Court Reporter No. 20042A157      Date
     Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25